**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ANDREW BARILLI AND RONALD PEÑA, Individually and on Behalf of All Others Similarly Situated, | Case No. 17-cv-4572-LTS-DCF |
| Plaintiffs, | |
| vs. | **JURY TRIAL DEMANDED** |
| SKY SOLAR HOLDINGS, LTD., WEILI SU, JIANMIN WANG, YI ZHANG, XIAOGUANG DUAN, HAO WU, DONGLIANG LIN, ROTH CAPITAL PARTNERS, LLC, AND NORTHLAND SECURITIES, INC., | |
| Defendants. | |

**SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**


**WOLF POPPER LLP**
Robert C. Finkel
Andrew E. Lencyk
Fei-Lu Qian
845 Third Avenue, 12th Floor
New York, New York 10022

*Attorneys for Lead Plaintiff and Lead Counsel for the Class*

## TABLE OF CONTENTS

I.     NATURE OF THE ACTION ........................................................................... 2

II.    PRELIMINARY STATEMENT ..................................................................... 3

III.   JURISDICTION AND VENUE ...................................................................... 7

IV.    PARTIES ......................................................................................................... 7

V.     PLAINTIFFS'CLASS ACTION ALLEGATIONS....................................... 12

VI.    SUBSTANTIVE ALLEGATIONS FOR THE SECURITIES ACT CLAIMS ............... 15

       A.     Background Facts Prior to the IPO ..................................................... 15

       B.     Initial Public Offering ......................................................................... 17

       C.     The False and Misleading Prospectus................................................. 19

              1.     The Prospectus Failed to Disclose Su's History of Avoiding Payment
                     of Civil Debt.  Su's Financial Background Was A Material Fact Since
                     He Was Identified As "Essential to [Sky Solar's] Continuing
                     Success." .................................................................................. 20

              2.     The Prospectus Further Misrepresented Sky Solar's Corporate
                     Governance and Internal Controls, which Were Inadequate to Catch
                     Su's Misconduct...................................................................... 35

              3.     The Prospectus Misrepresented Su's Success In Developing A
                     Spanish Solar Business and Failed to Disclosed that Su's Operations
                     in Spain Lost €30 Million Through Fraud ................................. 41

              4.     The Prospectus Misrepresented Facts Concerning the Japanese Feed-
                     in-Tariff Program and Its Impact on Sky Solar's Business .................... 43

                     a.     The Changes in Energy Industry and FIT..................... 48

                     b.     The Statements in the Prospectus Regarding Japan's FIT Regime
                            Were Materially False and Misleading. ........................ 55

              5.     The Prospectus Misrepresented Material Facts Concerning Chile .......... 62

              6.     The Prospectus Misrepresented that Sky Solar Had a "Broad
                     Geographic Reach," an "Established Presence Across Key Solar
                     Markets," and "Established Pipeline Projects."........................ 66

                     a.     Czech Republic ........................................................... 68

                     b.     Greece ......................................................................... 68

                     c.     Germany....................................................................... 69

              7.     The Prospectus Misrepresented Sky Solar's Access to Financing .......... 70

8.    The Prospectus Misrepresented Sky Solar's Ability to Expand Its Solar Assets ................................................................ 75

9.    The Prospectus Misrepresented Sky Solar's Reason for Converting to an IPP Business Model .................................................. 80

VII.   STATUTE OF LIMITATIONS ............................................. 80

VIII.  CLAIMS FOR RELIEF UNDER THE SECURITIES ACT .......................... 86

COUNT I .................................................................... 86

COUNT II ................................................................... 89

IX.   EXCHANGE ACT CLAIMS ............................................... 90

A.    Nature of the Action ............................................... 90

B.    Substantive Allegations ........................................... 92

1.    Weili Su's Troubled Past .................................... 92

C.    Materially False and Misleading False and Misleading Statements Issued .......... 94

1.    Defendant Su's Credentials ................................... 99

2.    Sky Solar's Push Into the Chinese Market With Its Flawed Corporate Governance Guidelines .......................... 100

3.    2014 Earnings Call .......................................... 101

4.    Q1 2015 Earnings Call ....................................... 102

D.    The Truth Slowly Emerges .......................................... 103

E.    Post-Class Period Events .......................................... 105

F.    Additional Scienter Allegations ..................................... 107

1.    Weili Su Acted with Scienter ................................. 110

2.    Jianmin Wang Acted with Scienter ............................ 112

3.    Sky Solar .................................................. 114

G.    Loss Causation ................................................... 115

H.    Presumption of Reliance .......................................... 120

I.    The Safe Harbor Provision Is Inapplicable ............................ 121

X.    CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT ........................... 121

COUNT III .................................................................. 121

COUNT IV .................................................................. 125

XI.   PRAYER FOR RELIEF ................................................. 126

XII.  DEMAND FOR TRIAL BY JURY .......................................... 127

Lead Plaintiff Ronald Peña ("Peña") and additional named plaintiff Andrew Barilli ("Barilli") (collectively, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, hereby bring this Second Consolidated Amended Class Action Complaint ("Complaint") against Sky Solar Holdings, Ltd. ("Sky Solar" or the "Company"), Weili Su ("Su"), Jianmin Wang ("Wang"), Yi Zhang ("Zhang"), Xiaoguang Duan ("Duan"), Hao Wu ("Wu"), Dongliang Lin ("Lin"), Roth Capital Partners, LLC ("Roth"), and Northland Securities, Inc. ("Northland") (collectively, "Defendants").

Plaintiffs' allegations are based on their personal knowledge as to their own acts, and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by Lead Counsel, which includes analyses of publicly available information, including, among other things (a) regulatory filings made by Sky Solar with the United States Securities and Exchange Commission ("SEC"); (b) press releases and investor presentations and conference calls issued or conducted by Sky Solar; (c) news stories, articles, reports, internet postings and other publicly available information concerning Sky Solar; (d) interviews of former employees (including a former employee identified as a Confidential Witness); (e) consultations with experts on accounting and solar power; and (f) information readily obtainable on the Internet.

Lead Counsel's investigation into the matters alleged herein is continuing.  Many relevant facts are known only to, or are exclusively within the possession of the Defendants. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

I.        **NATURE OF THE ACTION**

1.        This is a federal securities class action on behalf of a class consisting of all persons who purchased or otherwise acquired the American Depositary Shares ("ADSs") of Sky Solar: (1) pursuant or traceable to Sky Solar's false and misleading Registration Statement and Prospectus (collectively, the "Prospectus") issued in connection with the Company's initial public offering on or about November 13, 2014 (the "IPO") seeking to pursue remedies under §§11 and 15 of the Securities Act of 1933 ("Securities Act"); or (2) on the open market between November 13, 2014 and June 12, 2017, both dates inclusive, seeking to pursue remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5) (collectively referred to hereinafter as the "Class"). Excluded from the Class are those persons identified in ¶ 50.

2.        Plaintiffs' Securities Act claims allege strict liability, and other non-fraud based claims under the Securities Act. The Prospectus for the IPO contained statements of material fact and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading. These claims are brought against those defendants who are statutorily responsible for misstatements of material facts or omissions in the Prospectus. The Securities Act defendants include Sky Solar; all persons who signed the Registration Statement, including members of the Company's Board of Directors ("Board") at the time of the IPO; and the underwriters of the IPO. Plaintiffs expressly disclaim any allegations of fraud or intentional misconduct in connection with these non-fraud claims, which are pleaded separately in this Complaint from Plaintiffs' Exchange Act claims.

3.        Plaintiffs' Exchange Act claims allege both falsity and scienter against Sky Solar, Su and Wang. Plaintiffs allege that these defendants knowingly or with reckless disregard made untrue statements of material facts or omitted to state material facts necessary in order to make the

statements made, in light of the circumstance under which they were made, not misleading, and that defendants' materially false statements or omissions inflated the market prices of Sky Solar ADSs.

## II.   <u>PRELIMINARY STATEMENT</u>

4.      This securities class action relates to defendant Sky Solar's November 13, 2014 IPO of 6,353,750 ADSs at $8.00 per ADS.  The IPO was pursuant to a Registration Statement and Prospectus.  Sky's primary business at the time of the IPO was the development of solar fields and the sale of electricity generated therefrom.

5.      The Prospectus was materially false and misleading in violation of §11 of the Securities Act in at least eleven principal respects.  *See* Points VI. C. 1-9.  First, the Prospectus identified defendant Weili Su, Sky Solar's founder and executive chairman, as a key employee who was "essential" to Sky Solar's success.  *See* Prospectus at 20.  Yet, the Prospectus failed to disclose that Su had left behind a $44 million trail of unpaid debts.  These debts caused Chinese authorities to suspend defendant Su's right to spend money on "high-value consumptions."  Su also engaged in other unethical misconduct prior to the IPO.

6.      Given defendant Su's significance to the success of the offering, Defendants had an obligation to disclose the full truth with respect to defendant Su's business practices, and not just his purported successes.  In fact, with respect to defendant Su, past became prologue as he subsequently stole at least $15 million from the Company, forcing his termination from management of the Company for cause.  Su, however, remains the Company's largest shareholder and a Board member.

7.      Second, the Prospectus was materially misleading in that although Defendants recited the Company's internal controls concerning related party transactions, those controls were

inadequate as defendant Su was able to circumvent those controls in stealing money from the Company.  In addition to the $15 million in unauthorized transactions, Sky Solar (after the IPO but during the Class Period) paid a former managing director a "service fee" of $4.2 million in October 2016 and in exchange that (unnamed) managing director transferred to a company controlled by Su $800,000 of Sky Solar common stock (without consideration).

8.     Su and Wang were aware of Su's history of misconduct.  As stated in the Prospectus, prior to the IPO certain former shareholders had sent "letters threatening litigation and certain of these claimants have sent harassing emails, short messages and letters to certain of our shareholders, directors and professional advisors alleging that they were deprived of the economic benefits of their holdings in Sky Solar Holdings Co., Ltd." (a predecessor company to Sky Solar) and had accused Su of the "improper use of the proxy that such shareholders had granted him to attend shareholder meetings and vote shares on their behalf."  Prospectus at 21.

9.     Although not stated in the Prospectus, the Confidential Witness (who is described further below) had also been issued shares to a predecessor of Sky Solar and also was excluded from the IPO, leading to litigation against Su.

10.    Plaintiffs' claims also relate to the nature of Sky Solar's business itself.  Defendant Su had started in the solar industry in 2007 and formed Sky Solar in 2009 to manufacture and sell solar fields to Su in related party transactions.  Initially the solar industry was a success and benefitted heavily from government subsidies.  By 2014, however, the market (including the Japanese market) had become saturated with oversupply of electricity from alternative energies such as solar, and governments were in the process of reducing or eliminating price supports.  Moreover, by the time of the IPO, Sky Solar had suffered a succession of business failures,

requiring that it withdraw or severely limit business operations in Spain, the Czech Republic, Germany, Greece, and Bulgaria.

11.     First in Spain, €30 million went missing in a project financed by Goldman Sachs, then changes in the law in the Czech Republic caused a €13 million project to fail with Sky Solar leaving behind bank debt and defrauding creditors by transferring assets to related parties. Additionally, assets in the Czech Republic went missing from a project and were not recovered.

12.     Projects in Bulgaria and Greece were also rendered failures by changes in government policy towards solar energy.

13.     In Japan, where projects were in the process of development at the time of the IPO, the Japanese government was in the process of modifying its solar energy policies to limit funding.

14.     In fact, at the time of the IPO, Sky Solar had no business successes of note to report.

15.     As a result of the foregoing, during the period prior to the IPO, banks were unwilling to provide Sky Solar with construction financing.

16.     Rather than disclose the truth with regard to Su's ethics, Sky Solar's business failures, and the lack of access to financing, the Prospectus for the IPO misrepresented that the stock offering was well-timed to take advantage of "highly attractive solar radiation, regulatory environments, power pricing, land availability, financial access and overall power market trends." Among other things, the Registration Statement and Prospectus for the IPO misrepresented material facts concerning (i) Sky Solar's operations in Spain; (ii) Sky Solar's purported history of success in developing solar properties; (iii) the true state of Japanese government price supports; (iv) Sky Solar's ability to raise financing generally and specifically to raise financing to build out

its Japanese solar network; (v) Sky Solar's ability to convert "shovel-ready" projects to actual solar capacity, and to convert "advanced" projects in the "pipeline" to "shovel-ready" projects; (vi) the strength of the Chilean solar market and Sky Solar's ability to enter that market; and (vii) that operating Sky Solar parks provided a "stable and recurring long-term cash flow."

17.    Sky Solar's history of failure continued after the IPO notwithstanding its repeated statements in press releases, SEC filings, and on conference calls that it was actively developing its "shovel-ready" and "pipeline" projects in places such as Japan and Chile and was in the process of securing financing.

18.    As the truth was revealed, with regard to Su's misconduct and the lack of internal controls, and information entered the market concerning Sky Solar's failed business plan, Sky Solar's ADSs declined down from the $8 IPO price, to close on June 20, 2017, after defendant Su's theft was revealed, at $1.07 per ADS.

19.    Under §11 of the Securities Act, Plaintiffs need only offer plausible allegations that the Prospectus was materially false and misleading.  Plaintiffs are not required to plead defendants' state of mind, nor are they required to plead reliance or loss causation.  Rather, once plaintiffs plead (and, subsequently, prove falsity), the issuer (Sky Solar) is strictly liable, and the burden shifts to the non-issuer defendants to prove reasonable care.

20.    Plaintiffs' claims under §10(b) of the Exchange Act with respect to the non-disclosure of Su's debt-ridden and dishonest history, Sky Solar's misrepresentations with respect to its lack of internal controls to protect against related-party transactions, and Su's eventual defalcations, are similarly well-pled.  The Sky Solar Exchange Act management defendants (Su and Wang) had actual knowledge, particularly given Su's domination of the Company, of Sky Solar's lack of internal controls, and by at least October 2016 knew of the $4.2 million transaction

with the managing director and failed to take corrective action.  Subsequent revelation of Su's $15 million theft was the *coup de grace* for defendants' fraud, and called many of its other representations into question.

### III.   JURISDICTION AND VENUE

21.     The claims asserted herein arise pursuant to §§11 and 15 of the Securities Act (15 U.S.C. §§77k and 77o); or §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5)).

22.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331, §22 of the Securities Act (15 U.S.C. §77), and §27 of the Exchange Act (15 U.S.C. §78aa).

23.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) because Sky Solar trades on the NASDAQ, located within this Judicial District.

24.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of a national securities exchange.

### IV.   PARTIES

25.     As set forth in his certification previously filed with the Court (Dkt. No. 11-2), Lead Plaintiff Ronald Peña purchased Sky Solar ADSs in reliance on defendants' materially false and misleading statements and omissions of material facts, and on the integrity of the market for Sky Solar ADSs, at artificially inflated prices during the Class Period, and was damaged when the truth about Sky Solar was revealed to the market.  Peña suffered losses of approximately

$205,200 as a result of the federal securities law violations and false and misleading statements and material omissions alleged herein.

26.    As set forth in his certification previously filed with the Court (Dkt. No. 1), named plaintiff Andrew Barilli purchased Sky Solar ADSs pursuant or traceable to the Company's Registration Statement and Prospectus for the IPO, and suffered damages as a result of the federal securities law violations and false or misleading statements or material omissions alleged herein.

27.    Defendant Sky Solar is incorporated in the Cayman Islands and headquartered in Hong Kong, with principal executive offices located at Unit 402, 4th Floor, Fairmont House, No. 8 Cotton Tree Drive, Admiralty, Hong Kong Special Administrative Region, People's Republic of China.  Sky Solar's ADSs trade on the NASDAQ under the ticker symbol "SKYS."

28.    Defendant Su founded Sky Solar in 2009.  Defendant Su served as the Chairman of Sky Solar's Board of Directors from October 2009 through June 6, 2017 and served as the Company's Chief Executive Officer from shortly after the IPO in December 2014 through June 6, 2017.  On June 6, 2017, the Company issued a press release announcing that Defendant Wu had replaced Defendant Su as Chairman and CEO.  Defendant Su remains a director of the Company. Defendant Su served as the Chairman of the Company's Nominating and Corporate Governance Committee.  Defendant Su signed or authorized the signing of the Registration Statement for the IPO and signed the Company's Form 20-Fs for 2014, 2015 and 2016 (collectively "Form 20-Fs"). Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX"), Defendant Su also signed certifications in the Form 20-Fs with respect to Sky Solar's "internal control[s] over financial reporting" for years 2014, 2015, and 2016.

29.    Defendant Jianmin Wang has served since May 2011 as the Company's Chief Financial Officer ("CFO"), and Secretary of the Board, and has served since October 2015 as a

director.  According to Sky Solar's Form 20-F ended December 31, 2016 ("2016 Form 20-F"), Wang is a professional accountant.  Wang "is responsible for all financial accounting and capital management aspects" and "leads the information and technology and corporate legal compliance function."  Defendant Wang signed or authorized the signing of the Registration Statement for the IPO.  Pursuant to SOX, defendant Wang also signed certifications in the Form 20-Fs with respect to Sky Solar's "internal control[s] over financing reporting" for years 2014, 2015, and 2016.

30.     Defendant Yi [Amy] Zhang served as Sky Solar's Chief Executive Officer from May 2011 through December 2014.  Defendant Zhang served as Vice Chairman of the Board and Chief Strategy Officer from December 2014 through August 2015, and a director from May 2011 through August 2015.  Defendant Zhang signed or authorized the signing of the Registration Statement for the IPO.

31.     Defendant Xiaoguang Duan has been a director of the Company since May 2011, and a member of the Management Committee since June 2017.  Defendant Duan signed or authorized the signing of the Registration Statement for the IPO.

32.     Defendant Hao Wu has served as the Chairman of the Board and a member of the Management Committee since June 2017, and as a director of the Company since July 2012.  Defendant Wu signed or authorized the signing of the Registration Statement for the IPO.

33.     Defendant Dongliang Lin served as a director of the Company beginning in December 2009.  The Company did not disclose when Lin ceased serving as a director.  Lin is not identified as a director on Sky Solar's 2016 Form 20-F.  Defendant Lin signed or authorized the signing of the Registration Statement for the IPO.

34.     Defendants referred to in ¶¶ 28-33 are collectively referred to as the "Individual Defendants."

35.     Defendant Roth Capital Partners, LLC was the primary underwriter of the Company's IPO and assisted in the preparation and dissemination of Sky Solar's IPO materials. Roth's offices are located at 57 West 57th Street, 18th Floor, New York, NY 10019.

36.     Roth receives consistently negative reviews from employees on websites such as glassdoor.com.  One former employee wrote on August 17, 2016:

> [Roth has] the lowest quality reputation across the industry.  If you are okay dealing with the vagaries of microcap companies, as well as private companies that are strategically destined for failure, then this is a great place. The quality of its prospects are of the lowest common denominator. Roth will do any transaction for any company at any time. Its competitors know this, the companies know this, the regulators know this (look at its record of fines for FINRA infractions-oops). More importantly, if you are looking for a place to start a career, or a place to extend a career - it is a dead end.  Nearly every Roth deal is a dog.  Nearly every buy side client knows, or has been burned by a Roth transaction.  Universally, the street thinks of Roth as a bucket shop. Its research analysts have zero credibility, and are bankers' puppets to support Roth deals.  Additionally, it is a culture of fear, and employees come and go, forcing everyone to look over their shoulder. The bankers fund "ideas" that VC's wouldn't touch.  How senior management believe its clients to be credible is beyond imagination.

ROTH Capital Partners Reviews, https://www.glassdoor.com/Reviews/ROTH-Capital-Partners-Reviews-E11580.htm (last visited Feb. 15, 2018).

37.     On October 5, 2012, a then current employee in institutional sales stated that a

> small cap product which is often illiquid….investment bankers and research analysts do very limited due diligence, sometimes none at all they do not strive to improve themselves they are considered a deal shop, but will not pay up for talented bankers quality of companies/deals are horrendous and many are frauds.

ROTH Capital Partners Reviews, https://www.glassdoor.com/Reviews/ROTH-Capital-Partners-Reviews-E11580_P2.htm (last visited Feb. 15, 2018).

38.     Roth, during the Class Period, consistently provided investors with research on the Company, rating the ADSs a "buy" with price targets (until June 2017) at or above the $8.00 offering price.

39.     Defendant Northland Securities, Inc. was an underwriter of the Company's IPO and assisted in the preparation and dissemination of Sky Solar's IPO materials.  Northland's offices are located at 60 East 42nd Street, Suite 4540, New York, NY 10165.

40.     Northland's expertise is primarily in the issuance of tax-exempt securities rather than equity securities.

41.     In 2015, Northland consented to an SEC finding that Northland on three occasions failed to conduct adequate due diligence with respect to municipal bond offerings.  Northland also agreed to pay a $220,000 civil money penalty.  The SEC Order noted that "[a]n underwriter 'occupies a vital position' in a securities offering because investors rely on its reputation, integrity, independence, and expertise….  [U]nderwriters have a 'heightened obligation' to take steps to ensure adequate disclosure."  *In re Northland Securities, Inc.*, File No. 3-16858, Securities Act of 1933 Release No. 9946 (Sept. 30, 2015), at ¶ 10.

42.     The SEC Order concluded that Northland had failed to fulfill its duties as an underwriter.

43.     A review of a former employee of Northland on glassdoor.com dated October 2, 2017 entitled "Sky Far Away," states:

> High commission products (5%-7% Loads) Salesmanship.
> Very little stewardship taking place Ownership/management structure
> very dysfunctional
> Lack of knowledge about investing and markets
> Lack of Integrity (Be VERY careful)

Northland   Securities   Reviews,   https://www.glassdoor.com/Reviews/Northland-Securities-Reviews-E24981.htm (last visited Feb. 15, 2018).

44.     Northland initiated research coverage of Sky Solar on December 15, 2014 with an "outperform" and $15 price target.  Plaintiffs have been unable to determine when Northland discontinued coverage of Sky Solar, but it is not now providing coverage.

45.     Defendants Roth and Northland are collectively referred to as the "Underwriter Defendants."

46.     Sky Solar, the Individual Defendants, and the Underwriter Defendants are sometimes referred to herein as the "Defendants."

47.     Defendants Su and Wang are sometimes referred to herein as the "Management Defendants" for purposes of the Exchange Act claims.

48.     As officers and/or directors of a publicly held company whose ADSs were registered with the SEC, publicly traded and governed by the federal securities laws, the Management Defendants each had a duty to promptly disseminate accurate information about the Company's business, operations, financial statements, and internal controls and to correct any previously issued statements that had become materially misleading or untrue, so that the market prices of the Company's public traded securities would be based on accurate information.  The Management Defendants violated these requirements and obligations during the Class Period.

49.     Sky Solar, and the Management Defendants, are sometimes referred to herein as the "Exchange Act Defendants."

## V.      PLAINTIFFS' CLASS ACTION ALLEGATIONS

50.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Sky Solar ADSs (1) pursuant or traceable to Sky Solar's false and misleading Registration Statement and Prospectus issued in connection with the Company's initial public

offering on or about November 13, 2014, or (2) on the open market between November 13, 2014 and June 12, 2017, both dates inclusive, and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are: (i) Defendants, and all current and former officers and directors of Sky Solar; (ii) members of the immediate family and household members of any such person excluded under (i); (iii) any entities affiliated with, controlled by, or more than 5% owned by, any person excluded under (i) and (ii); (iv) any parent, subsidiary or affiliate of Sky Solar; and (v) the legal representatives, heirs, successors, or assigns of any person excluded under (i) through (iv).

51.    The members of the Class are so numerous that joinder of all members is impracticable.  At all relevant times, Sky Solar ADSs were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Sky Solar or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

52.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

53.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

54.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Sky Solar and the Individual Defendants in the Prospectus misrepresented or omitted material facts about the business, and operations and management of Sky Solar including financing for its shovel-ready projects; Feed-In-Tariff Programs and other trends in significant markets and their effect on Sky Solar;

- whether statements made by Sky Solar and the Management Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Sky Solar;

- whether the Management Defendants caused Sky Solar to issue false and misleading financial statements during the Class Period;

- whether Sky Solar and the Management Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Sky Solar ADSs during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

55.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## VI.   SUBSTANTIVE ALLEGATIONS FOR THE SECURITIES ACT CLAIMS

### A.   Background Facts Prior to the IPO

56.   According to the Prospectus (at 4), by 2007, defendant Su, Sky Solar's founder and executive chairman, was "already a successful businessman and founder of a few solar companies in China."   Beginning in 2007, Su "made [additional] investments in Europe and began to develop renewable energy power parks in Germany, the Czech Republic and Spain. Beginning in 2009, he expanded his investments to Japan, Canada, and the United States, focusing on the construction and operation of solar parks."   *Id.*

57.   Defendant Su founded Sky Solar in 2009 as a privately held company that according to the Prospectus primarily derived revenue from selling solar systems to entities controlled by defendant Su.  Prospectus at 18.  For example, in 2011, $55.9 million of Sky Solar's $83.1 million in revenue (67.2%) and in 2012, $133.4 million of Sky Solar's $203.8 million in revenue (65.4%), were derived from related party transactions.  Prospectus at 1, 57.

58.   In 2013, defendant Su caused Sky Solar to shift its focus to become (according to the Prospectus) a "global independent power producer or IPP" that would "develop, own and operate solar parks and generate revenue primarily by selling electricity."   *Id.*

59.   As described in the Prospectus (at 107), the parks "sell electricity to the grid throughout their operational lives."

60.   According to the Prospectus, Sky Solar began to "strategically reduce [its] system sale business in favor of the IPP model in order to retain more value from project development and generate stable and recurring long-term cash flow."   By the fourth quarter of 2013, the Company began to derive "a majority of [its] revenue from selling electricity from IPP solar parks."   *Id.* at 1.

61.    Sky represented in the Prospectus that at the time of the November 13, 2014 IPO, Sky Solar had and "established presence across key markets," and aimed "to establish operations in Japan, Chile, Uruguay, and other select geographies," which it claimed in the Prospectus had "highly attractive solar radiation, regulatory environment, power pricing, land availability, financial access and overall power market trends." *Id.* at 1 and 100.

62.    Further, as stated in the Prospectus, "[i]n countries such as Japan, Greece, Bulgaria, the Czech Republic, and Spain," Sky Solar's IPP solar parks sell power under power purchase agreements ("PPAs") subsidized by governments that fix the price of electricity for 20 years or more.  In countries such as Chile, "where the market for electricity has reached grid-parity, which occurs when the market price of energy from renewable sources is competitive with the price of conventional sources, [its] IPP assets will sell power in the electricity market." *Id.* at 107.

63.    The Prospectus (at 6 and 107), classified Sky Solar's IPP solar parks based on four milestones:

(i)     Solar Parks in Operation.  These solar parks have completed construction and are selling electricity;

(ii)    Solar Parks Under Construction.  These solar parks have secured site control, energy permits, all key agreements, zoning and environmental permissions and construction permits;

(iii)   Shovel-ready projects.  These projects have all permits required for construction and grid connection, even if those projects may lack certain non-discretionary permits for which we have begun the application process and which will be granted and maintained based on our compliance with certain administrative procedures; and

(iv)    Solar Projects in Pipeline.  These solar parks are being studied for feasibility or have achieved certain milestones, but are not yet ready for construction.  Our solar projects in pipeline are classified as either "advanced pipeline" "qualified pipeline" or "development pipeline."  We generally expect advanced pipeline solar projects to be shovel-ready

within 12 months.

64.     The Prospectus represented that at the time of the IPO, the Company owned and operated under its IPP revenue model, a total of 54.5 MW [megawatts] of solar parks located in Greece (23.0 MW), Japan (18.7 MW), the Czech Republic (5.6 MW), Bulgaria (3.7 MW), Canada (2.5 MW), Spain (0.9 MW), and the United States (0.1 MW).  *Id.* at 1, 100.

65.     The Prospectus further represented that as of the date of the Prospectus, Sky Solar had 22.6 MW of solar parks under construction, 257.1 MW of shovel-ready projects and 1,053.3 MW of solar parks in pipeline in nine countries.  *Id.* at 100.  Out of the 257.1 MW of shovel-ready projects, the Company had 155.7 MW; 44.0 MW; and 63.2 MW "of shovel-ready projects ready to be developed upon receipt of funding" in Japan, Chile and Uruguay, respectively.  *Id.* at 112.

**B.     Initial Public Offering**

66.     On April 15, 2014, Sky Solar filed a draft Registration Statement on Form DRS with the SEC in connection with its IPO.  The registration statement was subsequently amended five times, with the final amended registration statement filed on Form F-1/A with the SEC on November 10, 2014 (collectively, the "Form F-1").

67.     The Form F-1 contained a final prospectus for filing subject to acceptance by the SEC. The Registration Statement was signed by the Individual Defendants.  The SEC declared Form F-1 effective as of November 10, 2014.

68.     The final Prospectus dated November 13, 2014 was filed with the SEC on November 14, 2014.

69.     On November 18, 2014, Sky Solar completed its IPO, issuing 6,353,750 ADSs, including 828,750 ADSs sold by the underwriters after exercising their overallotment option to

purchase additional ADSs at $8.00 per ADS.  Each ADS represents eight ordinary Sky Solar shares.

70.     Market demand for the IPO had not developed as Defendants had planned.  Sky Solar's Amendment No. 3 to Form F-1 ("Third Amendment"), filed with the SEC on November 5, 2014, anticipated an offering of 12.5 million ADSs at a maximum offering price of $12.00 per ADS, and an overallotment option of 1,875,000 additional ADSs.

71.     The Third Amendment identified the following Use of Proceeds for that proposed offering:

> *We estimate that we will receive net proceeds from this offering of approximately US$121.9 million*... assuming no exercise of the underwriters' option.... We intend to use the net proceeds we receive from this offering for the following purposes:
>
> • US$40.0 million for the construction of our shovel-ready projects in Japan;
>
> • US$40.0 million for the construction of our shovel-ready projects in Latin America such as Chile and Uruguay; and
>
> • US$10.0 million to develop our project pipeline in other regions.
>
> We intend for the balance [*i.e.*, $31.9 million] to be used for general corporate purposes, including working capital needs, potential strategic investments and other business opportunities.

72.     As a result of the reduction in the size and price of the IPO, the Company only raised net proceeds of approximately $46.1 million, after deducting underwriting discounts and commissions and estimated offering expenses.

73.     As stated in the final Prospectus (at 9 and 48), Sky Solar intended to use the net proceeds from the IPO for the following purposes: (1) $20 million for the construction of Sky Solar's shovel-ready projects in Japan; (2) $10 million for the construction of its shovel-ready projects in Latin America such as Chile and Uruguay; and (3) the remaining balance to use to develop Sky Solar's "project pipeline in Japan, Latin America and other regions" and "for general

corporate purposes, including working capital needs, potential strategic investments and other business opportunities."

74.     This was a substantial reduction of $78.5 million from the minimum amounts that Sky Solar sought to raise in the initial offering and approximately two-thirds (or $60 million) from the $90 million that was earmarked in the Third Amendment for development of solar assets.

75.     The initial Registration Statement and amendments thereto contained, among other things, Sky Solar's Amended and Restated Memorandum of Association of Sky Solar Holdings, Ltd. ("Memorandum of Association"); the Amended and Restated Articles of Association ("Articles of Association"); and the Code of Business Conduct and Ethics ("Code of Ethics"). *See* Registration Statement, Exhibits 3.1, 3.2, and 99.1.

### C.     The False and Misleading Prospectus

76.     The final Prospectus was materially false and misleading in the following respects:

a.     The Prospectus identified Su as "essential" to Sky Solar's "continuing success," but failed to disclose his background of avoiding civil debts, which had led to him being sanctioned by Chinese civil authorities, and his other unethical and illegal activities.

The Prospectus also misrepresented that:

b.     Sky Solar had adequate internal controls to monitor related party transactions.

c.     Su's development of solar assets in Spain supported the contention that Su was "a successful business" and member of a "highly experienced management team."

d.     The Japanese regulatory environment was highly supportive of Sky

Solar's continuing investment.

      e.    Sky Solar had 44 MW of shovel-ready capacity in Chile, and other misrepresentations concerning the Chilean market.

      f.    Sky Solar had "an established presence across key solar markets," and a "proven record of developing revenue producing solar parks...."

      g.    Sky Solar had "increased financing capabilities" and a "demonstrated ability to design cost-effective project funding solutions."

      h.    Sky Solar would be able to grow out its power plants notwithstanding the reduction in the proceeds from the IPO.

      i.    Sky Solar had adopted the IPP model "in order to internalize more value from project development...."

      **1.    The Prospectus Failed to Disclose Su's History of Avoiding Payment of Civil Debt.  Su's Financial Background Was A Material Fact Since He Was Identified As "Essential to [Sky Solar's] Continuing Success."**

77.    The Prospectus for the IPO was materially false and misleading because it made repeatedly positive statements about defendant Su and his business acumen, while failing to disclose his history of unsatisfied civil indebtedness in an amount of $44 million and other unlawful and unethical conduct.

78.    The omitted facts were material information that a reasonable investor would want to know and were necessary to make the positive statements made about defendant Su not materially false and misleading.

79.     The Prospectus represented that Defendant Su was {1}[1] "<u>a successful businessman</u>" (at 4 and 55) and "was the founder of our company and has been our director and executive chairman since October 2009" and "is primarily responsible for our strategic planning, business operation and overall management." *Id.* at 144.  The Prospectus also described (at 144) Defendant Su's 12 year working experience in the solar power industry:

> Mr. Su has over 12 years of working experience in the solar power industry. From 2005 [through] 2010, Mr. Su founded a number of solar companies, which completed the development and construction of solar parks in Europe with a total capacity of approximately 100.0 MW. {2} <u>He also supervised the largest solar park in Spain in terms of capacity in 2008</u>. He established the only privately-funded independent national testing center for PV [photovoltaic] products in the PRC as of the date of this prospectus, which is a laboratory designated by the PRC Finance Ministry for qualifying solar parks for national subsidies. He was a cofounder, director and secretary of Yingli Green Energy Holding Co., Ltd., an NYSE-listed company from November 2001 to September 2004. He was also a judge at the Court of the Baoding City Xinshiqu from September 1992 to July 2000. Mr. Su was awarded a Bachelor of Law by Hebei University in July 1992. He also received an Executive Master of Business Administration from the University of International Business and Economics in December 2005.

80.     The Prospectus (at 20) stressed that the {3} "<u>industry experience, expertise and contributions of our executive chairman, Mr. Weili Su are essential to our continuing success</u>."

81.     Prospectus similarly represented at 104 that "[o]ur management team ... has a track record of successful execution":

> {4} <u>We are led by a highly experienced management team supported by strong, localized execution capabilities across all key functions and locations.</u>

---

[1] Defendants' materially false or misleading statements are identified herein by bracketed umbers and underlined text. Inasmuch as the Prospectus exceeded 200 pages in length (excluding the financial statements) and many of the statements in the Prospectus were repetitious and false, Plaintiffs have sought to be judicious in identifying the materially false and misleading statements (to avoid repetition).  Moreover, without discovery Plaintiffs have been unable to test the accuracy of certain statements in the Prospectus.  Given the overall false nature of the Prospectus's disclosures, Plaintiffs believe that they will be able to prove additional falsity with the benefit of discovery.

{5} <u>Our management team has a broad range of experience, an in-depth understanding of the ever-changing global PV industry, proven market insights and a track record of successful execution</u>. Our senior management has extensive experience in both upstream and downstream PV markets. Our founder and executive chairman, Mr. Weili Su, has over 13 years of business experience in the PV industry. He is a pioneer in the downstream PV market and spearheaded the PV project development business in 2005.  [Emphasis in the original.]

*See also id.* at 4 ("Mr. Su continues to lead our business as the executive chairman of our board of directors.").

82.     The Prospectus further emphasized (at 105) Su's extensive experience in China, and that he had entered into a "deed of non-competition" with Sky Solar, which would facilitate Sky Solar's ability to enter the Chinese market:

[W]e believe we are uniquely positioned to take advantage of opportunities in this market. We believe that China's demand for solar power will increase significantly in the future, as governmental and market conditions mature. Mr. Weili Su, our founder and executive chairman, is a founder and 90.1% owner of a few solar development companies with operations in five provinces in China (collectively, "Mr. Su's China Business"). Mr. Su's China Business, focused exclusively on solar energy system sales, has developed, constructed and sold 23 MW of systems since 2011. We have entered into a deed of non-competition and right of first refusal with Mr. Su, whereby Mr. Su promises that he and any company he controls will not engage in any business that competes with our company and we are granted a right of first refusal to purchase shares in his businesses in China in which he holds more than 50% of the voting shares in the event that Mr. Su receives from or otherwise negotiates with a third party a bona fide offer to purchase Mr. Su's shares in any of the business and the sale of such shares will result in Mr. Su ceasing control of that business…. We believe that Mr. Su's China Business has performed extensive due diligence and identified key provinces in China with favorable regulatory, environmental, pricing and energy market conditions and it has already established relationships with key players in those regions. When the regulatory and commercial environment matures, we will be prepared to rapidly enter that market.

83.     Defendant Su was also the largest shareholder in Sky Solar at the time of the IPO. According to the Prospectus, Su had a beneficial interest in 27.9% of Sky Solar's ordinary shares (assuming the over-allotment option was not exercised) and voting control over 49.5% of Sky Solar's aggregate voting shares.   Prospectus at 4, 155.

84.     Defendant Su's dominance over Sky Solar went well beyond his personal role as executive director.  Defendant Su also controlled many affiliates and other companies that did business with Sky Solar.

85.     There are approximately 37 companies (28 are currently active, and 9 have been dissolved or revoked) that are affiliated with Defendant Su including Changzhou Sky Solar New Energy Technology Co., Ltd. ("Changzhou Sky Solar"), as discussed in the Company's press release dated December 22, 2014, entitled, "Sky Solar Announces Entry Into China Solar Market."

86.     According to corporate records filed with China's State Administration for Industry and Commerce, Changzhou Sky Solar was established by Xie Xiaotuo ("Xie") and Sky Solar Group in 2007.  Defendant Su is the Chairman of Changzhou Sky Solar, and was Changzhou Sky Solar's legal representative until October 2014.  Up until May 22, 2017, Changzhou Sky Solar was 54% owned by Beijing Sky Solar Investment Management Co. Ltd. ("Beijing Sky Solar").  Defendant Su had 90% ownership of Beijing Sky Solar.  The remaining 10% ownership of Beijing Sky Solar is owned by an individual, Chen Li, who is the legal representative and executive director of Beijing Sky Solar.  *See* Organizational Chart of Changzhou Sky Solar and affiliated entities and individuals in paragraphs below.

87.      Due to the enforcement action that froze Defendant Su's 90% ownership of Beijing Sky Solar (*see infra* ¶ 295), Beijing Sky Solar transferred its 54% ownership interest in Changzhou Sky Solar to Changdu Tianlian Junzhi New Energy Development Co. Ltd. ("Changdu Tianlian New Energy").  As demonstrated in the organizational chart, Changdu Tianlian New Energy is 1% owned by Defendant Su's sister, Fengxian Su, and 99% owned by Sky Solar

Investment Co. Ltd. ("Sky Solar Investment").   Sky Solar Investment is 100% owned by Defendant Su.



88.     As demonstrated above in the organizational chart, based on plaintiffs' investigation, Changzhou Sky Solar (as of September 2017) is owned by Changdu Tianlian New Energy and two individuals.   Specifically, Changzhou Sky Solar is 54% owned by Changdu Tianlian New Energy; 36% owned by Xie; and 10% owned by defendant Duan, a member of the

Board.  Defendant Duan became a 10% owner of Changzhou Sky Solar on October 26, 2011.

Defendant Su is still the Chairman of Changzhou Sky Solar.  Changzhou Sky Solar has five

directors:  Defendants Su and Duan, Xie, Chen Li and Minquan Fu ("Fu").

89.     Besides his 36% ownership in Changzhou Sky Solar, Xie has had a management

position as the general manager at Changzhou Sky Solar since July 6, 2007.  Xie has been

Changzhou Sky Solar's legal representative since October 2014.  Xie is a close associate of

Defendant Su as demonstrated by his management position in Changzhou Sky Solar, and his roles

and management positions as the general manager, executive director and the legal representative

for three other companies affiliated with Defendant Su, Changzhou Zhengheng Power

Engineering Supervision Co. Ltd.; Changzhou Huayang Photovoltaic Testing Technology Co.

Ltd.; and Jiangsu Sky Solar Photovoltaic Research Co. Ltd.

90.     Fengxian Su, Defendant Su's sister, has ownership interests or serves in senior

management positions in at least ten companies affiliated with Defendant Su in the People's

Republic of China ("China").  For example, as stated above, Fengxian Su has 1% ownership of

Changdu Tianlian New Energy and Defendant Su's Sky Solar Investment has 99% ownership of

Changdu Tianlian New Energy.  Defendant Su is the legal representative, executive director and

general manager of Changdu Tianlian.  As demonstrated in the organizational chart, Fengxian Su

also has 1% ownership of Shenzhen Sky Solar International New Energy Development Co. Ltd.

("Shenzhen Sky Solar") and Defendant Su has 99% ownership of Shenzhen Sky Solar.

91.     In light of Su's essential role with respect to Sky Solar (*see* ¶¶ 79-80), any adverse

information concerning his business character would be highly material to an investor.  The

Prospectus, however, in this regard, was materially misleading in that it omitted Defendant Su's

numerous monetary enforcement obligations of approximately $44 million ordered by various courts in China prior to the IPO.

92.     Based on enforcement records in China, at least seven judgments, totaling approximately $44 million, had been entered against Su prior to the IPO:

(i)     August 3, 2011: An enforcement of RMB[2] 35,442,550 ($5,356,032) by the Zhejiang Intermediate People's Court.

(ii)    September 6, 2011: An enforcement of RMB 61,107,600 ($9,235,574.29) by the Zhejiang Intermediate People's Court.

(iii)   September 6, 2011: An enforcement of RMB 1,843,200 ($278,574.36) by the Zhejiang Intermediate People's Court.

(iv)    June 17, 2014: The Shanghai First Intermediate People's Court ordered Defendant Su not to spend money on "high-value consumptions" for failing to comply with four monetary enforcements against him to pay Zhongrong International Trust Co. Ltd., a total of RMB 189,408,800 ($28,634,519.40).

93.     According to enforcement records provided by Plaintiffs' investigation firm, Su was ordered by the Shanghai First Intermediate People's Court not to spend money on "high-value consumptions" not necessary for personal life and work:

(i)     Choosing airplanes, soft sleeper trains, or ships berths in second-class or higher, when traveling;

(ii)    Excess spending at venues such as star-rated hotels, inns, nightclubs, golf courses;

(iii)   Purchasing real property or newly constructed, expanded, or high-end redecorated houses;

(iv)    Leasing venues for work such as high-end office buildings, hotels, and apartments;

---

[2] RMB is the currency abbreviation for "Renminbi," the legal currency of China.  Conversion rates are as of the dates of the respective enforcements.  *See* OANDA, *Currency Converter*, https://www.oanda.com/currency/converter/

(v)     Purchasing vehicles not required for business operations;

(vi)    Travel and vacations;

(vii)   Having children attend high-cost private schools;

(viii)  Paying higher premiums for insurance and financial management products; and

(ix)    Excess spending not necessary for life or work such as taking any seats in G bullet trains, or first class or higher seats in other bullet trains.

94.     Su's troubled past is not limited to China.  Plaintiffs have been alerted by a former employee of Sky Solar Deutschland GmbH ("Deutschland" or "SSD"), a wholly owned subsidiary of a predecessor of Sky Solar, to other episodes of Su's misconduct that were omitted from the Prospectus that would be similarly material to a reasonable investor.

95.      From February 2, 2008 until his resignation effective January 29, 2013, the Confidential Witness worked for various subsidiaries or affiliates of predecessors to Sky Solar, as follows:

| Dates | Subsidiary | Duties | Reporting to |
|---|---|---|---|
| 2/1/08 – 9/30/08 | Germany | Project engineer | Mr. Karner |
| 10/1/08 – 2/28/09 | Spain | Chief engineer | Mr. Alberto & Antonio Qiu |
| 3/1/09 – 1/31/11 | Deutschland | Chief engineer | Mr. Su |
| 8/6/10-12/21/10 | Deutschland | Chief engineer | Mr. Su |
| 2/1/11 – 1/29/13 | Sky Capital Advisory | Chief engineer | Hao Zhi, Amy Zhang, Weili Su, Andrew Wang, Petra Leue Bahns |

96.     According to the Confidential Witness, Mr. Su had a history of corruption. Among other things, to avoid creditors in January 2011, Mr. Su orchestrated the sale of Sky Solar's common stock in Deutschland to Minquan (Mike) Fu, who at the time was a managing director of Sky Capital Advisory GmbH (100% subsidiary of a predecessor of Sky Solar) and

Deutschland and a close associate of Su.  As discussed above, defendant Su serves as the Chairman and a director of Changzhou Sky Solar where Fu also serves as a director.  *See* ¶ 88.

97.     The sale of stock was for one euro[3] (converted in Sky Solar's financial statements to $1) and was consummated pursuant to a Stock Transfer and Sale Agreement on January 17, 2011.  The Stock Transfer and Sale Agreement was notarized by Dr. Constanze Huber and executed pursuant to a Power of Attorney from Mr. Su.

98.     According to the Prospectus, the two shareholders who conveyed their interest in Deutschland to Fu pursuant to the Stock Transfer and Sale Agreement (Sky Solar Energy S.a.r.l. and Sky International Enterprise Group Limited) were wholly owned subsidiaries of Sky Solar. The transaction was conducted on behalf of those shareholders by John Yue, legal counsel for Sky Solar Holdings Co., Ltd.

99.     According to the Confidential Witness, subsequent to this sale to Mr. Fu, the assets of Deutschland were transferred back to subsidiaries of Sky Solar.

100.     {6} The Prospectus misrepresented (at page F-65) that the sale of stock in Deutschland was to an "independent third party."  The representation that the sale was to an "independent third party" and presumably at arm's length was consistent with Mr. Su's intent to defraud creditors of Deutschland's parent. {7} The Prospectus misrepresented that the sale was "conducted … in order to reduce the Group's net liabilities and focus its resources and working capital on geographic areas."  In truth, according to the Confidential Witness, the transaction was conducted to defraud creditors.

---

[3] Euro is referenced throughout the Complaint.  From January 1, 2010 through September 30, 2017, the euro traded in a range of $1.388 to $1.4830 per euro.

101.    Other misconduct of Mr. Su transpired in 2010 with respect to the business operations of Deutschland.  According to the Confidential Witness, at that time certain of the profitable businesses of Deutschland included the trading of solar modules and inverters. However, Mr. Su and his business associate (Rudolf Ignaszak) robbed Deutschland and its shareholders of that profitable business by causing Deutschland to purchase the inventory for that business and forming a separate company (Sky Solar International Trading GmbH) to issue invoices and be paid for the sale of those products.  The magnitude of the misconduct in one year was €2.3 million.  Ignaszak was himself a former managing director of Sky Solar, and the owner of 12 million shares (or 10%) of the trading company.

102.    On November 18, 2010, the Confidential Witness, a managing director of Deutschland at that time, wrote to Su stating that Deutschland [Germany] was entitled to the profits of the trading business (translated from Chinese to English):

> Sky Solar [International] Trading took over all components and inverter trading business of Germany Sky Solar in January 2010.

> Sky Solar International Trading also used the resources of Germany Sky Solar's manpower, equipment, software, hardware and so on. Of course, these expenses were also paid out by Germany Sky Solar.

> Therefore, as of October 2010, Germany Sky Solar should be able to get 2,300,000 euros in gross profit.

> For this part of the gross profit, even without Sky Solar International Trading, Germany Sky Solar could have also obtained it through trade.

> I'm the manager of Germany Sky Solar LLC, and from now on I have the responsibility to issue bills for the performance achievements made by Germany Sky Solar.

> I suggest deducting the amounts mentioned from the cost of the inverters purchased by Germany Sky Solar in the future.

103.    Because of the depth of his concern over the matter, the Confidential Witness, a native German speaker, had a co-worker translate the email into Chinese, and sent the email to the

financial personnel at Deutschland, to make certain that Mr. Su understood the significance of the communication.

104.    Mr. Su responded to the Confidential Witness that same day that he (Mr. Su) had total authority to allocate profits and losses between Deutschland [SSD] and Mr. Su's trading company and directed that the Confidential Witness "not go any further in the historical transactions between SSD and the trading company":

> I appreciate you acting as MD of SSD. But I wish you can put most of your time and effort in the development of SSD business. The business corporation and business allocation with the Sky Solar group is determined by myself considering the situations at that point of time. The fact that the trading is profitable while SSD is not so profitable is due to this year's shift market condition, which is unexpected to all of us. I have decided to change the name of the trading company, move it out of the SSD office and it will not be part of sky solar group in the future. I request that you do not go any further in the historical transactions between SSD and the trading company.

105.    Sky Solar's outside counsel (Dr. Frank Ebbing) told the Confidential Witness at that time that Mr. Su's conduct in operating Deutschland's trading business through a separate entity was a "100% breach of trust."

106.    By email dated July 29, 2015, the Confidential Witness wrote Su in English (their common language) describing in detail Su's misconduct with respect to Sky Solar Deutschland:

> In November 2009 in Ambassador Hotel Prague Mr. Weili Su asked me to call a prostitute for Mr. Dongliang Lin, IDG Capital, when the prostitute came to the table, we had been asked by her for the money and Mr. Weili Su paid about 6.300 CZK cash, in front of all who sit at the table, and brought the lady to the hotel room of Mr. Lin Dongliang. Why did he do this service?
> Only 1 week later IDG Capital invested about more than 30,000,000 $ in Sky Solar Holding Co Ltd, isn´t it?
> Is there any relation between the investment of IDG and the event in the lobby of the Ambassador Hotel Prague?
>
> In the end of November the following individuals founded the company Sky Solar International Trading GmbH
> Mr. Weili Su, 50 % of the share capital of total 25.000 €
> Mrs. Yonghua Mao-Härth 30 %

30

Mr. Michal Xia 10 %
Mr. Rudolf Ignaszak 10 %
Managing Directors: Su Weili, Mao Yonghua.

Based on the legal statement of Dr. Ebbing, Bissel + Partner, the founding of Sky
Solar International Trading GmbH has been a very criminal act of breach of trust
committed by the 4 individuals.
In the consequence of the unlawful activities by the 4 persons, the company Sky
Solar Deutschland, at least Sky Solar Holding Co. Ltd suffered a significant loss
in 2010.

But the business of Sky Solar International Trading GmbH exploded from 0 to an
annual turnover of more than 30 Mio € by a net profit about more than
3,000,000€
Within one single year, share capital of 25,000 €!
The company Sky Solar International Trading GmbH paid in 2010 more than
1,000,000 € to the shareholders.
Why did You, Mr. Weili Su, found this company, after Sky Solar Holding Co Ltd
had been founded only hours before?

As a consequence of Your activities as MD and Majority shareholder of Sky Solar
International Trading GmbH the company Sky Solar Deutschland suffered a
tremendous loss in 2010.
You sold SSD for 1€ to your dummy Mike Fu, furthermore You sold all the
valuable assets to other companies, but the bad ones You left in SSD. SSD left as
the Bad Bank of Your business in Europe.
In the beginning of 2011, after the horrible year 2010, I was forced to give away
200.000 shares of Sky Solar Holding Co Ltd to Mr. Dongliang Lin.
From the perspective of today, July 2015, there is a reasonable suspicion that You
and Mr. Lin Dongliang, acted in an unlawful way against my interests as a
shareholder of Sky Solar Holding Co Ltd and Sky Solar Holdings Ltd!
From the perspective of today I gave away more than 200,000 € to IDG.

107.    Further, although the Prospectus disclosed that one shareholder had sent through

counsel a threatening email to Sky Solar alleging that Su had deprived of the economic benefits of

their holdings, {8}  it failed to disclose that the Confidential Witness contends that he too was

also cheated by Su of his ownership interest in Sky Solar.

108.    These additional facts, concerning (i) Su's efforts to avoid creditors, (ii) shifting

assets and revenue to related businesses, (iii) failure to honor share ownership, and (iv) $44

million in unsatisfied judgments, would have been material to a reasonable investor.

109.     Su's conduct prior to the IPO foreshadowed his theft of corporate assets in 2017.

110.     On April 28, 2017, the Company filed a Form 12b-25 with the SEC, disclosing "a delay in preparing the 2016 Form 20-F and the audited financial statements required in the Form 20-F for the year ended December 31, 2016 and [that it] need[ed] additional time to complete the Form 20-F and the audited financial statements for the year ended December 31, 2016."

111.     On June 2, 2017, Sky Solar announced the resignation of Arthur (Lap Tat) Wong as an independent director of the Company.

112.     On June 6, 2017, shortly before the markets closed, Sky Solar issued a press release disclosing the replacement of Su as the CEO and Executive Chairman of the Board with Hao Hu.   The Company disclosed that Su will "no longer serve as the Company's Chief Executive Officer, or as director, officer, manager, legal representative or in any other management position of the Company's subsidiaries or any other consolidated entities."   In addition, the Company announced the resignation of Andrew Y. Yan as an independent director of the Company, and that he had been replaced by Glen Wei.

113.     On June 13, 2017, shortly before the market closed, Sky Solar issued a press release entitled "Sky Solar Announced Intended Formation of Independent Committee to Investigate the Conduct of Former CEO."   The press release disclosed "that after reviewing certain conduct of its former Chief Executive Officer Mr. Weili Su, its Management Committee intends to recommend to the board that it form a committee to investigate the conduct."

114.     Following this news, Sky Solar's ADSs temporarily ceased trading.

115.     On June 15, 2017, after the market opened, the Company disclosed that the independent committee will "investigate the conduct of its former Chief Executive Officer Mr.

Weili Su" involving "certain transactions and fund transfers which appear to lack proper board and audit committee authorizations" and their impact on the Company.

116.    On June 16, 2017, before the market opened, the Company announced the resignation of Glen Wei (who had been appointed on June 6, 2017) as an independent director of the Company.  Wei was replaced by Mr. Xuelong Pei ("Pei") as an independent director.  Pei was also appointed as a member of the audit committee, compensation committee and nominating and corporate governance committee.  In addition, the Company announced the establishment of an independent committee, consisting of Qiang Zhan and Pei.

117.    On June 16, 2017, during the day, Philip Stern, the research analyst at Roth, who provided coverage for Sky Solar, published a research report expressing "concern" with "the removal of the CEO and the subsequent investigation."  Stern further referenced the unusual circumstance that "three independent directors resign[ed] from the board in the past three weeks," and "the delay in SKYS's [reporting its] Q4 earnings result."

118.    Stern also expressed concern with a transaction disclosed by Sky Solar in its 2016 Form 20-F, in which a former managing director of the Company was stated to have been paid $4.2 million for what appeared to be a *quid pro quo* for a transfer of stock to a company controlled by Su:

> Specifically, we call out an Oct'16 transaction SKYS completed with a former managing director of the company. According to SKYS's most recent 20F the managing director was paid an upfront service fee of $4.2mn at the time of his resignation from the company in Oct'16 to seek, on a best-efforts basis, 140MW of permits in Japan. On Nov'16, the individual transferred 2.6mn ordinary shares of SKYS stock valued at USD ~800k to Flash Bright Power Ltd., a BVI company owned by CEO Mr. Weili Su.

119.    That transaction was referenced in footnote 1, page 91, of the 2016 Form 20-F. The disclosure raised questions concerning the *bona fides* of the transaction:

33

In October 2016, we sold two subsidiaries with no substantial business or projects under development to a managing director upon his resignation and recognized expense of US$30 thousand from disposal of subsidiaries. Contemporaneous with the resignation, we also entered into permit development agreement with the individual, to seek for his assistance, on a best efforts basis, in obtaining 140MW of permits. The related service fee of US$4.2 million paid up front, was recorded in administrative expenses, and a remaining contingent fee of approximately US$1.66 million, denominated in JPY, will be paid if and when the additional 140MW of permits are secured for us. Further, on November 21, 2016, the individual transferred 2.6 million of our ordinary shares to Flash Bright Power Ltd., a BVI company owned by Mr. Weili Su, our major shareholder and the CEO, with a fair value on the date of transfer of US$ 0.8 million, for no consideration.

120.    Stern concluded that this recent evidence of a lack of internal controls had a substantial, negative impact on the Company's value, causing him to "lower [his] price target to $1.30 from $8 as a result of the uncertainty regarding the ongoing conduct investigation of the former CEO."

121.    On September 19, 2017, before the market opened, Sky Solar announced the conclusion of the independent committee's investigation into defendant Su.  Specifically, the independent committee's lawyers "concluded that certain transactions and fund transfers between the Company and certain entities controlled by Mr. Su were not approved by the board or the audit committee.  In addition, there was insufficient documentary support of such fund transfers."

122.    Sky Solar's September 19, 2017 press release disclosed the following in respect to a settlement agreement of $15 million between Sky Solar and defendant Su:

On September 19, 2017, the Company entered into a settlement agreement with Mr. Su to resolve all potential claims by the Company against Mr. Su and certain entities controlled by him concerning the fund transfers, as well as all potential claims that Mr. Su and such entities may have against the Company in connection with Mr. Su's employment at the Company.  Under this agreement, various debt assignment agreements signed among the Company, certain third parties, and certain entities controlled by Mr. Su in April 2017 shall have no effect and be rescinded immediately; and Mr. Su agrees to pay back to the Company approximately US$15 million and failing this, authorize the Company to sell on behalf of him and/or transfer to the Company the American depositary shares that he holds in the Company to pay for such settlement amount.

123.    According to Sky Solar's most recent September 28, 2017 conference call with investors, Su has still not repaid Sky Solar the $15 million he stole from the Company as the timeline to pay back the $15 million will be "within 2018" according to defendant Wu.

124.    Sky Solar did not publicly file the report of the committee or attorneys that conducted the investigation, or any documentation related to the investigation, nor did it disclose whether there were any transactions reviewed other than the April 2017 transactions that were referenced in the press release dated September 19, 2017 discussing the settlement agreement.

125.    Significantly, in May and June 2017, prior to or contemporaneous with Sky Solar's announcement of its investigation, courts in China froze Su's $14.6 million of Su's equity interests in five different companies. *See infra* ¶¶ 295-296.  Although those proceedings appear to relate to Sky Solar's investigation of Su, neither Sky Solar nor its Board made any disclosure with respect to those freezes.

> **2.    The Prospectus Further Misrepresented Sky Solar's Corporate Governance and Internal Controls, which Were Inadequate to Catch Su's Misconduct.**

126.    The Prospectus for the IPO was materially misleading because {9} it represented in the body of the document and in exhibits incorporated by reference, that Sky Solar had adequate controls for approval of related party transactions, including transactions with its dominant shareholder (Su).  Those statements were materially false and misleading because Su had a history of avoiding civil debt and unethical conduct and was easily able to subvert Sky Solar's "internal controls" to cause the managing director to transfer $800,000 in stock to a Su-controlled company in exchange for a $4.2 million payment from Sky Solar, and to cause Sky Solar to execute "debt assignment agreements" with his companies, to convert $15 million of the Company's assets to his personal use.

127.     In fact, Sky Solar had inadequate procedures to avoid unauthorized agreements and theft of assets through related party transactions.

128.     Given Su's history of avoiding debts and the close association between Su's companies and Sky Solar, representations in the Prospectus and in the various Registration Statements with respect to Sky Solar's internal controls, and especially the internal controls over related party transactions, were material to investors.

129.     As part of the Company's corporate governance, Sky Solar acknowledged the significance of a director's fiduciary duties and represented in the Prospectus (at 174) that "a director of a Cayman Islands company is in the position of a fiduciary with respect to the company and a director is required to exercise a duty of care, {10} a duty to act bona fide in the best interests of the company, a duty not to make a profit based on his or position as director (unless the company permits him to do so) and a duty not to put himself in a position where the interests of the company conflict with his or her personal interest or his or her duty to a third party.  A director of a Cayman Islands company also owes to the company a duty to act with skill and care."   The Company additionally represented that under its "first amended and restated memorandum and articles of association, subject to any separate requirement for audit committee approval under the applicable rules of the NASDAQ or unless disqualified by the chairman of the relevant board meeting, {11} so long as a director discloses the nature of his interest in any contract or arrangement which he is interested in, such a director may vote in respect of any contract or proposed contract or arrangement in which such director is interested…."

130.     Similarly, in respect to interested transactions, the Prospectus represented (at 174) that {11} "[a] director may vote in respect of any contract or transaction in which he or she is

interested, provided that the nature of the interest of any directors in such contract or transaction is disclosed by him or her at or prior to its consideration and any vote in that matter."

131.    The Prospectus represented (at 149) ironically that Su would be the Chairman of Sky Solar's nominating and corporate governance committee, which is responsible for, among other things:

> • {12} advising the board periodically with respect to significant developments in the law and practice of corporate governance as well as our compliance with applicable laws and regulations, and making recommendations to the board on all matters of corporate governance and on any corrective action to be taken; and
>
> • {13} monitoring compliance with our code of business conduct and ethics, including reviewing the adequacy and effectiveness of our procedures to ensure proper compliance.

132.    The Company represented in the Prospectus (at 148) that its "audit committee is responsible for, among other things:"

> • {14} reviewing and approving all proposed related party transactions, defined as those transactions required to be discussed pursuant to Form 20-F, Item 7.8 and NASDAQ Listing Rule 5630(a);
>
> • {15} reviewing major issues as to the adequacy of our internal controls and any special audit steps adopted in light of significant control deficiencies;
>
> • annually reviewing and reassessing the adequacy of our audit committee charter;
>
> • such other matters that are specifically delegated to our audit committee by our board of directors from time to time; and
>
> • meeting separately and periodically with management and our internal auditor and independent registered public accounting firm.

133.    As discussed in the Prospectus, the Company's "independent registered public accounting firm identified a material weakness and other control deficiencies, each as defined in AU325, in our internal control over financial reporting as of December 31, 2013." *Id.* at 75.  In order to address the material weakness and control deficiencies identified by its independent

registered public accounting firm, Sky Solar represented in the Prospectus that it took or was planning to take a number of measures, including:

> (i) hiring additional accounting personnel with experience in [International Financial Reporting Standards] and SEC reporting requirements, especially at the regional level; (ii) providing regular training on an ongoing basis to our accounting personnel that covers a broad range of accounting and financial reporting topics; (iii) developing and applying a comprehensive manual with detailed guidance on accounting policies and procedures as well as procedures for maintenance and retention of accounting and financial records; (iv) {16} forming an internal audit department, which will directly report to the audit committee; and (v) {17} forming an audit committee which consists of independent directors to oversee the operation of our finance department, and to approve all related party transactions and other significant transactions. [*Id.*].

134.    The Articles of Association, adopted by a resolution passed on October 31, 2014, which became effective immediately after the completion of the IPO, represented (at 38) that {18} "the Company shall conduct an appropriate review of all related party transactions on an ongoing basis and shall utilize the Audit Committee for the review and approval of potential conflicts of interest." Furthermore, the Articles of Association represented the following in respect to the Audit Committee's responsibility in approving related party transactions:

> {19} Specifically, the Audit Committee shall approve any transaction or transactions between the Company and any [o]f the following parties: (i) any shareholder owning an interest in the voting power of the Company or subsidiary of the Company that gives such shareholder significant influence over the Company or any subsidiary of the Company, (ii) any director or executive officer of the Company or any subsidiary of the Company and any relative of such director or executive officer, (iii) any person in which a substantial interest in the voting power of the Company is owned, directly or indirectly, by any person described in (i) or (ii) or over which such a person is able to exercise significant influence, and (iv) any affiliate (other than a subsidiary) of the Company. [*Id.*]

135.    On September 10, 2014, the Board adopted the Code of Ethics which "applies to all of the directors, officers, employees and advisors of the Company." Furthermore, the Code of Ethics (which had been attached to a Registration Statement dated September 18, 2014 as Exhibit 99.1 for the IPO) stated that it "will become effective concurrently with the Company's first

public filing of a registration statement on Form F-1 with the SEC relating to the Company's

initial public offering of its ordinary shares in the form of American Depositary Shares in the

United States."

136.     At all relevant times, the Company's Code of Ethics stated, in part:

> {20} Sky Solar Holdings Ltd., a company incorporated in the Cayman Islands,
> and its subsidiaries (the "Company") is committed to conduct its business in
> accordance with applicable laws, rules and regulations and the highest standards
> of business ethics. This Code of Business Conduct and Ethics (the "Code")
> contains general guidelines for conducting the business of the Company. To the
> extent this Code requires a higher standard than required by commercial
> practice or applicable laws, rules or regulations, we adhere to these higher
> standards.

137.     The Code of Ethics was designed to deter wrongdoing and to promote:

(i)      {21} honest and ethical conduct, including the ethical handling of
         actual or apparent conflicts of interest between personal and professional
         relationships;

(ii)     {22} full, fair, accurate, timely, and understandable disclosure in
         reports and documents that the Company will file with, or submit to, the
         U.S. Securities and Exchange Commission (the "SEC") and in other
         public communications made by the Company;

(iii)    compliance with applicable governmental laws, rules and regulations;

(iv)     prompt internal reporting of violations of the Code; and

(v)      accountability for adherence to the Code.

138.     The Code of Ethics defined a conflict of interest "when an employee's private

interest interferes, or appears to interfere, in any way with the interests of the Company as a

whole."  As part of the Code of Ethics' conflicts of interest policy, the Code of Ethics states:

(i)      {23} no employee may have any financial interest (ownership or
         otherwise), either directly or indirectly through a spouse or other family
         member, in any other business entity if such financial interest adversely
         affects the employee's performance of duties or responsibilities to the
         Company, or requires the employee to devote certain time during such
         employee's working hours at the Company;

(ii)   no employee may hold any ownership interest in a privately-held company that is in competition with the Company;

(iii)   an employee may hold up to but no more than 1.0% ownership interest in a publicly traded company that is in competition with the Company; and

(iv)   no employee may hold any ownership interest in a company that has a material business relationship with the Company.

139.   The Code of Ethics required an employee to {24} "<u>fully disclose any situations that reasonably could be expected to give rise to a conflict of interest</u>" and "<u>[c]onflicts of interest may only be waived by the Board, or the appropriate committee of the Board, and will be promptly disclosed to the public to the extent required by law</u>."

140.   In respect to financial disclosures, the Code of Ethics represented, {25} "<u>Employees must strictly comply with all applicable standards, laws, regulations, and policies for accounting and financial reporting of transactions, estimates and forecasts.   Inaccurate, incomplete or untimely reporting will not be tolerated and can severely damage the Company and result in legal liability</u>."   Also, Sky Solar's "senior financial officers and other employees working in the finance and accounting department have a special responsibility to ensure that all of the Company's financial disclosures are full, fair, accurate, timely and understandable."

141.   The statements identified in ¶¶ 126; 129-134; 136-140 were false and misleading when made because Defendant Su had severe conflicts of interest based on his complex ownership of related entities, including his control over Changzhou Sky Solar New Energy Technology Co., Ltd. through various related entities and his sister, in violation of the Company's Code of Ethics' conflicts of interest policy; Sky Solar's internal controls were insufficient -- and would prove to be insufficient -- against theft of the Company's assets even though the Audit Committee's responsibility included, among other things, to review and approve "all proposed

related party transactions" and to review "major issues as to the adequacy of our internal controls and any special steps adopted in light of significant control deficiencies"; and Su had a history of failing to pay his indebtedness and theft of corporate assets and could not be trusted with access to Sky Solar's assets.

### 3. The Prospectus Misrepresented Su's Success In Developing A Spanish Solar Business and Failed to Disclosed that Su's Operations in Spain Lost €30 Million Through Fraud

142.    The Prospectus represented (at 144) that Su {26} "had supervised the largest solar park in Spain in terms of capacity in 2008." The Prospectus also represented (at 4 and 55) that Su was {1} "a successful businessman" and (at 104) that Sky Solar had a {4} "highly experienced management team supported by strong, localized execution capabilities across all key functions and locations."[4]

143.    The Prospectus also misrepresented that Sky Solar's success was premised on its ability to delegate to {27} "proven … on-the-ground capabilities" in local markets:

> {28} Each of our global regions is driven by our on-the-ground teams. We employ managing directors with an average of seven years of relevant industry experience to oversee our operations ... to lead localized business development teams in Japan, Chile, Canada, the Czech Republic, Greece, Bulgaria, Spain, Germany and the United States.…  Our local engineering and project management teams have deep and extensive experience in PV engineering, as well as civil and electrical engineering. They effectively design solar parks tailored to local regulatory, infrastructure and environmental conditions.

144.    These disclosures were materially false and misleading in that they created a false impression of management capability and failed to disclose that Su's operation in Spain had lost €30 million as a result of fraud.

---

[4] Statements that are false for more than more than one reason, may be repeated in different sections with the same bracketed number.

145.     In Spain, a predecessor of Sky Solar (Sky Global), controlled by defendant Su, had developed 22 MW of solar power fields that it sold to a third-party operator (2 x 10 MW and 1 x 1.9 MW).

146.     According to the Confidential Witness, who worked for Su in Spain during this period, Goldman Sachs had provided the construction financing for the 2 x 10 MW project.

147.     At the conclusion of the project however it was reported in the Spanish press on February 8, 2010 that €30 million was missing from Sky Global's accounts.  KPMG was retained to conduct an investigation and concluded that two of Sky Global's partners, Antonio Qiu and Alberto Qiu, and Jose Angel Mur de Viu, an attorney, and Fernando Muniesa, a businessman, were involved in the fraud.  According to KPMG, Alberto Qiu ran away and offered a tape in which Mur de Viu and Muniesa explained how they directed the money through different countries so that it could not be found.  This evidence was admitted in Spanish court in Madrid and Mur and Muniesa were indicted.  *See article published in 2010 by Interviu magazine*.[5]

148.     The Confidential Witness has confirmed that during his tenure for Sky Solar and other Su-controlled companies, in the aftermath of what happened in Spain, Sky Solar was not able to obtain construction financing from banks.

149.     According to the Confidential Witness, only second tier, low quality module manufacturers would provide Sky Solar with vendor financing; that happened in the Czech Republic, where the projects sold were of low quality.

---

[5] Daniel Montero, "Una grabación implica aún más al hijo del senadar Mur en una estafa millonaria al Gobierno chino" (Aug. 2, 2010), *available at* http://www.interviu.es/reportajes/articulos/una-grabacion-implica-aun-mas-al-hijo-del-senador-mur-en-una-estafa-millonaria-al-gobierno-chino (last visited Feb. 15, 2018).

150.    The Prospectus, by indicating that the Spanish solar park had been successful and by failing to discuss the loss caused by fraud, perpetuated the materially false and misleading impression that Su was "a successful businessman." (at 4 and 55).

151.    Plaintiffs only became aware of what happened in Spain from information provided to them by the Confidential Witness after the filing of the initial complaint.  Otherwise, Plaintiffs would not have been aware of the information primarily published in Spanish language in Spain.

### 4.    The Prospectus Misrepresented Facts Concerning the Japanese Feed-in-Tariff Program and Its Impact on Sky Solar's Business

152.    The Prospectus contained materially misleading statements, and omitted material facts, including facts concerning known trends and uncertainties with respect to the Feed-in-Tariff ("FIT") program in Japan.  According to the Prospectus, Japan was a "core growth area going forward," with well over half (155.7 MW)[6] of the Company's total 257.1 MW in shovel-ready projects, 18.7 MW in solar parks already operating, 18.5 MW in parks "under construction," and an additional 342.6 MW of solar parks in the pipeline.  Prospectus at 1, 100, 102, 112.

153.    FIT programs are government subsidies aimed at making generation of certain favored power sources lucrative to producers of that type of energy, so as to incentivize its production.

154.    In the case of Japan, the FIT was established by Japan's Ministry of Economy, Trade and Industry ("METI"), and required energy utilities to purchase set amounts of solar, wind, geothermal, hydropower and biomass energy from IPPs at elevated rates.

---

[6] At pp. 102 and 105, the Prospectus represents that the shovel-ready project capacity in Japan is 155.7 MW.  At pp. 109, 111 and 112, the Prospectus represents that the shovel-ready capacity in Japan is 148.0 MW.

155.    The Prospectus frequently acknowledged the importance of FIT programs to Sky Solar's revenue and profitability.  *See, e.g.*, Prospectus, at 61 ("Our revenue and profitability depend substantially on the demand for solar parks, which is driven by the economics of these systems, including the availability and size of government subsidies and economic incentives....").

156.    Throughout the Prospectus, Defendants repeatedly represented that Japan was a "highly attractive" market for Sky Solar, in particular because of its high FIT rates.  Indeed, in the very beginning of the Prospectus, Defendants stated:

> {29} We aim to establish operations in Japan, Chile, Uruguay and other select geographies with highly attractive solar radiation, regulatory environments, power pricing, land availability, financial access and overall power market trends. [Prospectus, at 1, 100.]

157.    The Prospectus stressed (at 61) that Japan was among the best markets for Sky Solar due primarily to "highly favorable" FIT rates:

> ***Market demand for and price of PV power***
>
> \*          \*          \*
>
> {30} A number of countries have introduced highly favorable FIT price support regimes. For example, Japan, which has a high demand for power and low domestic fossil fuel reserves, faces relatively high energy costs. As a result, the Japanese government has introduced an attractive FIT price support regime to encourage the development of solar parks.

158.    The Prospectus elsewhere (at 62-63) highlighted Japan as having "high FIT" rates, leading to higher gross margins:

> ***Our revenue model and the geographic mix of our project portfolio***
>
> \*          \*          \*
>
> {31} We generally expect higher gross margins in countries with high FIT, such as Japan and Canada.

159.     Similar statements were repeated in the Prospectus at 67 ("Gross Profit.  {32}  We would generally expect higher gross margins in countries with high FIT, such as Japan and Canada.").

160.     The Prospectus stressed that the Company was focusing on the Japanese market, as it was ostensibly "particularly attractive" due to the "high favorable FIT policy" and "attractive on-grid tariffs" in Japan, and giving investors that it had "a long track record" of identifying and developing such opportunities:

> {33} Of the 257.1 MW of our shovel-ready projects as of the date of this prospectus, 155.7 MW are located in Japan, 44.0 MW in Chile, 63.2 MW in Uruguay and 3.9 MW in Canada. We believe that the majority of these solar parks will be connected to the grid by the end of 2015. We believe Japan is a particularly attractive market given the high electricity demands and limited domestic fossil fuel resources for electricity production. In Japan, we developed several solar parks with an FIT rate of US$0.42 and PPAs of 20 years.  [*Id.* at 102.]

*     *     *

> We have a long track record of identifying market opportunities and strategically developing projects in geographic regions with favorable environmental, regulatory and energy market conditions.... We plan to increase recurring revenue and the long-term stability of our earnings and cash flow, by focusing on developing and operating IPP assets in countries with high-quality solar resources, attractive on-grid tariffs, sound power grid connection and transmission infrastructure and substantial PV energy generation growth potential. We believe that we can leverage our extensive pipeline and project development and management experience to grow our IPP business.

> We intend to primarily focus on markets, such as Japan, that have high demand for power, low domestic fossil fuel reserves, high energy costs, a highly favorable FIT policy and attractive local financing sources.  [*Id.* at 104-05.]

161.     Continuing its drumbeat extolling the Japanese market as a "core growth area going forward" due to its "highly favorable FIT price support scheme," the Prospectus stated:

> {34} We consider Japan to be a core growth area going forward.  We expect to continue to expand the capacity of our solar parks in Japan beyond our existing pipeline, as the Japanese government has established a highly favorable FIT price

support scheme and has set a generous target for the percentage of national power generated from renewable sources. Recent government investigations and rulings should accelerate the development of solar parks within the pipeline.  [*Id.* at 113.]

162.    In addition, although the Prospectus stated that some countries had taken action, such as reducing subsidies, that had an adverse effect on Sky Solar, it pointedly omitted Japan from that list of countries, and gave no such impression with respect to Japan, which it hailed as a key and flourishing market for the Company:

> The availability and size of such subsidies and incentives depend, to a large extent, on political and policy developments relating to environmental concerns in a given country. Changes in policies could lead to a significant reduction in or a discontinuation of the support for renewable energies in such country. {35} Government subsidies and incentives for solar energy were recently reduced in some countries and may be further reduced or eliminated in the future. For example, in 2010, the Czech Republic significantly reduced the amount of a subsidy to renewable energy off-takers. The expected future cash flows from a solar park developed by us in the Czech Republic therefore decreased and ... we impaired this asset in 2010. In December 2013, the Bulgarian National Assembly approved a proposal to introduce a 20% fee on revenue generated by PV and wind energy installations that benefitted from the FIT. The Constitutional Court of Bulgaria determined this fee was unconstitutional, and since August 2014, renewable energy producers are no longer required to pay this fee. In April 2014, the Greek government passed a law to reduce the FIT in effect on existing PPAs by roughly 30% and placed a discount on electricity sold in 2013. As a result, in relation to our Greek solar parks, we recognized an impairment loss of US$21.7 million in 2013 and US$1.3 million in the six months ended June 30, 2014. In Spain, a law was passed in December 2013 which is expected to change the fixed rate on the existing PPAs.  [Prospectus, at 14.]

163.    Indeed, in a continuation of the statement on page 61 quoted above (¶ 157), the Prospectus expressly differentiated Japan from "[o]ther countries" "that have reduced their support for the PV industry," indicating that Japan had a "highly favorable" and "attractive" FIT price support regime: {36} "Other countries [than Japan], such as Greece, Bulgaria, the Czech Republic and Germany, have reduced their support for the PV industry..."

164.    *See also id.* at 26 ("As an IPP, we generate electricity income primarily pursuant to FIT price support schemes or PPAs....  [R]egulatory authorities may retroactively alter their FIT

price support regimes in light of changing economic circumstances, changing industry conditions or for any number of other reasons," citing "the Greek government," "the Bulgarian government" and "Spain," and omitting any mention of Japan).

165.    Moreover, the statement on page 61 went on to create the misleading impression that decreases in subsidies were calibrated by governments to track the decreasing costs of energy production to the producer; meaning profitability would increase, without the need for government subsidies; and further created the misleading impression that Japan was immune from any adverse effect of this anyway as the Prospectus repeatedly highlighted Japan as the country to which Sky Solar was primarily shifting focus due to its "favorable subsidy regime":

> {37} While governments generally aim to ratchet down PV subsidies over time to reflect the generally decreasing system costs of solar parks, this decrease is often offset by the decreasing costs of PV systems. To foster our growth, we have shifted our focus away from countries with less favorable subsidy regimes to countries with more favorable subsidy regimes.
>
> In the long term, as PV technology advances and average systems costs of solar parks decrease, we expect the spot market price of electricity in a growing number of countries to become sufficiently high that solar parks can be economically developed without the need for government subsidies, a condition known as "grid parity." As the PV industry becomes more competitive against other forms of energy and increasing grid parity drives increased demand for solar parks, we expect our costs of sales to decrease and our revenue and profitability to increase. In light of these favorable conditions and our increased access to financing, we will continue to increase the proportion of solar parks that we own and operate as IPP solar parks.  [*Id.*, at 61.]

166.    However, as set forth below, in fact Japan was cutting FIT rates for a series of reasons unrelated to any decrease in cost of production for solar parks in general (much less Sky Solar's parks in particular) or increase in the spot price for electricity.

47

167.   {38} <u>In all, the Prospectus represented on at least eight separate occasions that Japan's FIT policy was "highly favorable," "highly attractive," "particularly attractive," or "attractive." Prospectus at 1, 61, (two references), 100, 102 (two references), 105 and 113</u>.

### a.   The Changes in Energy Industry and FIT

168.   Contrary to the misleading, overwhelmingly positive portrayal of Japan's FIT regime in the Prospectus, the regulatory environment and policy in Japan had changed dramatically from the preceding years.  Japan's drive toward renewable energy and solar power in particular had been spurred primarily by the 2011 Fukushima Daiichi nuclear power plant meltdown, which led to Japan's effort to reform its electrical generation and delivery system.  As part of those reforms, Japan chose to shut down all its nuclear plants and replace much of that generation with other resources, including fossil fuels, and large infusions of solar, wind, biomass and geothermal energy.  To encourage investment in the renewables sector, Japan's government in 2012 adopted a generous FIT program (originally introduced in November 2009), which resulted in a glut of new, mostly solar photovoltaic arrays (power-generating units) coming online from 2012 through summer 2014.

169.   When Japan's "Act on the Purchase of Renewable Energy Sourced Electricity by Electric Utilities" ("Renewable Energy Act") came into effect in July 2012 and introduced the post-Fukushima FIT, the guaranteed rates mandated by the FIT were among the world's highest.  The favorable rate of 40 JPY/kWh (excluding tax) for non-residential systems (42 JPY/kWh for residential systems) for solar power ("FIT 1") was an enticing invitation to private sector investment.  Such high prices helped fuel a surge in renewable energy development in Japan, leading to the addition of approximately 11,000 MW of solar capacity between 2012 and September 2014, with an additional 72,000 MW in the development pipeline according to METI

estimates as of October 2014. *See, e.g.*, Daniel Cusick, "Power Companies in Japan Move to Restrict Solar," *Scientific American, E&E News* (October 2, 2014) ("Cusick"), available at https://www.scientificamerican.com/article/power-companies-in-japan-move-to-restrict-solar/ (last visited Feb. 15, 2018). However, because artificially maintained prices could result in an unsustainable industry, the Renewable Energy Act allowed Japan's METI to set new tariff rates each fiscal year. This served as a throttle on investment and allowed the regulators to manage development. In fact, the METI reduced the solar tariff twice: to 36 JPY/kWh (excluding tax) in April 2013 ("FIT 2") and again to 32 JPY/kWh (excluding tax) in April 2014 ("FIT 3").

170.    In September 2014, in a move that undermined Japan's push to expand renewable energy supply, five of Japan's ten electricity utilities (serving Kyushu, Shikoku, Hokkaido, Tohuku and Okinawa) made the decision to suspend reviewing proposals by, or signing contracts with, renewable energy producers until further notice. Under the Renewable Energy Act, an electricity utility can refuse to sign a power purchase agreement on the basis that it unjustly harms the utility's profits or other justifiable grounds (including that transmission is likely to exceed the capacity of the interconnection point or utility) (Article 4 (1)) or refuse to accept a connection request if it is likely to disturb the stable supply of electricity by the utility (Article 5 (1)(ii)).

171.    The FIT tariff rate cuts, and the decision by the five Japanese utilities to suspend review of further proposals or signing of contracts, reflected then-existing serious and burgeoning issues that substantially undercut prospects for the solar industry in Japan, and particularly severely undercut the business model repeatedly promoted in the Prospectus – *i.e.*, of Sky Solar's reliance on Japan's high and very favorable FIT rates for its profitability, in a country that the Prospectus highlighted as a top market of the Company, both at the time and in terms of current expectations for growth.

172.     In particular, there were at least four fundamental changes underpinning the solar energy market in Japan that presented a radically different picture for solar producers in Japan than in 2012 and 2013, and as then portrayed by Defendants in the Prospectus.  *See* ¶¶ 173-183.

### (i)       The Japanese PV Market Suffered from Overdevelopment.

173.     As stated, in the aftermath of the Fukushima disaster, public and government sentiment, along with government subsidies in the form of a generous FIT, spurred widespread development of renewable energy projects, particularly in the solar energy area.  The result was a flood of new solar energy generation projects, with substantial amounts of capacity added and in the development pipeline by October 2014.  Commentators such as Ali Izadi-Najafabadi (head of Japan analysis for *Bloomberg New Energy Finance*) noted in October 2014 that as a result of the existing FIT rules, "project developers have rushed to develop projects where they can get maximum returns instead of where Japan really needs them."  *See* Cusick, *supra*.  Any unused space, in a country short on free land space, was seemingly targeted for solar energy development, from golf courses, to floating solar power plants on water bodies.  *E.g.*, Chisaki Watanabe, *Floating Solar Power Hits Land-Squeezed Japan Under Kyocera Plan*, BLOOMBERG (Aug. 29, 2014),        https://www.bloomberg.com/news/articles/2014-08-29/floating-solar-power-hits-land-squeezed-japan-under-kyocera-plan (last visited Feb. 15, 2018).  This resulted in a backlash and opposition to the build-out as being too much, too fast.  The resulting FIT rate cuts by the Japanese government were intended to, and did, slow the build-out.  This policy underlay the government's Strategic Energy Plan issued April 11, 2014 ("April 2014 SEP").  Even before October 2014, METI decreased the FIT rates for solar in 2013 and 2014, while holding tariffs for other renewable energy sources steady.  According to Japanese government and international (International Energy Agency, Photovoltaic Power Systems Programme reports) figures, the

installed PV capacity in Japan was 6,967 MW for 2013 (jumping from 1,718 MW in 2012), and 9,740 MW for 2014.  In 2015, as previously approved projects under prior FIT rates came online, it peaked at 10,811 MW, while for 2016 it slid back down to 8,600 (MW).  *See, e.g.*, EA PVPS, Snapshot of Global Photovoltaic Markets, (2017), http://www.iea-pvps.org/fileadmin/dam/public/report/statistics/IEA-PVPS_-_A_Snapshot_of_Global_PV_-_1992-2016__1_.pdf (last visited Feb. 15, 2018) ("the rapid growth of the Japanese PV market until 2015 was finally halted and the country reached around 8, 6 GW.").

### (ii)    Japan's Grid Was Unable to Handle the Increased Capacity.

174.    The explosion of growth in solar projects in Japan "placed a severe strain on the country's vertically integrated utilities, according to Japanese energy experts," who said "the surge in solar power threatens to overwhelm the country's transmission and distribution systems, which since the 1950s have been organized to serve each of the 10 distinct distribution areas and are not bound together by a robust transmission system."   Cusick, *supra*.   Indeed, Japan's electricity grid is effectively severed between east and west because utilities in the two regions move power using different frequencies -- 50 hertz in the east and 60 hertz in the west -- with limited conversion between the two parts of the country.  *Id.*  Tokyo Electric Power Co. planned to build a transmission line in central Japan as of October 2014, but it was not due for completion until 2020.  These factors, along with financial and operational pressures on utilities, "created a deep distaste for Japan's renewable energy push, experts say, especially in regions where new solar capacity exceeds customer demand and where integration of those resources has created headaches for utility grid managers."   *Id.*   Moreover, there was an underlying sentiment "renewables are not a reliable or constant source of power, and sudden dips or spikes in energy could stress the grids, potentially leading to damage and power loss."  *Id.*

175.     It was in part for this reason that the five Japanese utilities issued a moratorium on new projects.  This in turn prompted the Japanese government to review the FIT scheme further (even after the April 2014 SEP), with an eye toward slowing the rapid growth in solar, caused by overly generous FIT rates for producers.  METI set up at least two working groups after the April 2014 SEP, one to meet October 2014 to discuss grid connection and capacity problems; and another to meet around the same time to review the FIT.  There were indications within the industry that the working group was recommending that METI review FIT rates more frequently than once a year, partly to reduce project applications; and that METI was changing the timing for the FIT calculations for PV installations larger than 1 MW, so that the price was fixed when a project began operation (rather than when it received approval), to discourage the behavior of developers who sought to benefit from fixing high FIT rate by applying early, but delaying actual construction in the expectation that component prices to build the project would fall.  *See* Dan Brown and Celeste Koravos, "Japan's FIT:  Flying Too Close to the Sun?" *Asia Pacific Renewable Energy and Climate Change Group Update*, DLA Piper, (Oct. 2014), *available at* http://documents.jdsupra.com/65a050ef-0c63-40fa-a527-5b7be0705a54.pdf (last visited Feb. 15, 2018). Both of these recommendations were implemented (*see* METI actions of December 18, 2014 and final adoption thereof January 22, 2015; and on March 19, 2015 METI issued two scheduled FIT rate reductions for 2015, to JPY 29/kWh for projects from April 1 - June 30, and JPY 27/kWh from July 1, 2015; with additional rate cuts thereafter in 2016).

### (iii)     Sentiment Changed Back to Nuclear Power, as well as Coal and "Diversification"

176.     After the initial shock and outcry over the Fukushima nuclear accident – which had resulted in the shutdown of all of Japan's nuclear power plants – wore off, the Japanese government (especially with the election of a new prime minister, Shinzo Abe), began to return to

nuclear power, as well as other traditional energy sources, such as coal, stressing a need for "diversification," "reliability" and "stability" of power sources, over the development of renewables, especially solar.

177.   The April 2014 SEP contains significant policy statements indicating just such a shift, with adverse consequences for solar energy in Japan and its growth prospects.  Indeed, nuclear energy was again formally backed by the April 2014 SEP and Prime Minister Abe.  For instance, one of the SEP's formal Position statements affirmed that "Nuclear power's energy output per amount of fuel is overwhelmingly large....  Nuclear power is an important base-load power source as a low carbon and quasi-domestic energy source, contributing to stability of energy supply-demand structure, on the major premise of ensuring of its safety, because of ... 1) superiority in stability of energy supply and efficiency, 2) low and stable operational cost and 3) [the fact it was] free from GHG emissions during operation."  *See* Strategic Energy Plan, April 2014 [Provisional Translation], *available at* http://www.enecho.meti.go.jp/en/category/others/basic_plan/pdf/4th_strategic_energy_plan.pdf, p.24 (last visited Feb. 15, 2018).

178.   The two main principles around which the April 2014 SEP was built were, first, reaffirmation of Japan's prior "3E + S" policy, emphasizing the primacy of ensuring energy security, while also improving economic efficiency and environmental suitability, with safety (S) as a basic premise.  The second principle was aimed at building a "multilayered, flexible, and diversified energy supply-demand structure," and was primarily concerned with establishing a well-diversified and balanced portfolio of energy sources in an electricity generation mix whereby the strengths and weaknesses of various fuels were combined to achieve maximum efficient and low cost.  Various energy sources were prioritized.  The plan viewed nuclear and coal generation,

along with geothermal energy and ordinary hydropower as "base-load" power sources, natural gas as an "intermediate" source, and oil and pumped hydro as "peaking" power sources. Promotion of a "hydrogen society" was elevated in priority, along with new policy measures to achieve it. The April 2014 SEP also differed from prior SEPs in focusing on promoting competition. Thus, competition, and a broad and diversified portfolio, to achieve energy security, along with lower cost, was prioritized, over development of renewables, including solar.

179.    Along with this, the April 2014 SEP placed great emphasis on the government's broader plans for "revitalizing" the Japanese economy. In this regard, Japan's manufacturing industry had begun to suffer from higher power costs, and its competitiveness was deemed at risk. The "policy costs" of the government's post-Fukushima accident regulatory policies and the potential loss of relatively cheap nuclear power had been of major concern to manufacturing companies. *See* Jeffrey B. Kucharski and Hironobu Unesaki, *Japan's 2014 Strategic Energy Plan:   A Planned Energy System Transition*, JOURNAL OF ENERGY, (Hindawi, 2017), available at https://doi.org/10.1155/2017/4107614, at Section 4.5.1 (last visited Feb. 15, 2018).

180.    In short, the April 2014 SEP was critical of prior government FIT policy encouraging use of solar power, a fact punctuated by statements such as "the power generation cost of solar is high, and power output is unstable. Therefore, further technological innovation is necessary." The METI working group was tasked, therefore, with finding ways of reducing costly FIT rates subsidizing the rapid growth of solar energy projects, which were no longer the priority they had been in 2012.

(iv)    **Prices for Solar Energy Due to the FIT Were Deemed Unsustainably High**

181.    Under Japan's FIT system, the tariff cost was passed on to consumers, leading to higher consumer prices. Japan's electricity prices were already among the highest in Asia, with

surcharges for standard households becoming unaffordable. METI expressed concerns by October 2014 that if all renewable energy was brought online, annual renewable energy surcharges would reach JPY 2.7 trillion (or about $23 billion, four times the premiums then being paid), with monthly surcharges for standard households increasing from JPY 225 to JPY 935. *See, e.g.*, Brown and Koravos, *supra*.

182.   Utilities were already facing post-Fukushima financial constraints (among other things, having been forced to import expensive fuels), and opposed further increases that their consumers might not be able to bear.

183.   In this regard, the April 2014 SEP stressed, in the two paragraphs of its separate discussion of the FIT, that "from the standpoint of the cost burden on the people, appropriate consideration must always be made; for example, the procurement cost must be reviewed...."  It added:

> [T]he systems for promoting the use of renewable energy sources, such as the feed-in-tariff program, *must be comprehensively studied in light of such issues as a cost increase*, reinforcement of power grids, in reference to the situations in other countries, and on the axis of developing policy combination which can balance both promotion of maximum use of renewable energy and *mitigating people's burden*, in accordance with the revision of the Strategic Energy Plan based on the law.  Necessary steps *will be taken* based on the results of the study. [*Id.* at 46, emphasis added.]

Elsewhere the SEP asserted that "appropriate management of the feed-in-tariff system ... will be promoted."  (*Id.* at 42.)

### b.   The Statements in the Prospectus Regarding Japan's FIT Regime Were Materially False and Misleading.

184.   The foregoing shifts adverse to Sky Solar's business and prospects in Japan were either wholly ignored, minimized or otherwise misrepresented in the Prospectus, which overwhelmingly portrayed Japan's FIT regime as positive for the Company.

185.     The statements in the Prospectus regarding Japan's FIT regime and its favorable benefits to the Company were materially false and misleading and failed to disclose material adverse facts, and known trends and uncertainties, when made, for, *inter alia*, the following reasons:

a)       The Prospectus's repeated assertions that Japan had a "highly attractive solar radiation, regulatory environment[], power pricing, land availability, financial access and overall power market trends," a "highly favorable FIT price support regimes," and "an attractive FIT price support regime to encourage the development of solar parks" (*id.* at 61); that Sky Solar "expect[ed] higher gross margins in countries with high FIT, such as Japan" (*id.* at 62-63, 67); that "Japan is a particularly attractive market given the high electricity demands," citing their development of "solar parks with an FIT rate of US$0.42 and PPAs of 20 years" (*id.* at 102); that "we intend to primarily focus on markets, such as Japan, that have ... a highly favorable FIT policy" (*id.* at 105); and "[w]e consider Japan to be a core growth area going forward" and "expect to continue to expand the capacity of our solar parks in Japan beyond our existing pipeline, as the Japanese government has established a highly favorable FIT price support scheme and has set a generous target for the percentage of national power generated from renewable sources" (*id.* at 113) – failed to address that the regulatory environment in Japan changed substantially from the preceding years, with an assured material adverse impact on Sky Solar, as described above.

b)       The Prospectus's discussion at various points of countries experiencing FIT rate cuts, while omitting Japan (*id.* at 14, 26, 61), was false and misleading because not only had Japan also already experienced FIT rate cuts, but it was assured to

experience more frequent and deeper cuts as described above.

        c)      The Prospectus's statement that "[r]ecent government investigations and rulings should accelerate the development of solar parks within the pipeline" – especially in the next sentence after discussing Japan's "highly favorable FIT price support scheme" – (*id.* at 113) was false and misleading because, while the Prospectus portrayed this as something positive for the Company that would facilitate the building of such projects, in fact the changes emanating from these investigations and rulings (which did occur) were aimed at applying lower (and increasingly falling) FIT rates to solar park projects in the pipeline (to combat producers rushing applications to secure current high FIT rates, but delaying actual building in the expectation that building costs will fall, as described above).  Moreover, forcing Sky Solar to accelerate building its parks in the pipeline was disadvantageous to the Company, not only because of the ever-more precipitously falling FIT rates if they were unable to build them quickly (the FIT rates did begin to be reviewed, *i.e.*, reduced, more frequently than once a year, as was suggested prior to the IPO), but because Sky Solar would be building them at higher, current costs, and because Sky Solar did not have the financing in place to build them.

        d)      The Prospectus falsely and misleadingly indicated (at 61) that decreases in subsidies were calibrated by regulators to track the decreasing costs of energy production to the producer; and that this dynamic ultimately led to decreased costs of production, but higher spot prices of electricity, such that that profitability increased without the need for government subsidies; in fact, the decreases in subsidies were a serious and losing proposition that caused  Sky Solar to substantially curtail its Japanese expansion in 2016, and spot prices in electricity, if anything, were likely to decrease with increased

57

competition.

186.     In addition, the Prospectus's purported disclosures about potential FIT reductions were either inadequate or themselves misleading, as they ignored or misleadingly minimized adverse material facts:

a)     The Prospectus acknowledged (at 130), the fact that METI had reduced FIT tariff rates from JPY 40 in 2012 (FIT 1), to JPY 36 in 2013 (FIT 2), to JPY 32 in 2014 (FIT 3).  However, the Prospectus accompanied this disclosure with qualifications making it unclear to the reasonable investor exactly what the actual rate would be: "The price and terms for PPAs varies depending on the type, installation mode, scale and other factors of the relevant renewable electricity source, and is to be determined by the METI after their consideration of the opinions of other relevant governmental ministries as well as the opinion of a procurement price calculation committee, consisting of five members appointed by the METI with the approval of the Diet."  Moreover, the bare fact of setting forth these numbers did not convey the fundamental underlying shifts described above which assured deep additional cuts to FIT rates, and the strong regulatory policy sentiment away from a "high" FIT rate that was "favorable" to Sky Solar, the profitability of its current projects, or current business or prospects.

b)     The Prospectus acknowledged (at 15) the fact that five Japanese utilities had "announced plans to temporarily suspend reviews of proposals from solar energy producers, such as us, due to a foreseeable shortage in their available power transmission capacity in light of the popularity of the FIT program."  However, the Prospectus downplayed the significance of this event (beginning by characterizing it as "temporary" before even describing it) and casting it as a consequence of "the popularity of the FIT

program" without adequately explaining what that meant for Sky Solar or other solar producers in Japan (as described above).  In fact, this "temporary" suspension was only "lifted" in exchange for the utilities' right "to grant interconnection on the premise such interconnection may be subject to *uncompensated curtailment* beyond 30 days or 360 hours per year."  *See* 2015 20-F (filed 5/2/16).  The Prospectus also hastened to add that "the announcements indicate that projects that have received permission to participate in the FIT program may not be affected," whereas throughout the Prospectus Defendants created the impression that all of their projects received "permission to participate in the FIT program."  The Prospectus went on to acknowledge that the announcements "also suggest that the power transmission capacity in parts of Japan may not be able to handle all of the solar energy projects that are currently foreseen, especially projects with large capacity."  However, the Prospectus not only failed to adequately explain the scale and significance of that fact on solar producers in Japan such as Sky Solar, and how it tied in to other trends to undercut Sky Solar and solar energy producers in Japan (as described above), but – again under the guise of a risk "disclosure" – created a misleading impression that Sky Solar would likely not be affected because most of its projects were small (not projects with "large capacity"):  "Even though our projects have relatively small capacities of between 500 kW and 2.5 MW, we may still experience delays in connecting our projects to the grid and our future expansion options under the FIT program may be materially and adversely affected."

c)      Finally, the Prospectus noted that METI "started considering reform measures on their solar energy policies" which "may be passed by the end of 2014," but the Prospectus immediately sought to give the impression that Sky Solar's projects, or

most of them, would be grandfathered from any such changes, whatever they may be: "We expect that these policies would only apply to new projects and projects that have not obtained approval for connecting to the grid.... [W]e have approval for connecting to the grid for our shovel-ready projects and projects under construction in Japan....   These reform measures are not expected to apply to projects that have already been connected to the grid.... [T]here has been no final determination by METI...."  As noted, the Prospectus also misleadingly suggested that "[r]ecent government investigations and rulings should accelerate the development of solar parks within the pipeline (*id.* at 113), further creating the misleading impression that Sky Solar's projects in the pipeline would qualify for the higher FIT rates.

187.    Moreover, the Prospectus misleadingly indicated at various points that Sky Solar was increasingly insulated from any potential future FIT rate reductions because costs of production were coming down, meaning the Company would still reap increasing profits, regardless of government subsidies.  *See, e.g.*, Prospectus at 4 (emphasis added):

> {39} The PV industry has been driven by a number of government programs encouraging the adoption of solar power and other renewable energy sources. However, there has been a meaningful reduction in the cost of solar energy systems over the past five years. As a result, the levelized cost of energy, or LCOE, of solar is increasingly economically competitive compared to other forms of energy. Downstream market participants, which develop and in many cases retain solar power projects, are benefitting from these favorable market trends, capturing higher margins and long-term income from power generation.

Nor was the reduction in the FIT related to increases in the spot market for electricity as the Prospectus suggested at 61 and 64, cited above ("While governments generally aim to ratchet down PV ..., this decrease is often offset by the decreasing costs of PV systems.... [A]s PV technology advances and average systems costs of solar parks decrease, we expect the spot market price of electricity in a growing number of countries to become sufficiently high that solar

60

parks can be economically developed without the need for government subsidies, a condition known as 'grid parity'....   [W]e expect our costs of sales to decrease and our revenue and profitability to increase.   In light of these favorable conditions and our increased access to financing, we will continue to increase the proportion of solar parks that we own and operate as IPP solar parks.")   Moreover, Sky Solar's assertion that it expected profitability to increase because it expected the spot market price of electricity to increase was itself misleading, as increased competition (which Defendants knew was occurring, particularly in Japan) would only serve to decrease the spot price of electricity.   In short, the reasonable investor came away from the Prospectus with the impression that Sky Solar was insulated under any "Risk Factor" scenario mentioned in the Prospectus, when the seismic changes afoot described above assured that it was being adversely and materially affected.

188.   The impact of the changes in Japan's FIT regime, and the lack of financing capability for development, was significant as Japan projects that were formerly in the pipeline were no longer economically viable at reduced FIT rates.   What limited financial resources Sky Solar had were employed elsewhere while the Japan "pipeline" went undeveloped.

189.   The Prospectus stated that Sky Solar had 535.5 MW of potential capacity in Japan, consisting of 18.7 MW of installed capacity, 18.5 MW under construction, 155.7 MW shovel-ready, 54.3 MW advanced pipeline, and 288.3 MW qualified or in development pipeline.   *See* s*upra* ¶ 152.  When Sky Solar filed its 2016 Form 20-F on May 15, 2017, it reported as of December 31, 2016 a total of 386.3 MW of Japanese capacity consisting of 94.7 MW of installed capacity, 20.9 MW of solar parks under construction, 127.4 MW of shovel-ready projects, and 143.3 MW of solar parks in the pipeline (or a reduction of 149.2 MW or 27.9% of potential

capacity).  Significantly, projects in the pipeline were reduced by more than half (from 288.3 to 143.3 MW).  *See* 2016 Form 20-F at 43.

190.    While the Company had sold a *de minimis* amount of capacity, this 149.2 MW decline reflected a vastly different picture than presented in its Prospectus, of growth, expansion and profitability due to high FIT rates.  Indeed, the Prospectus vastly overstated the amount of MW in projects that Sky Solar could reasonably, economically develop with the cuts in FIT rates and the changed market in Japan (and lack of financing for development).

**5.    The Prospectus Misrepresented Material Facts Concerning Chile**

191.    The Prospectus misrepresented that {40} Chile was a "core growth area."  *See* also Prospectus at 151 {41} ("We expect a very strong and sustained spot market price for electricity in the [Chilean] regions where our projects will be constructed.").

192.    Chile was identified in the Prospectus as one of the markets {42} "with highly attractive solar radiation, regulatory environments, power pricing, land availability, financial access and overall power market trends."  Prospectus at 1, 100.  *See also* Prospectus at 102 {43} ("We also expect Chile to be a strong market given the local mining industry dynamics. Chile is the world's largest copper exporter and the energy-intensive nature of the copper mining industry creates substantial challenges in meeting power demand".).

193.    Defendants represented in the Prospectus that {44} Sky Solar had 44.0 MW of shovel-ready projects, and {45} "154.0 MW of advanced pipeline and 319.0 MW of other solar parks in our pipeline" in Chile.  Prospectus at 114.  The Prospectus {46} "classif[ied] 341.0 MW of these [pipeline] solar projects as advanced and qualified which we expect to become shovel-ready within 12 to 18 months."

194.    The Prospectus further represented (at 98) that Chile had a deficiency in domestically generated electronic power and was dependent on imported power:

{47} [C]urrent capacity cannot keep pace with rising energy demand.  As a result, Chile relies heavily on imported electricity generated from fossil sources.

195.    The Prospectus classified Chile as one of the markets where Sky Solar had a "near term focus."  The Prospectus also stated at 104: {48} "IADB [the Inter-American Development Bank] has also entered into a mandate with us worth US$72 million to construct our first project in Chile."  Inasmuch as the Prospectus represented that the only condition to begin construction for shovel-ready projects was the receipt of financing [*e.g.*, Prospectus at 129, n.2], this representation gave investors reasonable cause to believe that construction would begin in Chile imminently after the IPO.

196.    Contrary to these representations in the Prospectus, Chile did not represent a "core growth area" based on "highly attractive solar radiation, regulatory environments, power pricing, land availability, financial access and overall power market trends."  Prospectus at 1.  The Prospectus failed to disclose that, because of over-building of solar capacity in Chile, the grid infrastructure in Chile would greatly limit new projects, as the most attractive grid-access points were saturated.

197.    In Chile, Sky Solar was developing solar properties in the northern province of Arica, notwithstanding that the grid around Arica (SIGN) was not connected to the populous areas in Central Chile.  Sky Solar misrepresented that the 44.0 MW Chilean project was shovel-ready at the time of the IPO, when it fact Sky Solar did not at that time have permission to connect that capacity to the electric grid.

198.    Plaintiffs have consulted with Eelaw, Energy and Environment Legal Advice, a Chilean law firm with expertise in environmental and energy regulations, and have confirmed that at the time of the IPO (November 2014), Sky Solar's 44.0 MW project in Chile was not "*shovel-ready*" as defined in the Prospectus.  At the time of the IPO, Sky Solar did not have permission to

connect to the grid and was not in the capacity to request such permission because under Chilean regulations only a "ready to operate" power plant can request permission for interconnection in order to be able to undertake interconnection and synchronization tests.  Further, at the time of the IPO, Sky Solar only had obtained the environmental licenses for such projects but had not commenced construction nor requested other relevant sectorial permits for initiating construction. Those permits will be granted if technical requirements are met.  However, to produce the technical documents required to file the permits and successfully obtain them, requires substantial technical work and significant investment. Furthermore, to this date the projects have not been constructed and have a high risk of losing their environmental licenses issued in 2012 and 2013 due to the fact that Chilean regulations require project holders to initiate construction within 5 years of the date of issuance of the environmental license; after such period of time licenses expire without any possibility of renewal.  In addition, in 2014 Chilean government had not begun construction of a connection between the northern grid (SING) and the central grid (SIC), connection that was completed in 2018.  Chilean counsel was retained only after public disclosure of Su's theft of assets when investors began to question Su's credibility and thus had reason to be concerned that statements in the Prospectus were materially false and misleading.

199.    According to industry analysts, solar companies, such as Sky Solar, were expected at the time of the IPO to have difficulty connecting solar capacity to Chile's electric grid[7]:

> Chile will start 2015 with more than 600 MW in installed capacity and with an equal share under construction, IHS is forecasting. By the end of next year, Chile will have 1.4 GW of PV capacity installed, of which 90 percent will be in utility-scale projects -- primarily those larger than 20 MW….  The reason for the rush to install is the competition for grid access. After 2015, the grid infrastructure will

---

[7] Josefin Berg, *Emerging Markets Mature – Chile Follows South Africa to Reach 1 GW of Installed PV Capacity*, IHIS, https://www.ihs.com/pdf/Top-Solar-Power-Industry-Trends-for-2015_213963110915583632.pdf (last visited Feb. 15, 2018).

greatly limit new projects, as the most attractive grid-access points will be saturated. Installations are then projected to decline by 40 percent in 2016, and not until the end of the decade will the grid be ready to handle larger chunks of utility-scale PV.

200.    According to a *Bloomberg News* article dated June 2, 2016 entitled "Chile Has So Much Solar Energy It's Giving it Away for Free," "[s]pot prices reached zero in parts of [Chile] on 113 days through April [2016], a number that's on track to beat [2015's] total of 192 days." According to *Bloomberg News*, as forecasted by IHS, "power plants are oversupplying regions that lack transmission lines to distribute the electricity elsewhere…. Chile has two main power networks, the central grid and the northern grid, which aren't connected to each other. There are also areas within the grids that lack adequate transmission capacity. That means one region can have too much power, driving down prices because the surplus can't be delivered to other parts of the country."

201.    Jose Ignacio Escobar, a general manager for Acciona SA's Chile energy unit, was quoted in the June 2, 2016 *Bloomberg News* article as stating, "*[t]his situation was expected*, but new regulatory measures weren't taken, infrastructure wasn't built." Emphasis added.

202.    Because of the saturation of solar fields connected to the SIGN grid, price competition was very high. In fact, for the more than two year period after the IPO, Sky Solar chose not to use *any* of its limited financial resources to develop capacity in Chile and ended December 31, 2016 with the exact same status as it had at the time of the IPO. *Compare* Prospectus at 114 to 2016 Form 20-F at 44 (both stating that Sky Solar had 44.8 MW of shovel-ready, 154 MW of advanced, 187 MW of qualified, and 132 MW of development capacity in Chile).

203.    Further, the Prospectus's statement concerning IADB's "mandate" to provide Sky Solar financing was false since the parties had apparently not agreed to terms and those terms are

still being negotiated.  *See, e.g.,* 2016 Form 20-F at 44 ("We believe we will be able to finalize key agreements and begin construction [in Chile] upon the receipt of funding via project financing arrangements that are being negotiated.").

204.    In fact, Sky Solar has failed to date to build out any of its so-called "shovel-ready" or other "pipeline" capacity in Chile, or to advance the pipeline projects to shovel-ready status. *Id.*

> **6.    The Prospectus Misrepresented that Sky Solar Had a "Broad Geographic Reach," an "Established Presence Across Key Solar Markets," and "Established Pipeline Projects."**

205.    The Prospectus misrepresented that "[w]e believe our {49} <u>broad geographic reach and established presence across key solar markets are significant differentiators that provide global opportunities and mitigate country-specific risk</u>."  Prospectus at 1 and 100.

206.    The Prospectus further misrepresented that "[w]e intend to leverage our {50} <u>established pipeline projects</u> and increased financing capabilities to expand our IPP business." Prospectus at 1 and 100.

207.    Those misrepresentations contained false statements of fact that Sky Solar had a {51} "<u>broad geographic reach</u>," an {52} "<u>established presence across key solar markets</u>" and {   } "<u>established pipeline projects</u>."  The Company further misrepresented as a matter of fact that it had {53} a "<u>proven track record of identifying and developing revenue-producing solar parks, operating under local conditions, developing local relationships and managing a global platform</u>." *Id.*[8]   The Company's statements of fact were false.  It had no "broad geographic reach,"

---

[8] The Prospectus falsely referenced Sky Solar's "proven track record" eight times.  *See* Prospectus at 1, 2, 100, 101 (twice), 103, 104 ("proven market insights and a track record of successful execution"), and 121.

"established presence across key solar markets," "established pipeline projects, or "proven track record of identifying and developing revenue producing solar parks…." (*Id.* at 1).

208.    Specifically, Sky Solar's operations in Spain, Germany, the Czech Republic, Greece, and Bulgaria had proven unprofitable and Sky Solar had at the time of the IPO substantially withdrawn from those markets.  In fact, Sky Solar acknowledged in the Prospectus (at 61) that Germany, as well as Greece, Bulgaria, and the Czech Republic, had "reduced their support for the PV industry in light of the global economic crisis."  The Prospectus stated that Sky Solar had shifted its focus away from these countries "with less favorable subsidy regimes," which had been the initial countries for development.  *Id.*

209.    Although Sky Solar hoped to engage in operations in Chile and Uruguay those markets had not yet been developed and Sky Solar's projects were at most "shovel-ready" without confirmed financing or approval to connect to the electric grid.  *See also* ¶¶ 197-202 (alleging that Sky Solar's 44 MW project in Chile was non-economical and not "shovel-ready.").[9]

210.    The only market that Sky Solar was operating in with an intent to further develop was Japan, and as alleged at ¶¶ 168-183, the Japanese market was changing rapidly with reductions in FIT rates and a reorientation away from solar power.

211.    Thus, Sky Solar's operations as of the time of the IPO had neither a "broad geographic reach" nor an "established presence across key solar markets."  Nor did Sky Solar have "established pipeline projects" or a "proven track record.

---

[9] It was not until the second-half of 2017 that Sky Solar connected 63.6 MW of capacity in Uruguay.  *See* Form 6-F dated October 3, 2017, at 1.  Plaintiffs has been unable to establish, without the benefit of discovery, the status of the Uruguayan project as of the IPO.

a.      Czech Republic

212.    The Prospectus acknowledged (at 14) that "in 2010, the *Czech Republic* significantly reduced the amount of a subsidy to renewable energy off-takers. The expected future cash flows from a solar park developed by us in the Czech Republic therefore decreased and ... we impaired this asset in 2010."

213.    According to the Confidential Witness, the construction in the Czech Republic had been a major operation of Sky Solar's German subsidiary, and that when that operation failed because of the reduction in government subsidies, the German subsidiary committed a fraud on creditors by transferring control of the subsidiary to a confederate of defendant Su. *See supra* ¶¶ 96-100.  According to the Confidential Witness, Sky Solar defaulted in 2010-11 on approximately a €12-13 million loan from Raiffeisen Leasing.

214.    A separate project in the Czech Republic failed.  According to the Confidential Witness, in August or September 2010 a EPC partner in a joint venture (Jini Lamplot of Helios Energy s.p.o.) transferred nearly $1.74 million to Cyprus and other accounts of Helios Energy controlled companies pursuant to fraudulent purchase orders.  According to the Confidential Witness, Sky Solar also reneged on an oral argument with DRAKA GmbH, incurring liability of €1.2 million.

b.      Greece

215.    Sky Solar issued a press release dated March 21, 2013 announcing the "successful grid-connection of integral Greek 70MW PV power plants" on January 28, 2013 (40 MW) and March 12, 2013 (30MW).  The press release added that "[t]hese two projects are entitled to a 20-year Greek PV FiT subsidy, and the electricity price is locked between 0.29 Euro/kWh – 0.44 Euro/kWh."

216.     The Prospectus stated (at 1) that as of the IPO Sky Solar had 23 MW of assets in Greece.  The Prospectus failed to account for the remaining 47 MW.

217.     The Prospectus acknowledged that Sky had "recorded an impairment loss of US$21.7 million and US$1.3 million on IPP solar parks in 2013 and in the six months ended June 30, 2014, respectively, which were triggered when the Greek government passed a law in April 2014 to reduce the FIT in effect on existing PPAs by roughly 30%, placing a discount on electricity sold in 2013."

218.     Although Greece had been Sky Solar's largest market, Sky Solar further acknowledged (at 116) that it was not looking to Greece for further development of solar capacity:

"As the Greek government has substantially reduced the subsidies available for solar parks, we do not have any shovel-ready projects ready to be developed in Greece, nor do we have any solar parks in our pipeline.  We will continue to operate our existing assets in Greece and currently have no plans to divest such assets.  However, we do not expect that Greece will be a significant contributor to our capacity growth going forward."

### c.     Germany

219.     According to the Confidential Witness, Sky Solar constructed only limited capacity in Germany.  In fact, the Prospectus acknowledged (at 1, 60, and 100) that as of the date of the IPO, Sky Solar owned no capacity in Germany.

220.     The Confidential Witness informed Plaintiffs that certain projects were completed and sold to third parties in Germany successfully in 2009 and 2010.  By 2010, after the change of government in Germany, the political environment had begun to disfavor solar energy and fewer companies were looking to purchase solar fields.  Sky Solar had expended €2.2 million in 2012 on

one project (Luptitz), yet Sky Solar failed to acquire an easement that was essential for construction.

*        *        *

221.    Accordingly, given the markets where Sky Solar had historically operated (Spain, Czech Republic, Greece, Germany, and Bulgaria), markets where Sky Solar was currently operating (Japan), and markets that Sky Solar hoped to enter (Chile and Uruguay), Sky Solar did not have, as represented, a "proven track record" or an "established presence across key solar markets."

### 7.        The Prospectus Misrepresented Sky Solar's Access to Financing

222.    The Prospectus stated (at 1): "We aim to establish operations in Japan, Chile, Uruguay and other select geographies with highly attractive solar radiation, regulatory environments, power pricing, land availability, {54} financial access and overall power market trends." Emphasis added. The Company further represented, that it "intend[ed] to leverage our established pipeline projects and {55} increased financing capabilities to expand our IPP business." *Id.*

223.    In respect to the Company's ability to obtain financing, the Prospectus specifically represented (at 1), {56} "We have access to a variety of financing sources and a demonstrated ability to design cost-effective project funding solutions. We are well positioned to create efficient financing solutions that are responsive to local regulatory conditions and financial markets." Further, the Prospectus represented (at 1-2) that Sky Solar's {57} "global reach and extensive relationships provide access to a variety of financing solutions from various geographies" and that Sky Solar is {58} "well positioned to create efficient financing solutions that are responsive to local regulatory conditions and financial markets." The Company

represented that it has "extensive experience in financing large-scale solar parks, minimizing investment risks, optimizing capital structure and maximizing returns for each solar park…. We utilize a broad range of financing structures, tailored to the risks and opportunities of solar parks in each market, including project funding, equity financing, through affiliates and pre-financing agreements with off-takers." *Id*. at 104.

224.     The Company also represented that as "the PV industry becomes more competitive against other forms of energy and increasing grid parity drives increased demand for solar parks, we expect our costs of sales to decrease and our revenue and profitability to increase. In light of these favorable conditions and our {59} increased access to financing, we will continue to increase the proportion of solar parks that we own and operate as IPP solar parks." *Id*. at 61. For certain markets "such as Eastern Europe, Latin America and other emerging markets," the Company seeks {60} "to arrange debt financing by leveraging our strong relationships with international financing sources. We have also established affiliates with other entities who provide financing or guarantees to the affiliate to assist with long-term debt financing." *Id*. at 62.

225.     These statements were materially false and misleading. In fact, at the time of the IPO, Sky Solar lacked the ability to obtain financing for markets saturated with solar assets, such as Japan and Chile, and had only been able to obtain financing at adverse terms. Defendants' representations with respect to financing were particularly significant because the IPO raised $75.8 million less from investors than was originally anticipated, which money had been earmarked for expansion of Sky Solar's solar assets. Without that additional $75.8 million cash cushion, Sky Solar was unable to develop its solar assets, and financial firms were understandably reticent to do business with Sky Solar. The Prospectus also failed to disclose Sky Solar's lack of

access to bank financing as a result of the Spanish and Czech debacles.  Nor did it disclose the unwillingness of vendors to provide financing.  *See supra* ¶¶ 148-149.

226.    According to the Prospectus (at 113), on October 10, 2014, Sky Solar Japan Co. K.K. ("SSJ"), a wholly owned subsidiary of Sky Solar, entered into amended silent partnership agreements ("Agreements"), with two groups of third party investors ("Silent Partners").

227.    There was no separate legal entity established in connection with the agreements. Pursuant to the silent partnership agreements, "the Silent Partners provided financing and SSJ will develop and operate 21 solar parks with an aggregate capacity of 34.6 MW in Japan" (the "SSJ Silent Partnership Assets").  *Id.*  The "Silent Partners are not involved in the investment decisions associated with management of the SSJ Partnership Assets or other assets and businesses which continue to be held and operated by SSJ, outside the auspices of the silent partnership agreement." *Id.*

228.    With respect to the Japanese Silent Partnership, the Prospectus represented (at 113) that "SSJ contributed JPY750 million (US$7.4 million) in cash and solar power projects with a carrying amount of JPY2.3 billion (US$22.3 million) and an agreed valuation of approximately JPY4.6 billion (US$45.5 million).  The Silent Partners contributed JPY5 billion (US$49.4 million) in cash."  The Prospectus further stated (*id.*) the following:

> The contributed solar parks had an aggregate capacity of 34.6 MW, consisting of approximately 11.5 MW which were completed and in operation and approximately 23.1 MW shovel-ready as of October 10, 2014.

229.    According to the Prospectus (*id.*), the "SSJ Silent Partnership Assets are held and managed through the SSJ legal entity, subject to the provisions of the silent partnership agreement."  From the date of the agreements through June 2017, the silent partners were to have a priority on distribution of profits based on a 15% cumulative internal rate of return:

distributable profits from the SSJ Silent Partnership Assets shall be first distributed to the Silent Partners in proportion to their respective capital contributions, until a cumulative annual internal rate of return, or IRR, of 15% on their capital contributions is achieved.  Any remaining profits shall be distributed to SSJ until a cumulative annual IRR of 15% of SSJ's contributed amount, based on the agreed valuation, is achieved.  The remaining profits, if any, shall be distributed to SSJ and the Silent Partner at the ratio of approximately 51% and 49%, respectively.  Silent Partners shall only bear losses up to the amount of money they financed.

The IRR of 15% is the discount rate required to make the present value of the total distributable profits expected to be generated by SSJ Silent Partnership Assets payable to certain members of Silent Partnership equal to the present value of the cumulative total of investments of certain Silent Partners. Distributable profits represent the cash that may be distributed to investors, including cash received from generating electricity or other sources, less the debts which fall due. Investments include the cash proceeds received from Silent Partners of US$49.4 million, cash contribution made from SSJ of US$7.4 million and contribution of solar power projects with an agreed valuation of approximately US$45.5 million. Subject to the availability of distributable profits, the annual amount to be distributed to the Silent Partners is estimated to be approximately US$7.4 million (without considering the cumulative effect of IRR), before any amounts are distributable to us.  [Prospectus at 113-14.]

230.    In connection with the investigation of their claims, plaintiffs retained a forensic accountant to analyze the Silent Partner transaction.  According to the forensic accountant, the terms of the Silent Partnership Agreements demonstrated that Sky Solar had difficulty obtaining financing to build out its Japanese assets and entered into the Silent Partnership Agreements on distressed terms.

231.    The Silent Partnership Agreements evidenced that Sky Solar lacked "a demonstrated ability to design cost-effective project funding solution[s]."  *See* Prospectus at 1, 2, and 100.

232.    First, as part of the Silent Partnership Agreements, Flash Bright Power Ltd. ("Flash Bright"), a wholly owned entity of Defendant Su, "granted to an affiliate of one of the Silent Partners an option to purchase from Flash Bright up to US$30 million worth of existing ordinary shares of Sky Solar Holdings, Ltd." at a per share price equal to the per ordinary share

IPO price.  Prospectus at 114.  The call option was required "to induce the Silent Partners to provide the financing...."  Prospectus at F-114.

233.    Further, the assets contributed to the Silent Partnership Agreements (which were primarily shovel ready) were unlikely to generate a 15% annual internal rate of return from operations.    Thus, because Sky Solar was only paid "distributable" profits after the Silent Partners received a cumulative 15% internal rate of return, Sky Solar was unlikely to generate any return on those assets through the September 8, 2017 termination date of the Silent Partner Agreements. For example, for the six month period ended June 30, 2014, Sky Solar had only achieved a profit of $2.0 million on the 11.5 MW of completed solar parks contributed to the Silent Partnership.

234.    When the Silent Partnership deal was renegotiated a year later in September 2015, Sky Solar paid the silent partner consideration of $5.8 million, which reflects an apparent deficiency on the $7.4 million annual income the silent partners would have received, if not for the lack of distributable profits.

235.    Although the Prospectus represented that the solar assets contributed by Sky Solar as part of the Silent Partner Agreements had an "agreed valuation" of $45.5 million, the actual value of those assets, given the cost to build-out those assets, the option given to the Silent Partners on the IPO shares, the requirement for Sky Solar to contribute $7.4 million (JPY750 million) in cash, and the preferential payment terms to the Silent Partners (a cumulative, 15% IRR), was actually substantially less than $45.5 million.  *See* Prospectus at 113-14.

236.    As a result of the lack of financing commitments, and concerns over the revenue realizable under the FIT, Sky Solar reduced the rate at which it build out its Japanese network in the first half of 2016.  *See* Press Release dated June 17, 2016 ("Our overall installation during the

quarter [4.5 MW] was modest as expected."  In fact, in the nine quarters, from the IPO through December 31, 2016, Sky Solar was only able to increase the megawatts of solar parks accepted by METI for its FIT program by 3.5 MW, or less than 1.5% of the capacity at the time of the IPO (from 239.5 MW to 243.0 MW).  *Compare* Prospectus at 112 to 2016 Form 20-F at 43.

237.    Similarly, although Sky Solar stated in the Prospectus (at 104) that it had a mandate for financing construction in Chile, it had not and would not subsequently conclude negotiations of that mandate.  *See supra* ¶¶ 203-204.

238.    Accordingly, because Sky Solar did not have access to bank financing because of its prior performance, and only had access to Japanese financing on distressed terms, the statements identified in ¶¶ 226-229, concerning Sky Solar's access to financing, were materially false or misleading.

### 8. The Prospectus Misrepresented Sky Solar's Ability to Expand Its Solar Assets

239.    The Prospectus misrepresented that Sky Solar had the financial commitments to grow out its "shovel-ready projects" and had access to financing to pursue its "advanced and qualified projects."   In truth, Sky Solar lacked that ability because of the diminished IPO proceeds, changes in the Japanese regulatory environment, and lack of outside financing. Defendants failed to disclose the known trend and uncertainty that Sky Solar did not have financial commitments to advance its "shovel-ready projects" and "advanced and qualified projects."

240.    The Prospectus stated (at 1 and 100) that {60} "[i]n addition to our existing operational project portfolio, we have over 1.3 GW of solar projects in various stages of development in countries such as Chile, Uruguay, Japan, Canada and South Africa, consisting of 22.6 MW under construction, 257.1 MW of shovel-ready projects and 1,053.3 MW of solar parks

under development.  We classify 543.4 MW of these solar projects under development as advanced or qualified and *expect them to become shovel-ready projects within 12 to 18 months*." *See also* Prospectus at 102 {61} ("We currently have 257.1 MW of shovel-ready projects, which we believe provides us with clear near-term growth potential. In addition, we have 1,053.3 MW of solar projects under development, including 543.4 MW of advanced and qualified pipeline projects *which we expect to be ready for funding within 12 to 18 months*." (Emphasis added.).

241.    This is the exact same statement and estimate that Defendants made in Amendment No. 5 of the Registration Statement, dated November 5, 2014 (at 1, 101, and 103), although at that time Sky Solar anticipated receiving a minimum of an additional $75.8 million in proceeds from the IPO (excluding the over-allotment option) to develop capacity.

242.    Defendants' failure to modify their estimates with respect to developing the 1,053.3 MW "pipeline" and 543.4 MW of "advanced and qualified pipeline projects," from Amendment No. 5 dated November 5, 2014 to the final Registration Statement dated November 10, 2014, was materially false and misleading in light of Sky Solar's inability to obtain third party financing on reasonable terms, and the loss of $75.8 million of equity investments from the reduced IPO.

243.    In respect to the Company's shovel-ready projects, the Prospectus considered a park shovel-ready even if Sky Solar has "not obtained certain non-discretionary permits, so long as we comply with the relevant criteria."  Prospectus at 17.

244.    The Prospectus represented the strength of its shovel-ready projects, {62}  "Our extensive portfolio of shovel-ready projects and pipeline solar parks provides us with clear and actionable opportunities to grow power generation and earnings."  *Id.* at 2 and 102.  In addition, the Prospectus represented, {63} "We select solar parks with the highest expected return on

investment for development, based on our technological feasibility studies and permitting efforts." *Id.* at 102.

245.   In respect to the Japanese market, the Company represented in the Prospectus (at 112) that it had "148.0 MW of shovel-ready projects ready to be developed upon receipt of funding, including one shovel-ready project where we have equity holding of 30% for attributable capacity of 0.6 MW."  The Company represented in the Registration Statement that in Japan, Sky Solar's shovel-ready projects {64} "have secured site control, energy permits and all key agreements that are required for construction of solar parks in Japan." *Id.*

246.   Similarly, Sky Solar represented that it "normally submit[s] certain administrative notifications at the time we receive funding. {65} For 16 projects in Japan with an aggregate 73.5 MW of capacity, construction can begin upon receipt of forestry and land use permits which we normally expect to receive within nine months after commencing the process of obtaining the permits and submissions of certain administrative notices." *Id.* at 109.

247.   In addition, the Prospectus represented that the permits required to begin construction on shovel-ready projects were "non-discretionary."

> For 16 projects representing a total of 73.5 MW, we are still waiting for certain non-discretionary permits that will be granted, so long as we comply with the relevant criteria, under the Forest Land Act (shinrin hou) Law No. 249 of 1951, as amended) and the Agricultural Land Act (nou chi hou) (Law No. 229 of 1952, as amended) and the submission or notifications under the Soil Contamination Act (dojo osen taisaku hou) (Law No. 53 of 2002, as amended).  {66} *We have already commenced the process of obtaining these permits and we expect to receive these permits within nine months from the date that we commenced the process.* [Emphasis added.]

248.   Thus, with respect to the 73.5 MW of shovel-ready projects referenced in the Prospectus, because Sky Solar represented that it had {67} "commenced the process of obtaining those permits," Sky Solar created a misleading impression that it had financing for those projects.

249.    The Company further represented {68} "that most of these [257.1 MW of shovel-ready] solar parks will be [ ] constructed and connected to the grid within six to eighteen months after the completion of the offering."  *Id*. at 105.  Similarly, the Company represented {69} "[w]e believe that that the majority of these [257.1 MW of shovel-ready] solar parks will be [ ] connected to the grid by the end of 2015."  *Id*. at 102.  *See* pp. 103, 106.

250.    These were the same disclosures that Sky Solar and the Defendants had made in the Third Amended Registration Statement dated November 5, 2014 notwithstanding that Sky Solar had $75.8 million less funding for the expansion.  *See* pp. 103, 106.  Because of the disappointing proceeds from the IPO, Sky Solar did not have financing in place for the shovel-ready projects and needed to modify the language in the final Prospectus to reflect this truth.

251.    The statements identified in ¶¶ 240; 244-249 were false and misleading when made as the Company prematurely classified certain of its IPP solar parks in Japan as shovel-ready projects when the approval of non-discriminatory permits were more than nine months away and financing for the shovel-ready projects was uncertain.

252.    Similarly, the representations that "most of this" shovel-ready projects "will be [ ] constructed and connected to the grid within six to eighteen months after the completion of the offering" and that "the majority of these solar parks will be [ ] connected to the grid by the end of 2015," were materially false and misleading, among other reasons, because of the lack of financing.

253.    In the seven quarters during and subsequent to the IPO, starting in the fourth quarter of 2014, because of the lack of financing, Sky Solar was unable to meaningfully increase its installed base of solar parks.  At the time of the IPO, Sky Solar stated that it had 54.5 MW of installations and 22.1 MW under construction.  Prospectus at 110-11.  As of December 31, 2015,

78

according to its Form 20-F filed with the SEC, it only had 128.6 MW of solar parks installed.  As of June 30, 2016, according to its Form 6-K filed with the SEC, it only had 133.1 MW of solar parks installed.

254.    Thus, from the IPO to June 30, 2016, Sky Solar was only able to install 56.5 MW of solar fields or approximately 22% of the 257.1 MW of purportedly shovel-ready projects that existed as of the IPO (133.1 MW in existence as of June 30, 2016 – 54.5 MW in existence as of the IPO - 22.1 MW in construction as of the IPO).

255.    The comparable number as of December 31, 2015 was 52 MW of solar fields installed or approximately 20% of the 257.1 MW of shovel-ready projects that existed as of the IPO.

256.    Moreover, given the existing lack of financing and regulatory conditions at the time of the IPO, Sky Solar was unable to advance the 543.4 MW of solar projects classified at the time of the IPOs as "advanced or qualified" and "expect[ed] ... to become shovel-ready projects within 12 to 18 months."  Thus, the net number of completed projects (133 MW), projects under construction (27.9 MW), and shovel-ready projects (232.3 MW), was only 59.1 MW or 10.9% greater (393.3 MW – 334.2), than the equivalent number at the time of the IPO (54.5 MW, 22.6 MW, and 257.1 MW), respectively.  In contrast, the Prospectus represented that "543.4 MW of advanced and qualified pipeline projects [were]" expected to be ready for funding (*i.e.*, shovel-ready) within 12 to 18 months.  Prospectus at 102.

257.    The failure to advance solar construction at a faster rate was the result of facts that existed at the time of the IPO and were misrepresented in the Prospectus, to wit, (i) the saturation of solar markets, (ii) the reduced proceeds from the IPO, and (iii) the difficulties in arranging financing for expansion.

### 9. The Prospectus Misrepresented Sky Solar's Reason for Converting to an IPP Business Model

258.     The Prospectus misrepresented that {70} "[i]n 2013, we began to strategically reduce our system sale business in favor of the IPP model in order to internalize more value from project development and generate stable and recurring long-term cash flow."

259.     According to the Confidential Witness this statement is false.  Rather, Sky Solar began to convert to an IPP business model because demand to purchase its solar fields had dried up.  Among other things, Sky Solar used second-rate Chinese modules to manufacture its solar fields, because those manufacturers were willing to provide vendor financing.  Without vendor financing, Sky Solar had difficulty financing construction.

## VII.   STATUTE OF LIMITATIONS

260.     At no time prior to June 2017, upon the announcements of Su's theft of assets from Sky Solar, did plaintiffs have reason to believe that there were any false statements in the Prospectus.

261.     Although Sky Solar's performance as a public company was poor and its stock price declined in value, there was no government investigation or company acknowledgement of wrongdoing.  There was no one-day dramatic decline in stock price or increase in trading volume indicative of falsity in the Prospectus.  Sky Solar repeatedly assured investors that its future would be prosperous.   No law firm announced that it was conducting an investigation of misconduct and no complaint was filed against Sky Solar.

262.     It was only after the announcement of Su's misconduct that investors had reason to question the *bona fides* of the IPO.  Sky Solar is a small company with foreign operations that conducts business primarily in foreign languages.  An investigation into the IPO would be very

time consuming and expensive.  Investors had no reason to conduct that investigation until after June 2017.

263.    In addition, following the IPO, and continuing through at least the May 2017 filing of Sky Solar's Form 20-F, Sky Solar reassured the investing public that Japan and other solar markets remained strong.

264.    For example, Sky Solar stated in its Form 20-F ended December 31, 2014 ("2014 Form 20-F") (filed 4/29/2015), Form 20-F ended December 31, 2015 ("2015 Form 20-F") (filed May 2, 2016), and 2016 Form 20-F (filed May 15, 2017) that:  "We aim to expand our current operations such as those in Japan, Chile, Uruguay" (2014 Form 20-F at 33, 2015 Form 20-F at 38, 2016 Form 20-F at 38); "We intend to continue selectively expanding our operations with a near-term focus on key solar markets, such as Japan, Chile, Uruguay,..." (2014 Form 20-F at 33, 2015 Form 20-F at 38, 2016 Form 20-F at 39); "We consider Japan to be a core growth area going forward" (2014 Form 20-F at 37, 2015 Form 20-F at 43, 2016 Form 20-F at 43); "We generally act as a primary developer, especially in markets with abundant solar resources, attractive financing sources or long-term green energy subsidies, such as Japan"; (2014 Form 20-F at 40, 2015 Form 20-F at 47, 2016 Form 20-F at 48); "We plan to expand our business operations in Japan, Uruguay, Chile,... and other jurisdictions" (2014 Form 20-F at 62, 2015 Form 20-F at 73, 2016 Form 20-F at 74); "A number of countries have introduced highly favorable FIT price support regimes. For example, Japan, which has a high demand for power and low domestic fossil fuel reserves, faces relatively high energy costs. As a result, the Japanese government has introduced an attractive FIT price support regime to encourage the development of solar parks" (2014 Form 20-F at 63, 2015 Form 20-F at 73, 2016 Form 20-F at 75); "Project funding for our solar parks is typically obtained from local banks in countries with well-developed appetite for

renewable energy investments, such as Japan, Canada and the Czech Republic" (2014 Form 20-F at 63, 2015 Form 20-F at 74, 2016 Form 20-F at 76); "We generally expect higher gross margins under both our IPP business and our solar energy system sales business in countries with a high FIT, such as Japan and Canada" (2014 Form 20-F at 64, 2015 Form 20-F at 75, 2016 Form 20-F at 77); and "We primarily plan to expand our IPP portfolio in Japan, Canada, Latin America and China, where electricity prices are fixed by PPAs for periods varying from 20 years to 30 years" (2014 Form 20-F at 65, 2015 Form 20-F at 76, 2016 Form 20-F at 78).  The 2015 Form 20-F also highlighted a strategic partnership with Hudson Clean Energy Partners "to fund our construction of approximately 128 megawatts of solar projects in Chile and Uruguay" and "to collaborate on identifying and acquiring suitable renewable assets in Japan and the United States" (*id.* at 47), and that Sky Solar recently spent considerable money on investments in building more solar parks in Japan, and had begun to generate significant revenues from sales of solar parks in Japan (*id.* at 96) ("Our net cash used in investing activities in 2014 was US$51.4 million ... primarily attributable to (i) payments for IPP solar parks of US $66.5 million, as a result of our construction of IPP solar parks in Japan and Uruguay.... This cash outflow was primarily offset by ... (ii) proceeds from disposal of solar parks in Japan and other property, plant and equipment of US $5.6 million....").

265.   Sky Solar made similar statements in other SEC filings, including press releases filed on Form 6-K.  *See, e.g.*, 5/26/15 press release filed on Form 6-K on 5/27/15 ("Weili Su ... commented [on 1Q15 results], 'We are pleased with our first quarter financial and operational results.  We saw top line growth both year-over-year and sequentially, driven by strong electricity sales in Japan. We connected 26.4 MW in Japan during the quarter and it remains one of our most important markets.  We also continue to make strides in the Latin American market.... The growth in electricity sales was primarily due to the connection of additional solar parks in Japan and

Canada....  The growth in revenue from solar energy system and other sales was primarily due to increased permit sales in Japan to a joint venture where we are a minority shareholder.'"); 9/21/15 release filed on Form 6-K 9/23/15 (announcing strategic partnership with Hudson Clean Energy Partners to fund solar projects in Chile and Japan, including for secondary market opportunities in Japan; and quotes Hudson's founder and managing partner as saying Sky Solar has "developed a portfolio of high-quality solar projects in attractive markets such as Chile, Uruguay and Japan"); 11/24/15 release filed on Form 6-K 11/24/15 (stating Sky Solar was "targeting key solar markets globally; particularly Japan, Latin America and the US," discussing two new agreements investing in Japan, and noting that increased expenses were "primarily due to continued investment to support Sky Solar's growth initiatives in key markets, such as Japan," and that "The Company had 36.0 MW of projects under construction at the end of the quarter, compared to 26.9 MW under construction as of June 30, 2015. All of the 36.0 MW of projects under construction are located in Japan"; and in total "had 1.3 GW of projects in various stages of development, which includes the projects under construction described above as well as 242.4 MW of shovel-ready projects and more than 1.0 GW of projects in pipeline [including] 103.3 MW of IPP assets in Latin America close to breaking ground"); 3/30/16 release, filed on Form 6-K 3/31/16 ("Our view on the attractiveness of the solar market remains unchanged and we continue to see profitable opportunities for growth in the US market and in Japan"; "we have one of the largest pipelines in the solar industry in Japan coupled with a sizeable operating portfolio that carries very limited debt;" "The Company had 28.2 MW of projects under construction as of December 31, 2015, compared to 36.0 MW under construction as of September 30, 2015. All of the 28.2 MW of projects under construction are located in Japan"); 5/15/17 press release, filed the same day on Form 6-K ("We expect significant growth in the United States, Uruguay and Chile and

continue to build out our existing pipeline in Japan;" "The increase in SG&A expenses was due to expansion in key markets such as Japan, the United States and Latin America;" noting higher margins in Japan than North and South America, and "20.9 MW [of project[s] under construction] in Japan.").

266.   Sky Solar made similar reassuring statements in conference calls.  *See, e.g.*, 3/17/15 4Q14 conference call ("The Feed-in Tariff for FIT 4 is going to be JPY27 per kilowatt power and we have already negotiated various land lease and land purchase agreement with the landlords in Japan, which can give us another visibility of another 330 megawatts to 350 megawatts of FIT 4 opportunity;" discussion of financing for new projects in Chile).  Sky Solar also reassured investors on conference calls that it was well-prepared to manage any curtailments by electricity providers by being able to accelerate construction and connection and selling electricity earlier to avoid curtailment in the first place, monitoring and calibrating volume, and even taking advantage of secondary market asset acquisition opportunities.  *See, e.g.*, 3/17/15 4Q14 earnings conference call; *see also* 6/17/16 earnings conference call ("we are exploring ways to maximize value with our portfolio of operating assets and pipeline, particularly as it relates to our operating assets in Japan.... We currently have additional 24.1 megawatt under construction in Japan;" "Electricity sales in Asia were up 143.5% year-over-year and 28.6% sequentially, primarily due to revenue contributed by the solar parks in Japan that were connected during the year;" Sky Solar CIO Sanjay Shrestha responded to analyst question, "are you seeing any risk to the portfolio in terms of feed-in tariff permits [in Japan]?" with "No, we're not. ... One, we now have almost 84 megawatt connected, right and most of those are FIT 1 and most of our again -- and again we've always -- what's going [ph] and I think a pretty good breakdown of these are shovel ready permit what is in the advanced stages.  So we have well over another 100 megawatt

that is frankly in the shovel ready status, some FIT 1 and some FIT 2. So, going forward in the bidding process, what happens to overall policy outcome is that FIT 5 is that an option mechanism overall return in that market, that I think it's a different topic, but as it relates to what we view as our shovel ready permits and our operating assets in Japan, we do not see any risk associated with that;" "Latin America ... remains a very important geographic region for us [and w]e remain positive about our overall outlook in this market. Again, our focus is really in Uruguay and Chile, as it relates to Latin America [and we're] evaluating the right timing to further develop our projects in Chile, as we believe we can generate attractive returns with an optimized design and cost structure").

267.    Analysts also issued reports echoing the Company's positive statements in particular about Japan.  *See, e.g.*, 3/31/16 Oppenheimer report, with an "Outperform" rating (applauding the Company's "clearly appropriate" strategic review to monetize certain assets in Japan, noting "With 389MW of permits of projects in Japan (11MW in FIT 1, 135 in FIT 2, and 143 in FIT 3), we estimate the potential profit from the portfolio at $700M-$1B+" with potential "additional upside to that number"); 4/1/16 Roth report, with a "Buy" rating (reporting that "SKYS expects to connect 28MW in Q1'16 (all Japanese FIT1)" and noting among "Key Takeaways": "(2) Attractive capital recycling opportunities in Japan. With one of the largest solar footprints in Japan (operating assets & pipeline), SKYS's operating assets are 'meaningfully under-levered.' We believe recycling capital out of Japan can serve as a key near-term catalyst for the company.").

## VIII.   CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

### COUNT I

**Violations of Section 11 of the Securities Act Against
Sky Solar, the Individual Defendants and the
Underwriter Defendants**

268.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  With respect to this Count, Plaintiffs exclude allegations that could be construed as alleging fraud or intentional misconduct, as this Count is based solely on claims of strict liability.

269.    This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class of persons who purchased Sky Solar's ADSs pursuant or traceable to the Registration Statement, against Sky Solar, the Individual Defendants and the Underwriter Defendants.  Plaintiff Barilli and other members of the Class purchased or otherwise acquired Sky Solar's ADSs pursuant or traceable to a materially untrue Registration Statement and are not subject to any affirmative defenses.   Barilli did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained therein.

270.    The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

271.    Sky Solar is the registrant for the IPO.  The Individual Defendants named herein signed the Registration or were otherwise responsible for the contents and dissemination of the Registration Statement.

272.    As issuer of the shares, Sky Solar is strictly liable to Plaintiffs and the Class for the misstatements and omissions.   Sky Solar, the Individual Defendants, and the Underwriter

Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

273.    Defendants are not entitled to an affirmative defense of due diligence.  None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.  This claim is not based on and does not sound in fraud.  For purposes of asserting this claim under the Securities Act, Plaintiffs do not allege that the defendants named in this count acted with scienter or fraudulent intent, which is not an element of a §11 claim.

274.    By reasons of the conduct herein alleged, each Defendant violated §11 of the Securities Act.

275.    Plaintiff Barilli and the Class have sustained damages. The value of Sky Solar ADSs has declined substantially subsequent to the IPO.

276.    The measure of damages for violation of §11 of the Securities Act, pursuant to §11(e) thereof, is "the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit, or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and the value thereof as of the time such suit was brought."  However, defendants have an affirmative defense that "if the defendant proves that any portion or all of such damages represents other than the depreciation in value of such security resulting from such part of the

registration statement, with respect to which his liability is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading, such portion of or all such damages shall not be recoverable, under §11(e) of the Securities Act."

277.   Here, the facts do not support an affirmative defense on damages.

278.   Under the Securities Act, the statute of limitations is an affirmative defense that is not supported by the facts.   In any event, less than one year elapsed between the time that Plaintiffs discovered or reasonably could have discovered by the exercise of reasonable diligence the facts upon which this complaint is based and the time that the first complaint was filed asserting claims against these Defendants arising out of the falsity of the Prospectus.   It was not until investors learned of Su's misconduct in June 2017 that they had reason to question the *bona fides* of the representations in the Prospectus.   Sky Solar's businesses were almost exclusively conducted in foreign countries and foreign languages.   The investigation of securities claims without the benefit of discovery is in any environment difficult, but with respect to Sky Solar's businesses is particularly time consuming, arduous, and expensive.   Less than three years elapsed between the time that the securities at issue were *bona fide* offered to the public and the time that the first complaint was filed against these Defendants asserting claims arising out of the Registration Statement.

## Failure to Disclose Information Required Under Items 303 and 503 of SEC Regulation S-K

279.   Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303 ("Item 303") requires the Registration Statement to describe "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."   17 C.F.R. §229.303(a)(3)(ii).

280.    The Prospectus failed to disclose the known trends or uncertainties with respect to the facts alleged in this complaint, including with respect to the Japanese regulatory environment, the lack of capacity on the Chilean grid, the inability of Sky Solar to raise financing, and the insufficiency of Sky Solar assets to build out the network. Additionally, Item 503 of SEC Regulation S-K, 17 C.F.R. §229.503 ("Item 503"), required the Prospectus to include, among other things, a "discussion of the most significant factors that make the offering speculative or risky." 17 C.F.R. §229.503(c). Although the Registration Statement included a discussion of risk factors, as described above, it was materially incomplete and therefore misleading.

281.    Nowhere in the Registration Statement did Sky Solar disclose these material facts which it was required to do under Item 503. Among other things, the Prospectus did not disclose that one of the most significant factors that made the IPO speculative or risky to investors was Defendant Su's numerous monetary enforcement obligations of approximately $44 million ordered by various courts in China prior to the IPO. Su's history of avoiding debt was material information that a reasonable investor would have wanted to know in connection with an investment in Sky Solar.

## COUNT II

### Violations of Section 15 of the Securities Act Against Su, Zhang and Wang

282.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein. With respect to this Count, Plaintiffs exclude allegations that could be construed as alleging fraud or intentional misconduct, as this Count is based solely on claims of strict liability and/or negligence.

283.    Defendants Su, Zhang and Wang, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling

persons of Sky Solar within the meaning of §15 of the Securities Act. Defendants Su, Zhang and Wang had the power and influence and exercised the same to cause Sky Solar to engage in the acts described herein.

284.   The positions of Defendants Su, Zhang and Wang made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiffs and the Class.

285.   By virtue of the conduct alleged herein, Defendants Su, Zhang and Wang are liable for the aforesaid wrongful conduct and are liable to Plaintiffs and the Class for damages suffered.

286.   Less than one year elapsed between the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based and the time that the first complaint was filed against these Defendants asserting claims arising out of the falsity of the Registration Statement.  Less than three years elapsed between the time that the securities at issue were bona fide offered to the public and the time that the first complaint was filed against these Defendants asserting claims arising out of the Registration Statement.

## IX.   EXCHANGE ACT CLAIMS

### A.   Nature of the Action

287.   Plaintiffs assert claims against Sky Solar and the Management Defendants, Weili Su and Jianmin Wang, pursuant to Sections 10(b) and 20(a) of the Exchange Act and Rule 10(b)-5 promulgated thereunder.

288.   Throughout the Class Period, as part of the Company's corporate governance policy and its push into the Chinese market, the Exchange Act Defendants consistently represented that "[a] director may vote in respect of any contract or transaction in which he or she is interested, provided that the nature of the interest of any directors in such contract or transaction

is disclosed by him or her at or prior to its consideration and any vote in that matter" (2014 Form 20-F at 92; 2015 and 2016 Form 20-Fs at 108) and that "any acquisition of businesses, solar parks or other assets from related parties or independent third parties" (12/22/14 Press Release) must be approved by the Company's "rigorous control procedures and corporate governance procedures" (4Q 2014 Call), which consisted of approval by "all of the Company's independent directors" of the Audit Committee.  (12/22/14 Press Release).   Specifically, when the Company announced "the establishment of legal and operational entities to enter the China market," it represented to the market that its "strong internal controls [will] ensure that any related-party transaction will occur at a fair market price." *Id.*

289.    However, unbeknownst to investors, Sky Solar's corporate governance procedures and internal controls were severely lax and deficient, enabling defendant Su to steal at least $15 million of Sky Solar's assets through related party transactions.  Without the proper oversight and authorization from the Company or its Audit Committee, defendant Su was able to utilize his complex web of controlled entities, which were intertwined with other entities controlled by Defendant Su or individuals affiliated with him.  Further, Sky Solar's investors were not informed of defendant Su's troubled past that the Company omitted in its SEC filings, including monetary enforcements of $44 million ordered against him by various courts in China prior to the Class Period.  Defendant Su's history of avoiding debt was material information that a reasonable investor would have wanted to know in connection with an investment in Sky Solar.

290.    As evidence of the ineffectiveness of the Company's corporate governance procedures and internal controls, in October 2016, undisclosed to investors, Sky Solar's Board approved a material transaction where Sky Solar paid a related service fee of $4.2 million to a former managing director of the Company, and in exchange the former managing director

transferred $800,000 of Sky Solar ordinary shares to a company controlled by defendant Su "for no consideration." 2016 Form 20-F.

291. The transaction was referenced in footnote 1, page 91 ("October 2016 Transaction"), of the 2016 Form 20-F. The disclosure raised questions concerning the *bona fides* of the transaction. *See* ¶ 119.

292. Through a series of disclosures over nearly four months, from June 6, 2017 through September 28, 2017, the Company revealed defendant Su's theft of assets and the true nature of Sky Solar's corporate governance, which was wholly deficient and ineffective.

      **B.**     **Substantive Allegations**

         **1.**     **Weili Su's Troubled Past**

293. Sky Solar's SEC filings starting with the Prospectus, 2014 Form 20-F; 2015 Form 20-F; 2016 Form 20-F (collectively "Form 20-Fs"), disclosed an arbitration action commenced with the Hong Kong International Arbitration Centre in March 2015 by a group of former employees and shareholders of Sky Solar "against our chairman and certain other shareholders in connection with the restructuring of Sky Solar Holdings Co., Ltd." However, the Company failed to discuss in its public filings defendant Su's other legal proceedings against him prior to and during the Class Period, or the similar dispute he had with the Confidential Witness concerning share ownership.

294. Consistent throughout Sky Solar's Form 20-Fs, the Company described defendant Su as "the founder of our company," and the "chairman of the board since October 2009." Defendant Su was represented to be "primarily responsible for our strategic planning, business operation and overall management."  However, the Company's SEC filings failed to disclose Defendant Su's various legal proceedings in China including several monetary enforcements.

Based on litigation records in China, at least seven judgments, totaling approximately $44 million, were entered against defendant Su prior to the Class Period which were not disclosed in the Company's Form 20-Fs. *See supra* ¶¶ 91-93.

295.    The following five additional civil judgments entered against defendant Su were in connection with his interests in other affiliated entities.   Through these five civil judgments, defendant Su's interests were ordered frozen or monetary judgments were enforced against him by respective courts:

> i.    May 15, 2017: Freezing Defendant Su's 90% ownership interest of Beijing Sky Solar Investment Management Co. Ltd. from May 15, 2017 through May 14, 2020 by the Shanghai Fengxian District People's Court.   Consequently, on May 22, 2017, Beijing Sky Solar Investment Management Co. Ltd. transferred its 54% ownership interest in Changzhou Sky Solar to Changdu Tianlian Junzhi New Energy Development Co. Ltd.  *See supra* ¶ 87.
>
> ii.    May 24, 2017: Freezing of Defendant Su's shares worth RMB 50,000,000 ($7,557,081.06) in a company, from May 24, 2017 through May 23, 2020 by the Shanghai Fengxian District People's Court.
>
> iii.    June 13, 2017: Freezing of Defendant Su's shares in a company, from June 13, 2017 through June 12, 2019 by the Beijing Third Intermediate People's Court.
>
> iv.    June 14, 2017: Freezing of Defendant Su's shares worth RMB 50,000,000 ($7,557,081.06) in a company, from June 14, 2017 through June 13, 2020 by the Beijing Third Intermediate People's Court.
>
> v.    June 20, 2017: Freezing of Defendant Su's shares in a company, from June 20, 2017 through June 19, 2020 by the Beijing Third Intermediate People's Court.

296.    In total, with the $44 million debt obligations prior to the Class Period, and the additional freezing of equity interests of approximately $14.6 million since May 2017, defendant

Su has had approximately $58.6 million of enforcement judgments entered against him by multiple courts in China.

297.    Su's improper behavior was not limited to China and started long before the IPO, where he developed a reputation for avoiding creditors and transferring assets and revenues to related entities. ¶ 96.  According to the Confidential Witness, Su had a history of corruption in Germany.  For example, in 2010, Su and a business associate, Rudolf Ignaszak caused Deutschland to purchase inventory for a solar module and inverter trading business but had a trading company called Sky Solar International Trading GmbH ("Sky Solar International") issue invoices for the resale of that inventory and receive payment for the sale of the solar modules and inverters. ¶ 101.  On November 18, 2010, when the Confidential Witness expressed to Su that Deutschland was entitled to the €2.3 million profit of Sky Solar International, Su responded to the Confidential Witness that "[t]he business corporation and business allocation with the Sky Solar group is determined by myself" and demanded that the Confidential Witness "do not go any further in the historical transactions between SSD and the trading company."  ¶¶ 102-104. According to the Confidential Witness, Sky Solar's outside counsel at that time told him that Su's conduct by using Sky Solar International to operating Deutschland's trading business was a "100% breach of trust."  ¶ 105.  A few months later in January 2011, to avoid creditors, Su orchestrated the sale of Sky Solar's equity interest in Deutschland to one of his closest associates, Minquan Fu, for one euro.  *See* ¶¶ 96-98.  After the sale, the assets of Deutschland were transferred back to subsidiaries of Sky Solar.  *See* ¶ 99.

## C.    Materially False and Misleading False and Misleading Statements Issued

298.    Sky Solar's Non-Rigorous Corporate Governance Guidelines. Throughout the Class Period, the Company consistently represented how rigorous its "control procedures and

corporate governance procedures" and internal controls were which included the First Amended and Restated Articles of Association ("Articles of Association"); and the Code of Business Conduct and Ethics ("Code of Ethics"); Cayman Islands law; the Audit Committee; and the Nominating and Corporate Governance Committee (hereinafter sometimes referred to as "Corporate Governance Procedures").  *See supra* ¶¶ 134-140.  The Articles of Association and Code of Conduct were filed as exhibits to the Registration Statement and {18-25} the statements in those documents are incorporated by reference herein.  *See* Exhibits 3.2 and 99.1 of the Registration Statement dated September 18, 2014.

299.    Indeed, as part of Sky Solar's corporate governance policy, the Company represented in the Prospectus that "a director of a Cayman Islands company is in the position of a fiduciary with respect to the company and a director is required to exercise a duty of care, {10} a duty to act bona fide in the best interests of the company, a duty not to make a profit based on his or position as director (unless the company permits him to do so) and a duty not to put himself in a position where the interests of the company conflict with his or her personal interest or his or her duty to a third party.  A director of a Cayman Islands company also owes to the company a duty to act with skill and care."  Sky Solar's corporate governance policy continued as the Company represented in the Prospectus, "Under our first amended and restated memorandum and articles of association, subject to any separate requirement for audit committee approval under the applicable rules of the NASDAQ or unless disqualified by the chairman of the relevant board meeting, {11} so long as a director discloses the nature of his interest in any contract or arrangement which he is interested in, such a director may vote in respect of any contract or proposed contract or arrangement in which such director is interested and may be counted in the quorum at such a meeting."

300.    The Prospectus also represented that the Company's "nominating and corporate governance committee is responsible for, among other things:"

- identifying and recommending to the board nominees for election or reelection to the board, or for appointment to fill any vacancy;

- reviewing annually with the board the current composition of the board in light of the characteristics of independence, age, skills, experience and availability of service to us;

- {12} advising the board periodically with respect to significant developments in the law and practice of corporate governance as well as our compliance with applicable laws and regulations, and making recommendations to the board on all matters of corporate governance and on any corrective action to be taken; and

- {13} monitoring compliance with our code of business conduct and ethics, including reviewing the adequacy and effectiveness of our procedures to ensure proper compliance.

301.    The Company represented in the Prospectus that its "audit committee is responsible for, among other things:"

- selecting our independent registered public accounting firm and pre approving all auditing and non-auditing services permitted to be performed by our independent registered public accounting firm;

- reviewing with our independent registered public accounting firm any audit problems or difficulties and management's response;

- {14} reviewing and approving all proposed related party transactions, defined as those transactions required to be discussed pursuant to Form 20-F, Item 7.8 and NASDAQ Listing Rule 5630(a);

- discussing the annual audited financial statements with management and our independent registered public accounting firm;

- {15} reviewing major issues as to the adequacy of our internal controls and any special audit steps adopted in light of significant control deficiencies;

- annually reviewing and reassessing the adequacy of our audit committee charter;

- such other matters that are specifically delegated to our audit committee by our board of directors from time to time; and

- meeting separately and periodically with management and our internal auditor and independent registered public accounting firm.

302.     During the Class Period, the Company filed three Form 20-Fs ("Form 20-Fs") with the SEC on April 29, 2015 ("2014 Form 20-F"), May 2, 2016 ("2015 Form 20-F") and May 15, 2017 ("2016 Form 20-F"), for the years ended December 31, 2014, 2015 and 2016, respectively. The Company's Articles of Association and Code of Ethics are incorporated by reference in the Form 20-Fs.    The Code of Ethics is publicly available on Sky Solar's website at http://media.corporate-ir.net/media_files/IROL/25/253697/Code_of_Business_Conduct_and_Ethics%20without%20certificate.pdf.

303.     In regard to interested transactions, the Company's Prospectus and Form 20-Fs consistently represented that a {11} "<u>director may vote in respect of any contract or transaction in which he or she is interested, provided that the nature of the interest of any directors in such contract or transaction is disclosed by him or her at or prior to its consideration and any vote in that matter</u>."

304.     The Form 20-Fs consistently represented, in part, the duties of its directors:

Under Cayman Islands law, {71} <u>our directors have a fiduciary duty to act honestly, in good faith and with a view to our best interests</u>.   Our directors also have a duty to exercise the skill they actually possess and such care and diligence that a reasonably prudent person would exercise in comparable circumstances.   In fulfilling their duty of care to us, {72} <u>our directors must ensure compliance with our memorandum and articles of association, as amended and restated from time to time</u>.   A shareholder has the right to seek damages if a duty owed by our directors is breached.

305.     The Form 20-Fs also represented that the Company's "nominating and corporate governance committee is responsible for, among other things:"

- identifying and recommending to the board nominees for election or reelection to the board, or for appointment to fill any vacancy;

- reviewing annually with the board the current composition of the board in light of the characteristics of independence, age, skills, experience and availability of service to us;

- {12} advising the board periodically with respect to significant developments in the law and practice of corporate governance as well as our compliance with applicable laws and regulations, and making recommendations to the board on all matters of corporate governance and on any corrective action to be taken; and

- {13} monitoring compliance with our code of business conduct and ethics, including reviewing the adequacy and effectiveness of our procedures to ensure proper compliance.

306.    To address material weakness and control deficiencies identified in preparation and external audit of its consolidated financial statements for the year ended December 31, 2013, Sky Solar represented in the 2014 Form 20-F that it took or was "planning to take a number of measures," including

    (i) hiring additional accounting personnel with experience in IFRS and SEC reporting requirements, especially at the regional level; (ii) providing regular training on an ongoing basis to our accounting personnel that covers a broad range of accounting and financial reporting topics; (iii) developing and applying a comprehensive manual with detailed guidance on accounting policies and procedures as well as procedures for maintenance and retention of accounting and financial records; (iv) {16} forming an internal audit department, which will directly report to the audit committee; and {17} (v) forming an audit committee which consists of independent directors to oversee the operation of our finance department, and to approve all related party transactions and other significant transactions.

307.    The Form 20-Fs for years 2015 and 2016 similarly represented the Company's remediation actions and plans to address Sky Solar's material weaknesses and other control deficiencies, by among other things, forming {17} "an audit committee, which consists of independent directors to oversee the operation of our finance department and to approve all related party transactions and other significant transactions."

308.    The Form 20-Fs also consistently represented that its "audit committee is responsible for, among other things:"

- {14} <u>reviewing and approving all proposed related party transactions, defined as those transactions required to be discussed pursuant to Form 20-F, Item 7.8 and NASDAQ Listing Rule 5630(a);</u>

          ***

- {15} <u>reviewing major issues as to the adequacy of our internal controls and any special audit steps adopted in light of significant control deficiencies.</u>

309.    In respect to related party transactions, the Form 20-Fs represented that the Company's audit committee charter {73} "<u>requires that the audit committee review all related party transactions on an ongoing basis and that all such transactions be approved by the committee.</u>"

310.    The Form 20-Fs were signed by Defendant Su and contained signed certifications pursuant to SOX by Defendants Su and Wang, stating that the financial information contained in the Form 20-Fs was accurate and disclosed any material changes to the Company's internal control over financial reporting.   The SOX certifications represented in relevant part, the following:

(a)    {74} <u>All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting</u> which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

(b)    {75} <u>Any fraud whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.</u>

## 1.    Defendant Su's Credentials

311.    The Form 20-Fs positively represented Defendant Su's background and credentials as being {1} "<u>a successful businessman</u> and founder of" Chinese solar companies, and with "investments in Europe," he "began to develop renewable energy power parks in Germany, the

Czech Republic and Spain." *See supra* at ¶¶ 79-81.  In defendant Su's biographical information in the Form 20-Fs, Sky Solar represented that he has "over 13 years of working experience in the solar power industry" and is "the founder of our company."  Further, defendant Su "is primarily responsible for [Sky Solar's] strategic planning, business operation and overall management."  Significantly, the Company represented in the Form 20-Fs that the {3} "<u>industry experience, expertise and contributions of our chairman and chief executive officer, Mr. Weili Su, are essential to our continuing success</u>."

### 2. Sky Solar's Push Into the Chinese Market With Its Flawed Corporate Governance Guidelines

312.    On December 22, 2014, Sky Solar announced in a press release, a push into the Chinese solar market on the representation "that the country is a high-priority growth opportunity due to its large size and rapidly growing renewable energy sector, as well as the Company's own extensive knowledge of the market."  As part of Sky Solar's push into the China market, the "Company's board of directors approved the establishment of legal and operational entities to enter the China market, and authorized the Company's management team to evaluate acquisition targets to build the operating assets in China."

313.    Significantly, the Company's targets in China included "solar park and [engineering, procurement and construction services ("EPC")] assets owned by private entities controlled by the Company's Chairman, Mr. Weili Su, which own 165 MW of projects in operation and under construction and 4.9 GW of projects in various stages of development."  In the press release, the Company specifically pointed out that it was "evaluating a potential acquisition of Changzhou Sky Solar New Energy Technology Co., Ltd. ("Changzhou Sky Solar")," a related entity controlled by Defendant Su.

314.    As part of the Company's Corporate Governance Procedures, Sky Solar represented in the press release that {76} "a majority of the Company's directors, including all of the Company's independent directors, must approve any acquisition of businesses, solar parks or other assets from related parties or independent third parties."   Moreover, the Company represented that its {77} "strong internal controls ensure that any related-party transaction will occur at a fair market price" as the Board's approval will be {78} "based on a myriad of factors including but not limited to IRR, technical specifications of the solar project (including sun irradiation hours, components and performance guarantees) and technical, financial and legal due diligence."   Further, "under the Company's Guidelines, two-thirds of all shareholders must also approve certain purchases from related parties that are individually or in the aggregate over the last twelve months equivalent to 20% or more of the Company's market capitalization."

315.    The Company reiterated in the December 22, 2014 press release that given Changzhou Sky Solar is a related entity controlled by Defendant Su, {79}  "the acquisition would need to be approved under the Company's strict Corporate Governance Guidelines."

### 3.    2014 Earnings Call

316.    On March 17, 2015, before the market opened, the Company held a conference to discuss its financial results for the year ended December 31, 2014 ("4Q 2014 Call").

317.    Sky Solar, through its Chief Strategy Officer, Yi Zhang, represented that the Company was {80} "evaluating some assets owned by Sky China, by their Chairman, Mr. Su and his affiliates" as they {81} "are natural opportunities, given our historical relationship" with defendant Su.  Accordingly, the Company, through Zhang represented that {82} "any acquisition of related party assets must be approved by our rigorous corporate governance procedures and we

will do our best to deliver value to our shareholders in any transaction with our Chairman or other potential sellers."

318.   During the question and answer session of the call, an analyst from Northland Capital Markets asked about the "Company's process for evaluating assets from the Chairman's portfolio" as "it would be very helpful for everyone to understand how that process works…."

319.   Defendant Wang explained the Company's {83} "rigorous control procedures and corporate governance procedures put in place:"

> So in short, we were requested by the Independent Director to provide to the Independent Director a full valuation for the assets and also the Audit Report for the assets as well.  We're also looking for a third-party consultant or DD report, and {84} all these information will be summarized and presented to Independent Director for review and approval.  If the total acquisition for the project reached certain threshold, it will request two-third the shareholders' approval for the transactions.  So, this is the corporate governance procedures we have put in place.

### 4.   Q1 2015 Earnings Call

320.   On May 26, 2015, before the markets opened, the Company held a conference call to discuss its financial results for the quarterly period ended March 31, 2015.  Sky Solar, through Zhang, represented that it had "already set up the platform for our China operations and future acquisitions and the Sky Solar management team is evaluating acquisition opportunities and project financing."   Sky Solar, through Zhang represented Sky Solar's purported rigorous corporate governance policy, {85} "We still remain selective in our approach as we evaluate our acquisition opportunities and all potential targets will have to meet our rigorous investment standards and corporate governance procedures."

321.   The Exchange Act Defendants' foregoing statements were materially false and misleading for the following reasons: (1) ¶¶ 298-300; 302-306; 310; 312-320: the Company's

Corporate Governance Procedures and internal controls were deficient and ineffective (a) to detect and/or prevent theft of the Company's assets through related-party transactions by defendant Su, (b) as defendant Su had severe conflicts of interest based on his complex ownership of related entities including his control over Changzhou Sky Solar which was controlled by individuals or entities closely affiliated with defendant Su, including his sister, in violation of the conflict of interest policy of the Code of Ethics, and (c) as defendant Su had a history of failing to pay his indebtedness and could not be trusted with access to Sky Solar's assets; (2) ¶ 311: the Company failed to disclose that defendant Su, a key employee of Sky Solar, had numerous monetary enforcement obligations of approximately $44 million, and other unethical and illegal conduct which were material information that a reasonable investor; (3) ¶¶ 301; 307-309: the Audit Committee failed to review, approve or authorize (a) certain related-party transactions and fund transfers between the Company and certain entities controlled by defendant Su; and (b) various debt assignment agreements that were signed among the Company, certain third parties, and certain entities controlled by defendant Su.

### D.     The Truth Slowly Emerges

322.     On April 28, 2017, the Company filed a Form 12b-25 with the SEC, disclosing "a delay in preparing the Form 20-F and the audited financial statements required in the Form 20-F for the year ended December 31, 2016 and [that it] needs additional time to complete the Form 20-F and the audited financial statements for the year ended December 31, 2016."

323.     On June 2, 2017, Sky Solar announced the resignation of Arthur (Lap Tat) Wong as an independent director of the Company.

324.     On June 6, 2017, shortly before the markets closed, Sky Solar issued a press release disclosing the replacement of Su as the Chairman of the Board with Hao Hu.

Significantly, the Company disclosed that Su will "no longer serve as the Company's Chief Executive Officer, or as director, officer, manager, legal representative or in any other management position of the Company's subsidiaries or any other consolidated entities."   In addition, the Company announced the resignation of Andrew Y. Yan as an independent director of the Company, and replaced by Glen Wei.

325.     On this news, the Company's ADS price fell $0.02, or 1.06%, to close at $1.87 on June 7, 2017.

326.     On June 9, 2017, the Company announced the appointment of Qiang Zhan as an independent director of the Company.

327.     On Tuesday, June 13, 2017, shortly before the market closed, Sky Solar issued a press release entitled "Sky Solar Announced Intended Formation of Independent Committee to Investigate the Conduct of Former CEO."   The press release disclosed "that after reviewing certain conduct of its former Chief Executive Officer Mr. Weili Su, its Management Committee intends to recommend to the board that it form a committee to investigate the conduct."

328.     Following this news, Sky Solar's ADSs temporarily ceased trading.

329.     On June 15, 2017, after the market opened, the Company disclosed that the independent committee will "investigate the conduct of its former Chief Executive Officer Mr. Weili Su" involving "certain transactions and fund transfers which appear to lack proper board and audit committee authorizations" and their impact on the Company.

330.     When trading resumed, on June 15, 2017, Sky Solar's ADS price fell $0.19 or more than 10%, to close at $1.66 on June 15, 2017.

331.     On June 16, 2017, before the market opened, the Company announced the resignation of Glen Wei as an independent director of the Company, who was replaced by Mr.

Xuelong Pei ("Pei") as an independent director.  Pei was also appointed as a member of the audit committee, compensation committee and nominating and corporate governance committee.  In addition, the Company announced the establishment of an independent committee, consisting of Qiang Zhan and Pei.

332.    Following this news, Sky Solar's ADS price fell $0.28 or nearly 17%, to close at $1.38 on June 16, 2017.

333.    Sky Solar's ADS declined an additional $0.31 or 22% for the next two trading sessions, to close at $1.07 on June 20, 2017.  Cumulatively, Sky Solar's ADS declined $0.78 or 42% over the four day trading sessions.

### E.    Post-Class Period Events

334.    On July 10, 2017, before the market opened, Sky Solar announced the appointment of Naiwei Chen as an independent director and a member of its nominating and corporate governance committee.

335.    On July 28, 2017, before the market opened, the Company announced the approval by its shareholders of the resignations of Huang Lida and Yan as independent directors of the Company effective June 1, 2017.  Importantly, the Company disclosed that its shareholders rejected resolutions to remove Defendant Wang as the Company's CFO, director and secretary of the Board, and replace Defendant Wang with Wu as the CFO.

336.    On September 19, 2017, before the market opened, Sky Solar announced the conclusion of the independent committee's investigation into defendant Weili Su.  Specifically, the independent committee "concluded that certain transactions and fund transfers between the Company and certain entities controlled by Mr. Su were not approved by the board or the audit committee.  In addition, there was insufficient documentary support of such fund transfers."

Moreover, Sky Solar disclosed the following in respect to a settlement agreement of $15 million between Sky Solar and defendant Su:

> On September 19, 2017, the Company entered into a settlement agreement with Mr. Su to resolve all potential claims by the Company against Mr. Su and certain entities controlled by him concerning the fund transfers, as well as all potential claims that Mr. Su and such entities may have against the Company in connection with Mr. Su's employment at the Company.  Under this agreement, various debt assignment agreements signed among the Company, certain third parties, and certain entities controlled by Mr. Su in April 2017 shall have no effect and be rescinded immediately; and  Mr. Su agrees to pay back to the Company approximately US$15 million and failing this, authorize the Company to sell on behalf of him and /or transfer to the Company the American depositary shares that he holds in the Company to pay for such settlement amount.

337.    On September 28, 2017, during the day, the Company held a conference call to discuss financial results for the first half of 2017.  During the question and answer session, an analyst with Roth asked for details about "the transactions and fund transfers that did not receive board and audit committee authorization."  In response, the Chairman of the Board Hao Wu stated that the "details are—I think it's confidential at the moment."   Also, Wu stated that "the conclusion is very clear, that these transactions and fund transfers" lacked "audit committee authorization" and "there was insufficient documentation support of such fund transfer."  With respect to the $15 million agreement with Su, Wu disclosed the Company's cash balance as of June 30, 2017, should be $15 million higher.

338.    However, what is critically missing for Sky Solar investors, is an official report or any documentation related to the internal investigation by Sky Solar's independent committee detailing defendant Su's misconduct including material information in connection with the unauthorized related party transactions and fund transfers that resulted in theft of the Company's assets, or material information whether there were any transactions reviewed other than the April 2017 transactions that were referenced in the settlement agreement.

F.    **Additional Scienter Allegations**

339.    Throughout the Class Period, the Management Defendants held themselves out to investors as the persons most knowledgeable about Sky Solar's business and related-party transactions.  The Management Defendants voluntarily and repeatedly chose to speak on these issues during the Class Period.

340.    Throughout the Class Period, the Management Defendants had personal knowledge, and approved the Company's Articles of Association and the Code of Ethics, and their applicability to the Management Defendants as executives and/or directors of the Company. Indeed, the Code of Ethics "applies to all of the directors, officers, employees and advisors of the Company."

341.    In addition, the Management Defendants had personal knowledge of the jurisdiction of incorporation of Sky Solar, the Cayman Islands and its laws.  The Management Defendants had personal knowledge that the laws of the Cayman Islands require them as directors of Sky Solar to act as fiduciaries and that they are "required to exercise a duty of care, a duty to act bona fide in the best interests of the company, a duty not to make a profit based on his or position as director (unless the company permits him to do so) and a duty not to put himself in a position where the interests of the company conflict with his or her personal interest or his or her duty to a third party."  Further, the Management Defendants had personal knowledge that as directors, they "must ensure compliance with [Sky Solar's] memorandum and articles of association."  The Management Defendants had personal knowledge that Sky Solar had a policy in regard to interested transactions that a "director may vote in respect of any contract or transaction in which he or she is interested, provided that the nature of the interest of any directors in such contract or transaction is disclosed by him or her at or prior to its consideration and any vote in that matter."

342.    Sky Solar and the Management Defendants participated in a scheme to defraud investors by falsely representing that the Company had rigorous corporate governance procedures and internal controls.  The Management Defendants had personal knowledge that the Company's corporate governance procedures and internal controls were seriously flawed as the procedures failed to avoid and/or detect defendant Su's misconduct of conducting related party transactions without the authority of the Company's Board or audit committee which resulted in theft of the Company's assets.  The Management Defendants had personal knowledge of, or recklessly disregarded, the fraudulent scheme.

343.    The October 2016 Transaction is evidence of the deficiency and ineffectiveness of the Company's Corporate Governance Procedures and internal controls.  The Company's Board approved an extraordinary transaction where Sky Solar paid a related service fee of $4.2 million to a former managing director for what appeared to be a *quid pro quo* for a transfer of stock to a company controlled by defendant Su.  *See supra* ¶¶ 119; 290-291.  Accordingly, from at least October 2016 with respect to the $4.2 million transaction with the former managing director, made in conjunction with the $800,000 payment of stock to a company controlled by defendant Su, and subsequently with respect to the April 2017 theft of assets by defendant Su, the Management Defendants either knew or but for their reckless indifference to the truth, would have known, of Sky Solar's inadequate internal controls.

344.    While the transaction occurred October 2016, the Management Defendants failed to disclose material information about the transaction until Sky Solar filed its 2016 Form 20-F on May 15, 2017, eight months after the transaction occurred.  However, the Management Defendants, as the top executives of the Company, had ample opportunities to reveal material information about the October 2016 Transaction.  Through various SEC filings and press releases

issued by the Company, between November 15, 2016 and April 28, 2017, the Management Defendants had at least four separate opportunities to disclose material information about the October 2016 Transaction.

345.    Indeed, on November 16, 2016, the Company filed a Form 6-K signed by defendant Wang, enclosing three items as exhibits including a press release dated November 15, 2016 stating that Sky Solar "will hold its 2016 annual general meeting on December 20, 2016" and proposed the re-election of Arthur (Lap Tat) Wong, who had presumably approved the $4.2 million transaction as he was a director from the completion of the IPO in November 2014 through June 2, 2017, when he resigned as an independent director.

346.    On December 22, 2016, the Company filed a Form 6-K signed by defendant Wang, enclosing a press release as an exhibit dated December 22, 2016 where it announced results of its annual general meeting, including the re-election of Wong, who had presumably approved the $4.2 million transaction.

347.    On February 10, 2017, the Company filed a Form 6-K signed by defendant Wang, enclosing a press release as an exhibit dated February 8, 2017 where it announced financial results for the third quarter ended September 30, 2016 and provided "Business Updates (to date)." While, the Company listed four items as part of its business updates to date, it failed to include the October 2016 Transaction as part of the business update.

348.    On April 28, 2017, the Company filed a Form 12b-25 signed by defendant Wang, disclosing "a delay in preparing the Form 20-F and the audited financial statements required in the Form 20-F for the year ended December 31, 2016." However, Sky Solar failed to specify the cause of the delay, or whether the $4.2 million October 2016 Transaction was a contributing factor to the delay.

349.    In addition to the allegations set forth above, during the Class Period, Sky Solar and the Management Defendants had both the motive and opportunity to commit fraud.  As alleged herein, each of the Management Defendants acted with scienter in that they knew or recklessly disregarded that the public statements and documents issued and disseminated in the name of the Company or with the Company's assent were materially false and misleading, knew or acted with deliberate recklessness in disregard that such statements and documents would be issued and disseminated to the investing public, and knowingly and substantially participated and/or acquiesced in the issuance or dissemination of such statements and documents as primary violators of the federal securities laws.  In so doing, Sky Solar and the Management Defendants committed acts, and practiced and participated in a course of business that operated as a fraud or deceit on purchasers of Sky Solar's ADSs during the Class Period.

### 1.    Weili Su Acted with Scienter

350.    During the Class Period, Defendant Su was: (i) a founder of Sky Solar; (ii) the CEO of Sky Solar; (iii) the Chairman of the Board; (iv) a director; (v) Chairman of the Nominating and Corporate Governance Committee; (vi) Chairman of Changzhou Sky Solar; (vii) sole owner of Sky Solar Investment; (viii) 99% owner of Shenzhen Sky Solar; and (ix) exercised absolute control over many related and complex entities including Changzhou Sky Solar; Sky Solar Investment and Shenzhen Sky Solar.  Due to his status and positions in Sky Solar, Su had the opportunity to conduct the unauthorized related party transactions and fund transfers, and execute various debt assignment agreements "among the Company, certain third parties, and certain entities controlled by Mr. Su." Defendant Su had the motive as he was able to steal $15 million from the Company through the unauthorized related party transactions and fund transfers for the benefit of "certain entities controlled by Mr. Su" and himself.

351.    As disclosed by Sky Solar, defendant Su was replaced as the Chairman and removed as the Chief Executive Officer.  Defendant Su remains as a director of Sky Solar.  An independent committee "concluded that certain transactions and fund transfers between the Company and certain entities controlled by Mr. Su were not approved by the board or the audit committee."  Defendant Su acknowledged the unauthorized related party transactions and fund transfers, and agreed to settle with the Company and "pay back to the Company approximately $15 million" "to resolve all potential claims by the Company against Mr. Su and certain entities controlled by him concerning the fund transfers."  The settlement agreement of $15 million has not been paid back to the Company as defendant Wu confirmed that it will not be paid back until sometime "within 2018."

352.    In five separate enforcement actions in China between May 15, 2017 and June 20, 2017, Defendant Su's ownership interests, valued at approximately $14.6 million, were frozen by the Shanghai Fengxian District People's Court and Beijing Third Intermediate People's Court. The time frame of these five enforcement actions falls within almost the same time frame of the independent committee's investigation into the misconduct of Defendant Su.  There is a strong inference that these asset freezes, although not explained by the Company in its public statements, relate and are incremental to the disclosed subject matters of the "independent" investigation.

353.    Defendant Su had personal knowledge that the Company's corporate governance procedures and internal controls were seriously flawed as he served as Sky Solar's Chairman of the Nominating and Corporate Governance Committee and was able to circumvent these procedures.  As the Chairman and a member of the Nominating and Corporate Governance Committee, defendant Su was charged and responsible for, among other things, "monitoring

compliance with our code of business conduct and ethics, including reviewing the adequacy and effectiveness of our procedures to ensure proper compliance."

354.    Additionally, in his role as chief executive officer, Defendant Su signed certifications under Section 302 of the Sarbanes-Oxley Act of 2002 on April 29, 2015, May 2, 2016 and May 15, 2017 filed with the SEC as exhibits to the Company's annual reports, that indicated he reported to the Company's auditors and audit committee, "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting" of Sky Solar and "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting" of Sky Solar.  As set forth herein, these SOX certifications were materially false and Defendant Su either knew or was reckless in not knowing the related party transactions and fund transfers were without the authorization by the Board or the Audit Committee, and in violation of the Company's Corporate Governance Guidelines.

## 2.    Jianmin Wang Acted with Scienter

355.    Defendant Wang "is a professional accountant" with "extensive experience with financial services and accounting."  2016 Form 20-F, at 101.  As the Chief Financial Officer and Secretary of the Board since May 2011, and a director since October 2015, defendant Wang had personal knowledge of the Company's corporate governance procedures and internal controls, and their applicability to Sky Solar's executives and directors, as defendant Wang "leads the information and technology and corporate legal compliance function."  *Id*.  As the Chief Financial Officer and Secretary of the Board since May 2011 and a director since October 2015, defendant Wang was privy to any outside contracts or agreements made between the Company and related entities as he was in charge of the Company's "financial accounting and capital management aspects."  *Id*.  Given the fact that defendant Su controlled approximately 37 companies, defendant

Wang either knew or but for his deliberate recklessness should have known the true facts concerning the unauthorized related-party transactions between Sky Solar and entities controlled by Defendant Su.

356.   Defendant Wang had personal knowledge of the Company's Corporate Governance Guidelines as he made false and misleading statements concerning the Company's "rigorous control procedures and corporate governance procedures."   For example, during the conference call on March 17, 2015, defendant Wang represented that as part of the "corporate governance procedures we have put in place[d]" to evaluate assets from defendant Su's portfolio, "the Independent Director" will review and approve a related-party transaction by reviewing the "full valuation for the assets and also the Audit Report for the assets as well."

357.   Additionally, in his role as chief financial officer, Wang signed certifications under Section 302 of the Sarbanes-Oxley Act of 2002 on April 29, 2015, May 2, 2016 and May 15, 2017 filed with the SEC as exhibits to the Company's annual reports, that indicated he reported to the Company's auditors and audit committee, "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting" of Sky Solar and "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting" of Sky Solar. As set forth herein, these SOX certifications were materially false and Wang either knew or was reckless in not knowing that the Company was conducting related party transactions and fund transfers, without the authorization by the Board or the Audit Committee, and in violation of the Company's Corporate Governance Guidelines.

358.   Defendant Wang either knew or was reckless in failing to know of (i) the $4.2 million transfer to the managing director as a *quid pro quo* for a stock payment to a defendant Su

entity; and (ii) the unauthorized Defendant Su transactions that led to defendant Su's termination as Chairman and CEO.

359.    Defendant Wang, as the signatory of the Form 6-Ks and Form 12b-25 filed, from November 15, 2016 through April 28, 2017, and as the CFO of the Company, either knew or recklessly disregarded the October 2016 Transaction as the Company materially increased its administrative expenses from $22.6 million in 2015 to $29.7 million in 2016, "primarily due," in part to "the related service fee of US$4.2 million" as disclosed in the 2016 Form 20-F, a document that defendant Wang certified under SOX.

### 3.    Sky Solar

360.    As alleged herein, Defendant Su was acting in his capacity as the Chairman and Chief Executive Officer of Sky Solar when he had Sky Solar engage in related party transactions. Defendant Su acted with the requisite scienter attributable to the corporation, when as the Chairman and CEO for the Company, he knew about or recklessly disregarded the unauthorized related party transactions, evidencing either knowledge of the scheme or a reckless disregard of the fact that Sky Solar had conducted unauthorized related-party transactions with entities that he controlled which resulted in theft of the Company's assets.  Defendant Su also signed several SOX certifications attesting to the absence or full disclosure of any known frauds at that time, yet failed to include the unauthorized related party transactions which caused theft of the Company's assets alleged herein in the relevant SEC documents.

361.    Furthermore, during the Class Period, Wang acted with the requisite scienter attributable to the corporation.  Acting in his capacity as the CFO for the Company, he knew or recklessly disregarded that the Company's Corporate Governance Guidelines were deficient and ineffective to prevent theft of the Company's assets by unauthorized related party transactions, evidencing either knowledge of the scheme or a reckless disregard of the fact that Sky Solar was

conducting unauthorized related-party transactions with entities that Defendant Su controlled. Wang also signed several SOX certifications attesting to the absence or full disclosure of any known frauds at that time, yet failed to include the unauthorized related party transactions which caused theft of the Company's assets alleged herein in the relevant SEC documents.

362.    The scienter of Sky Solar's employees and agents (including Defendants Su and Wang) is imputed to Sky Solar under the doctrine of *respondeat superior* and common law principles of agency.

**G.    Loss Causation**

363.    As alleged herein, the Exchange Act Defendants either (i) actively engaged in a scheme to deceive investors during the Class Period by misrepresenting and omitting material facts concerning the Company's Corporate Governance Procedures; or (ii) upon learning of the Company's participation in the scheme, made no efforts to correct the misinformation placed into the market and instead perpetuated the falsity that the Company had engaged in no fraudulent acts.

364.    Relying upon the integrity of the market price of Sky Solar's ADSs and public information relating to the Company, Plaintiffs and the other Class Members purchased or otherwise acquired Sky Solar's ADSs at prices that incorporated and reflected Defendants' misrepresentations and omissions of material fact, as alleged herein.

365.    Plaintiffs and the Class suffered actual economic loss and were damaged when the foreseeable risks of the Exchange Act Defendants' fraudulent scheme and concealment by the Exchange Act Defendants' misstatements and omissions materialized through the public disclosure of defendant Su's misconduct in connection with unauthorized related-party transactions, through a series of partial disclosures.

366.    As alleged above in Section IX.D and in this section, these partial corrective disclosures and/or materializations of the foreseeable risks concealed by the Exchange Act Defendants' fraud caused foreseeable declines in the price of Sky Solar's ADSs by removing portions of the artificial inflation in the price of Sky Solar's ADSs that resulted from the Exchange Act Defendants' fraud.  The timing and magnitude of the declines in the price of Sky Solar's ADS is in response to the public disclosure of new, Company-specific news on each of the foregoing days, as alleged herein, negating any inference that the losses suffered by Plaintiffs and the Class were caused by changed market conditions or other macroeconomic factors unrelated to the Exchange Act Defendants' fraud.

367.    As set forth in detail above, a partial disclosure occurred on June 6, 2017, shortly before the markets closed.  The Company issued a press release disclosing the replacement of Defendant Su as the Chairman of the Board with Hao Wu, and revealed that Defendant Su will "no longer serve as the Company's Chief Executive Officer, or as director, officer, manager, legal representative or in any other management position of the Company's subsidiaries or any other consolidated entities."  In addition, Sky Solar announced the resignation of Yan as an independent director.

368.    As a direct and proximate result of the June 6, 2017 partial disclosure, the price of Sky Solar's ADS declined by approximately $0.02 or 1.06% on June 7, 2017, from $1.89 to $1.87.  The revelation that Defendant Su had been replaced by Hao Wu as the Chairman of the Board removed a portion of the artificial inflation cause by the fraudulent related-party transaction scheme from the price of Sky Solar's ADS.

369.    As set forth above, Sky Solar's disclosure on, June 13, 2017, shortly before the market closed, where Sky Solar revealed that its Management Committee intends to recommend

to the Board to form an independent committee to investigate Defendant Su's conduct, started a dramatic decline of Sky Solar's ADS for four consecutive trading sessions.

370.    Next, on June 15, 2017, the Company revealed that the independent committee will investigate the conduct of Defendant Su in respect to "certain transactions and fund transfers which appear to lack proper board and audit committee authorizations" and their impact on the Company.

371.    Following the disclosure on June 13, 2017, trading of Sky Solar's ADSs was temporarily halted.  When trading resumed on June 15, 2017, Sky Solar's ADS declined by $0.19 or more than 10%, from $1.85 to $1.66.  This decline was a direct and proximate result of the June 13 and 15, 2017 partial disclosures.  The revelation that the Company was going to form an independent committee to investigate Defendant Su's conduct, and then the additional revelation that the independent committee will investigate the conduct of Defendant Su in connection with certain transactions and fund transfers conducted without the proper board and audit committee authorizations, constituted partial disclosures.  In removing a portion of the artificial inflation caused by the fraudulent misconduct from the price of Sky Solar's ADS, they revealed that the Company's Corporate Governance Procedures and internal controls were deficient and that Sky Solar, through Defendant Su, had been an active participant in a related-party transaction scheme that had previously gone undisclosed to the investing public that resulted in theft of the Company's assets.

372.    As set forth in detail above, a partial disclosure occurred on June 16, 2017, before the market opened, when the Company revealed the resignation of an independent director, Gen Wei.

373.   As a direct and proximate result of the June 16, 2017 partial disclosure, the price of Sky Solar's ADS declined by $0.59 or 35.6% over three cumulative trading sessions.  In total, between June 15, 2017 and June 20, 2017, Sky Solar's ADSs declined $0.78 or 42%, from $1.85 to $1.07.  The revelation of the resignation of an independent director further removed a portion of the artificial inflation cause by the fraudulent scheme from the price of Sky Solar's ADS.

374.   A post-Class Period announcement related to the fraudulent scheme occurred before the market opened on September 19, 2017, when the Company announced the conclusion of the independent committee's investigation.   Specifically, the independent committee "concluded that certain transactions and fund transfers between the Company and certain entities controlled by Mr. Su were not approved by the board or the audit committee.  In addition, there was insufficient documentary support of such fund transfers."  As a result, Defendant Su agreed "to pay back to the Company approximately US$15 million."

375.   A second post-Class Period announcement on September 28, 2017, when the Company held a conference call to discuss financial results for the first half of 2017, where Hao Wu and Defendant Wang revealed that due to the fraudulent scheme, its cash balance as of June 30, 2017 was $15 million less.

376.   The disclosure of the difference in the Company's balance sheet due to the fraud by Defendant Su undertaken on behalf of Sky Solar, was a foreseeable consequence of, and within the zone of risk concealed by, the Exchange Act Defendants' misrepresentations and omissions of material facts concerning Sky Solar's involvement in the related-party transaction activities.

377.   As set forth herein, the Exchange Act Defendants' wrongful conduct directly and proximately caused the damages suffered by Plaintiffs and the Class.  Throughout the Class

Period, the prices at which Plaintiffs and the Class purchased Sky Solar's ADSs were artificially inflated as a result of the Exchange Act Defendants' materially false and misleading statements and omissions of material fact concerning Sky Solar's deficient Corporate Governance Procedures which permitted the illegal related-party transactions to occur.  Had the Exchange Act Defendants disclosed complete, accurate, and truthful information concerning these matters during the Class Period, Plaintiffs and the Class would not have purchased or otherwise acquired Sky Solar's ADSs at the artificially inflated prices that they paid.  It was entirely foreseeable to the Exchange Act Defendants that engaging in the fraud designed to tout the Company's prospects and investment worthiness by issuing false and misleading statements, and then concealing the existence of such material adverse facts from the public would cause the prices of Sky Solar's ADSs to be artificially inflated, or would maintain existing artificial inflation.  It was also foreseeable that the ultimate disclosure of this information, and/or the materialization of the risks concealed by the Exchange Act Defendants' material misstatements and omission, would cause the price of Sky Solar's ADSs to decline, as the inflation resulting from the Exchange Act Defendants' earlier materially false and misleading statements and omissions of material fact was removed from the price of Sky Solar's ADSs.

378.   Accordingly, the Exchange Act Defendants' conduct, as alleged herein, proximately caused foreseeable losses to Plaintiffs and the Class who purchased or otherwise acquired Sky Solar's ADSs during the Class Period.

379.   The economic loss, i.e., damages, suffered by Plaintiffs and the Class are direct and foreseeable results of: (i) the Exchange Act Defendants' materially false or misleading statements and omissions of material fact; (ii) the perpetuation of the illicit scheme; and (iii) the subsequent significant declines in the price of Sky Solar's ADSs when the truth was gradually

revealed and/or the risks previously concealed by the Exchange Act Defendants' fraud gradually materialized, as set forth herein.

### H.    Presumption of Reliance

380.    At all relevant times, the market for Sky Solar ADSs was efficient for the following reasons:

   a.    Sky Solar's ADS met the requirements for listing, and were listed and actively traded on NASDAQ, a highly efficient and automated market;

   b.    As a regulated issuer, Sky Solar filed periodic reports with the SEC and NASDAQ;

   c.    Sky Solar regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

   d.    Sky Solar was followed by numerous securities analysts including Roth Capital Partners, LLC and Oppenheimer and Co. which wrote reports which were distributed to those brokerage firms' sales force and certain customers.  Each of these reports was publicly available and entered the public market place.

381.    As a result of the foregoing, the market for Sky Solar ADS promptly digested current information regarding Sky Solar from all publicly available sources and reflected such information in Sky Solar's ADS price.  Under these circumstances, all purchasers of Sky Solar ADS who purchased during the Class Period suffered similar injury through their purchase of Sky Solar ADS at artificially inflated prices, and a presumption of reliance applies.

382.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Sky Solar and the Management

Defendants omitted material information in their statements in violation of a duty to disclose such information, as detailed above.

### I.      The Safe Harbor Provision Is Inapplicable

383.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to the allegedly false statements pled in this Complaint.   The statements alleged to be false and misleading herein all related to then-existing facts and circumstances.   To the extent certain of the statements alleged to be false and misleading may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made, and were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.   Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pled herein, Defendants are liable for those false and misleading forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of Sky Solar who knew that those statements were false and misleading when made.

## X.    CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT III

**Violations of Section 10(b) of the Exchange Act
and Rule 10b-5 Promulgated Thereunder Against Sky
Solar and the Management Defendants**

384.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

385.     This Count is asserted against the Exchange Act Defendants and is based upon §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

386.     During the Class Period, Sky Solar and the Management Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to and did:  (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Sky Solar ADSs; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Sky Solar ADSs at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

387.     Pursuant to the above plan, scheme, conspiracy and course of conduct, Sky Solar and the Management Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Sky Solar ADSs.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Sky Solar finances and business prospects.

388.    By virtue of their positions at Sky Solar, the Management Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, the Management Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the Management Defendants.   Said acts and omissions of the Management Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

389.    Information showing that Sky Solar and the Management Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Sky Solar and the Management Defendants' knowledge and control.  As the senior managers and/or directors of Sky Solar, the Management Defendants had knowledge of the details of Sky Solar internal affairs.

390.    The Management Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Management Defendants were able to and did, directly or indirectly, control the content of the statements of Sky Solar.  As officers and/or directors of a publicly-held company, the Management Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Sky Solar's businesses, operations, future financial condition and future prospects.   As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Sky Solar ADSs was artificially inflated at all relevant times.  In ignorance of the adverse facts concerning Sky Solar business and financial condition which were concealed by

Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Sky Solar ADSs at artificially inflated prices and relied upon the price of the ADSs, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

391.   At all relevant times, Sky Solar ADSs were traded on an active and efficient market.   Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Sky Solar ADSs at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said ADSs, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Sky Solar ADSs was substantially lower than the prices paid by Plaintiffs and the other members of the Class.  The market price of Sky Solar ADSs declined sharply upon public disclosures of the facts alleged herein to the injury of Plaintiffs and Class members.

392.   By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

393.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's ADSs, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT IV

### Violations of Section 20(a) of the Exchange Act
### Against the Management Defendants

394.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

395.    At all relevant times, the Management Defendants participated in the operation and management of Sky Solar, and conducted and participated, directly and indirectly, in the conduct of Sky Solar business affairs.    Because of their senior positions, they knew the adverse non-public information about Sky Solar misstatement of income and expenses and false financial statements.

396.    As officers and/or directors of a publicly owned company, the Management Defendants had a duty to disseminate accurate and truthful information with respect to Sky Solar financial condition and results of operations, and to correct promptly any public statements issued by Sky Solar which had become materially false or misleading.

397.    Because of their positions of control and authority as senior officers, the Management Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Sky Solar disseminated in the marketplace concerning Sky Solar results of operations.   At all relevant times, the Management Defendants exercised their power and authority to cause Sky Solar to engage in the wrongful acts complained of herein. The Management Defendants therefore, were "controlling persons" of Sky Solar within the meaning of §20(a) of the Exchange Act.   In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Sky Solar ADSs.   Each of the Management Defendants, therefore, acted as a controlling person of Sky Solar.   By reason of their senior management positions and/or being directors of Sky Solar, each of the Management Defendants

had the power to direct the actions of, and exercised the same to cause, Sky Solar to engage in the unlawful acts and conduct complained of herein.  Each of the Management Defendants exercised control over the general operations of Sky Solar and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

398.    By reason of the above conduct, the Management Defendants are liable pursuant to §20(a) of the Exchange Act for the violations committed by Sky Solar.

## XI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## XII.   DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: February 16, 2018
New York, New York

Respectfully submitted,

**WOLF POPPER LLP**

*/s/ Robert C. Finkel*
Robert C. Finkel
Andrew E. Lencyk
Fei-Lu Qian
845 Third Avenue, 12th Floor
New York, New York 10022
Tel: (212) 759-4600
Fax: (212) 486-2093
rfinkel@wolfpopper.com
alencyk@wolfpopper.com
fqian@wolfpopper.com

*Attorneys for Lead Plaintiff and Lead Counsel
for the Class*

**POMERANTZ LLP**
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Tel: (212) 661-1100
Fax: (2121) 661-8665
jalieberman@pomlaw.com
ahood@pomlaw.com

*Attorneys for Andrew Barilli*