UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

ANDREW BARILLI and RONALD PENA,
Individually and on Behalf of All Others
Similarly Situated,

        Plaintiffs,

    -v-                                   No.  17 CV 4572-LTS-DCF

SKY SOLAR HOLDINGS, LTD., WEILI SU,
JIANMIN WANG, YI ZHANG,
XIAOGUANG DUAN, HAO WU,
DONGLIANG LIN, RORTH CAPITAL
PARTNERS, LLC, and NORTHLAND
SECURITIES, INC.,

        Defendants.

--------------------------------------------------------x

### MEMORANDUM OPINION AND ORDER

        Andrew Barilli and Ronald Pena ("Plaintiffs") bring this action against Sky Solar

Holdings, Ltd. ("Sky"), Roth Capital Partners, LLC ("Roth"), and Northland Securities, Inc.

(together the "Underwriter Defendants"), Weili Su, Jainmin Wang, Yi Zhang, Xiaoguang Duan,

Hao Wu, and Dongliang Lin (collectively, the "Defendants"), asserting claims for violations of

section 11 of the Securities Act of 1933 ("the Securities Act"), 15 U.S.C. § 77k ("Section 11"),

section 15 of the Securities Act, 15 U.S.C. § 77o ("Section 15"), section 10(b) of the Securities

Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §78j(b) ("Section 10(b)") and 17 C.F.R.

§ 240.10b-5 ("Rule 10b-5"), and section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) ("Section

20(a)").  (Second Consolidated Amended Class Action Complaint (the "SAC"), Docket Entry

No. 56.)  Defendants Sky, Wang, and the Underwriter Defendants (the "Moving Defendants")

move to dismiss the SAC pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Docket Entry No. 65.)

The Court has jurisdiction of this action pursuant to 28 U.S.C. section 1331 and 15 U.S.C. sections 77v and 78aa.

The Court has considered the parties' submissions carefully and, for the following reasons, grants the Moving Defendants' motion to dismiss the SAC.

I.  BACKGROUND

The following facts are alleged in the SAC and are taken as true for the purpose of resolving the Moving Defendants' motion to dismiss.

Sky is a solar power company incorporated in the Cayman Islands with its principal place of business in Hong Kong.  (SAC ¶ 27.)  Founded in 2009 by Su, Sky began by developing and selling solar power systems to operators, which would generate revenues by selling electricity to power grid operators.  (Id. ¶¶ 28, 57.)  In 2013, Sky began to shift its business model away from developing solar projects for sale in favor of becoming an independent power producer ("IPP"), which would develop solar projects and operate them, producing revenue through the sale of electricity to grid operators.  (Id. ¶ 58.)

Su was Sky's largest shareholder, as well as its CEO, and executive director, controlling 49.5% of Sky's voting shares as of 2014.  (SAC ¶¶ 28, 83-84.)  Prior to founding Sky, Su had worked in the solar power industry since 2005, founding several companies that developed and constructed solar power projects.  (Id. ¶ 79.)  Prior to and throughout his tenure with Sky, Su has had an interest in or affiliation with 37 companies, including many in the solar power sector in China.  (Id. ¶ 87-90.)  From 2011 through June 2014, various Chinese courts

entered at least seven judgments against him for a cumulative liability of $44 million for avoiding civil debt.  (Id. ¶¶ 77, 92.)

A confidential witness, who apparently did not reveal himself until after the First Amended Complaint ("FAC," Docket Entry No. 34) was filed, informed Plaintiffs that, in January 2011, Su engineered a transaction to transfer the stock held indirectly by Sky's predecessor in Sky Solar Deutschland GmbH ("SSD") to Minquan Fu, a close associate who was the managing director of another Sky subsidiary, for one euro, in exchange for a waiver of receivables, purportedly to reduce Sky's "net liabilities and focus its resources and working capital on geographic areas."  (SAC ¶¶ 94, 96-98; Prospectus at F-65.)  The confidential witness asserts that Fu then transferred the stock to other Sky subsidiaries and that the transaction was engineered to avoid creditors.  (SAC ¶¶ 96, 99.)  On November 18, 2010, the confidential witness, who was at the time a managing director of SSD, confronted Su about the propriety of the transaction.  (SAC ¶¶ 102-106.)  The confidential witness asserts that Su cheated him out of his ownership interest in Sky.  (Id. ¶ 107.)

In 2008, Su supervised the largest solar project in Spain through Sky Global, a predecessor of Sky.  (Id. ¶¶ 142, 145.)  According to Plaintiffs' confidential witness, who worked for Su on the project, €30 million went missing from Sky Global's accounts and a subsequent 2010 investigation concluded that two of Sky Global's local partners had diverted this money through fraudulent means.  (Id. ¶¶ 146-47.)  The confidential witness asserts that, after this incident, Sky and other companies associated with Su were no longer able to secure construction financing from banks.  (Id. ¶ 148.)  Sky was only able to secure financing through vendors that produced low quality solar modules that were used to construct the projects, resulting in Sky's subsequent sale of low-quality solar projects.  (Id. ¶¶ 148-49)

Prior to November 2014, Sky began developing solar projects in Japan and started to develop such projects in Chile.  (Id. ¶¶ 13, 17, 73, 193.)  Following the meltdown of the Fukushima Daiichi nuclear power plant, Japan engaged in an effort to decrease its reliance on nuclear energy in favor of a diverse group of other sources, including solar power.  (Id. ¶ 168.)  The Japanese government enacted the Act on the Purchase of Renewable Energy Sourced Electricity by Electric Utilities, which introduced a program of feed-in-tariffs ("FIT") in July 2012 that subsidized the generation of electricity from renewable sources through surcharges on electricity customers.  (Id. ¶¶ 169, 181 (citing Daniel Cusick, "Power Companies in Japan Move to Restrict Solar," Scientific American, E&E News (October 2, 2014) ("Cusick Article"), available at https://www.scientificamerican.com/article/power-companies-in-japan-move-to-restrict-solar/ (last visited May 22, 2019)).)  The first iteration of this subsidy was set at 40 yen/kilowatt hour and spurred the private sector to build 11,000[1] MW of solar generation between 2012 and September 2014, with an additional 72,000 MW of capacity in development as of October 2014.  (Id.)  Japan's Ministry of Economy, Trade and Industry ("METI") lowered the FIT rate to 36 yen/kilowatt hour in 2013 and 32 yen/kilowatt hour in April 2014.  (Id.)  In September 2014, five of Japan's 10 utility companies suspended consideration of procurement of electrical power from renewable sources.  (Id. ¶ 170; see also Cusik article.)  In addition to these developments, other trends were undermining the market for solar power in Japan, including:  (1) a sudden glut of solar power generation projects, which were being developed too rapidly and were also using up too much of Japan's open spaces[2]; (2) the inability of the Japanese power

---

[1]     The SAC uses MW as an abbreviation for megawatt.

[2]     (SAC ¶ 173 (citing Chisaki Watanabe, Floating Solar Power Hits Land-Squeezed Japan Under Kyocera Plan, Bloomberg (Aug. 29, 2014), https://www.bloomberg.com/news/articles/2014-08-29/floating-solar-power-hits-landsqueezed-japan-under-kyocera-plan (last visited May 22, 2019) and IEA PVPS,

transmission grids to accommodate the increased generation of solar power;[3] (3) government policy, embodied in the April 2014 Strategic Energy Plan, to diversify Japanese power generation capabilities with a greater emphasis on nuclear and coal-fueled plants in order to provide a more stable and economical power supply, (SAC ¶¶ 176-180); and (4) increasing concern about funding the FIT payments through burdensome surcharges on the end-user of the electricity.[4][5] (Id. ¶¶ 181-83.)

Plaintiffs allege that FIT rates in the Japanese market continued to fall, and that these reductions were enacted in a manner intended to apply the lower rates to projects that were in the pipeline and dissuade solar builders from seeking quick approval to lock in a favorable FIT rate while delaying construction in anticipation of falling construction costs. (SAC ¶ 185(c).) Plaintiffs allege that this dynamic had the effect of incentivizing Sky to accelerate construction, forsaking probable future reductions in construction costs, to secure favorable FIT rates before they were further reduced, but Plaintiffs do not allege that such acceleration actually occurred. (Id.)

---

Snapshot of Global Photovoltaic Markets, (2017), http://www.ieapvps.org/fileadmin/dam/public/report/statistics/IEA-PVPS_-_A_Snapshot_of_Global_PV_-_1992-2016__1_.pdf (last visited May 22, 2019)) ("IEA PVPS Article").)

[3]    (SAC ¶ 174-75 (citing IEA PVPS Article).)

[4]    (See SAC ¶¶ 175, 181 (citing Dan Brown and Celeste Koravos, Flying Too Close to the Sun? Asia Pacific Renewable Energy and Climate Change Group Update, DLA Piper, (Oct. 2014), available at https://www.dlapiper.com/en/singapore/insights/publications/2014/10/japan-s-fit/.)

[5]    Defendants also cite several other articles detailing the conditions of the Japanese solar market published between March 3, 2015 and June 1, 2016. (Defs.' Brief, Docket Entry No. 67, at 11 n. 7 (citing Docket Entry Nos. 66-10—66-13).)

In Chile in 2014, grid access for solar power providers was restricted due to increased solar production in that country, thus limiting the number of new solar projects that could be undertaken.[6] A report on the trends to expect in 2015 noted that, in 2016, the lack of grid capacity would limit new solar projects.[7] Specifically, Sky sought to build projects in northern Chile, where the power grid was not connected to the grid serving the more populous central region of the country. (SAC ¶¶ 197, 202.) In 2016, the general manager for Accoina SA's Chile energy unit stated that this situation, arising from a lack of grid capacity, was expected. (Id. ¶ 201 (quoting Dezem Article).) Plaintiffs further allege that electricity prices in Chile were depressed due to oversupply. (Id. ¶ 196.)

On April 15, 2014, Sky filed its first draft registration statement, including a draft prospectus, with the SEC in connection with an initial public offering ("IPO") of American Depositary Shares ("ADS"). (SAC ¶ 66.) The registration statement and prospectus were amended five times; the final registration and prospectus, dated November 13, 2014[8] (the "Prospectus," Docket Entry No. 66-2), was filed on November 14, 2014. (Id. ¶ 68.)

In its third draft of the registration statement, Sky contemplated offering 12.5 million ADSs at a maximum price of $12 per ADS, with an overallotment option for 1,875,000

---

[6] (Id. ¶¶ 196, 199-203 (citing Josefin Berg, Emerging Markets Mature – Chile Follows South Africa to Reach 1 GW of Installed PV Capacity, IHIS, at pg. 11-12, available at https://www.ihs.com/pdf/Top-Solar-Power-Industry-Trends-for-2015_213963110915583632.pdf (last visited May 22, 2019) ("Berg Article") and Vanessa Dezem and Javiera Quiroga, Chile Has So Much Solar Energy It's Giving It Away for Free, Bloomberg, June 2, 2016, available at https://www.bloomberg.com/news/articles/2016-06-01/chile-has-so-much-solar-energy-it-s-giving-it-away-for-free (last visited May 22, 2019) ("Dezem Article").)

[7] (Berg Article at pg. 11.)

[8] The Court treats the Prospectus as an extrinsic document integral to the Complaint. See I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., 936 F.2d 759, 762 (2d Cir. 1991).

shares, which would raise approximately $121.9 million dollars. (Id. ¶ 70; Registration Statement Form F-1, Amendment 3, Docket Entry No. 66-3, at 48.) Due to lower than anticipated demand, Sky offered, in its final registration statement, 6,353,750 ADSs (including the overallotment purchased by the underwriters) for $8 per ADS, raising approximately $46.1 million. (SAC ¶¶ 69, 72.) In the third draft of the registration statement, Sky stated that it intended to allocate $40 million to shovel-ready projects[9] in Japan, $40 million to shovel-ready projects in Latin America, and $10 million for projects elsewhere, with the balance of its proceeds to be allotted to general corporate purposes. (Registration Statement Form F-1, Amendment 3 at 48.) The third amendment also stated that Sky had "257.1 MW of shovel-ready projects . . . [and] 1,053.3 MW of solar projects under development, including 543.4 MW of advanced and qualified pipeline projects which [Sky] expect[ed] to be ready for funding within 12 to 18 months." (SAC ¶ 240.)

The Prospectus contains several passages describing Su's experience and credentials. The Prospectus characterized Su as a "successful businessman" who was "primarily responsible for [Sky's] strategic planning" and was "essential to [Sky's] continuing success." (Prospectus at 4, 20, 144.) The Prospectus also asserted that Su had founded several solar companies and "supervised the largest solar park in Spain." (Id. at 144.) The Prospectus asserted more generally that Sky had a "proven track record . . . operating under local conditions, developing local relationships and managing a global platform," a "highly experienced

---

[9]    The term "shovel-ready" is defined in the Prospectus as describing a project that has "all permits required for construction and grid connection, even if those projects may lack certain non-discretionary permits for which [Sky has] begun the application process, and which will be granted and maintained based on [Sky's] compliance with certain administrative procedures." (Prospectus at 107.)

management team supported by strong, localized execution capabilities across all key functions and locations," and experienced "local engineering and project management teams." (Id. at 1, 2, 101, 104.) The Prospectus represented that Sky had "broad geographic reach and established presence across key solar markets." (Prospectus at 1, 100.)

The Prospectus further asserted that Sky was "well positioned to create efficient financing solutions that are responsive to local regulatory conditions and financial markets" and that it sought to arrange financing by leveraging relationships with its partners. (Prospectus at 1, 62.) The Prospectus characterized Sky as experienced in securing efficient financing for its projects, tailored to local conditions, and represented that Sky had ready access to financing, increased financing capabilities, and strong relationships with international financing sources. (Prospectus at 1, 2, 62, 104, 123.) The Prospectus also stated that, despite the goals of various governments to reduce subsidies, Sky expected that profitability in the solar industry would increase as the costs of solar technology decreased and/or the spot price of electricity increased. (Prospectus at 61.)

The Prospectus disclosed that Sky had identified "material weakness and other control deficiencies in [its] internal control over financial reporting, which . . . have not been remediated" and which might undermine Sky's ability to prevent fraud. (Prospectus at 31-32.) Sky stated that, to address these deficiencies, it planned, inter alia, to form an audit committee of independent directors, to be supported by an audit department, to oversee the operation of Sky's finance department and review all related-party and other significant transactions, but noted that the identified internal control deficiencies over financial reporting had not yet been remediated and that the failure to do so could affect Sky's ability to prevent fraud. (Id. at 75.) The new audit committee would also be charged with "reviewing major issues as to the adequacy of

[Sky's] internal controls." (<u>Id.</u> at 148.) The Prospectus also described fiduciary duties of a corporate director under Cayman Islands law. (Prospectus at 147, 174.)

The Prospectus disclosed a multitude of related-party transactions that Sky had entered into with companies in which Su held an interest. (<u>Id.</u> at 27, 41, 42, 156-61.) The prospectus also warned that Su's interest might not align with those of other shareholders and that he might not act in the best interests of other shareholders. (<u>Id.</u> at 41.) The Prospectus further stated that Sky and Su had entered into a non-competition agreement in which Su agreed to give Sky the right of first refusal to purchase Su's interest in solar companies that compete with Sky. (<u>Id.</u> at 41.)

Sky's board of directors promulgated a code of ethics, to be adopted upon the filing of its registration statement. (SAC ¶ 135.) The code stated that Sky "is committed to conduct its business in accordance with applicable laws, rules and regulations and the highest standards of business ethics." (<u>Id.</u> ¶ 136.) The code was designed to promote "full, fair, accurate, and understandable disclosure" in documents prepared for the Securities and Exchange Commission and other parties. (<u>Id.</u> ¶ 137.) The Code required all Sky employees to disclose any conflict of interest and comply with all relevant reporting requirements. (<u>Id.</u> ¶¶ 139-40.)

The Prospectus also contained a discussion of Sky's current and planned future operations, both in general and with respect to specific regions, countries, and individual projects as well as the conditions in certain national markets. With respect to Japan, the Prospectus made several statements extolling the appeal of the national market for solar power including that: (1) Japan "introduced an attractive FIT price support regime to encourage the development of solar parks"; (2) Sky intended to focus on "markets, such as Japan, that have high demand for power, low domestic fossil fuel reserves, high energy costs, a highly favorable FIT policy and attractive

local financing sources"; and (3) Sky expected to continue to expand its Japanese capacity because of the "highly favorable FIT price support scheme and . . . generous target for the percentage of national power generated from renewable sources." (Prospectus at 61, 104-105, 113.) The Prospectus also stated that Sky intended to focus its operations in Japan, Chile, Uruguay, and other markets with "highly attractive solar radiation, regulatory environments, power pricing, land availably, financial access, and overall power trends." (Id. at 1.) The Prospectus further stated that "[r]ecent government investigations and rulings should accelerate the development of solar parks within [Sky's Japanese] pipeline." (Id. at 113.) The Prospectus also noted that several countries had reduced solar subsidies, providing examples that did not include Japan. (Id. at 14.) The Prospectus included a discussion of media reports that METI was considering measures such as the suspension of new projects, reduction of FIT for future projects, and encouraging other types of renewable energy, but stated that Sky believed that the measures would not affect projects already approved for connection to the grid and expressed uncertainty as to whether Sky's projects that had not yet been approved for grid connection would be negatively affected. (Id. at 15-16.)

The Prospectus contained warnings that, in light of the popularity of FIT subsidies, Japanese power transmission grids were suffering from a shortage of transmission capacity. (Id. at 15-16.) The original FIT rate and the two subsequent reductions were all noted in the Prospectus. (Id. at 130.) The Prospectus disclosed that five of Japan's utilities had temporarily suspended review of new solar projects and that other utilities might also have suspended reviews without making formal announcements. (Id. at 15.)

With respect to Sky's projects in Chile, the Prospectus characterized the country as a "core growth area" with a strong power market, a favorable regulatory environment, and

access to financing, partly due to the large and energy intensive mining industry.  (Prospectus at 101, 115.)  The Prospectus named Chile as a market upon which Sky had a "near-term focus." (Id. at 100.)  The Prospectus disclosed that Sky had 44 MW of shovel-ready projects and 341 MW of projects in its "pipeline" that Sky expected to be shovel-ready in 12 to 18 months.  (Id. at 115-16.)  The Prospectus also asserted that Sky had "secured project funding from a number of major international institutions" for projects in several countries and, specifically, that Sky "entered into a mandate with [the Inter-America Development Bank (the 'IADB')] worth US$72 million to construct [Sky's] first project in Chile."  (Id. at 104.)  As of 2016, the terms were still being negotiated with the IADB and no projects in Chile were built.  (SAC ¶¶ 203-204.)

In the final Prospectus, Sky stated that it would allot $20 million for shovel-ready projects in Japan, $10 million for shovel-ready projects in Latin America, and the balance for projects in Sky's "pipeline" in Japan, Latin American, and elsewhere, as well as for general corporate purposes.  (Prospectus at 9.)

The Prospectus contained a description of Sky's current and future projects, including a recitation of projects in operation, under construction, in its "pipeline," and those that were considered shovel-ready, that was unchanged from the third amended registration statement.  (SAC ¶¶ 240-241; Prospectus at 108-116.)  This list was accompanied by a map of global operations.  (Prospectus at 111.)

Although the Prospectus listed 44 MW of Sky solar projects in Chile as shovel-ready, Sky lacked grid connection permits, but the Prospectus noted that such permits are not granted in Chile until construction is complete and the connection can be tested.  (SAC ¶¶ 198; Prospectus at 132-34.)  Plaintiffs allege that Sky did not secure construction or other sectorial permits and that, although such permits were granted upon meeting certain technical

requirements, these were complex and required a significant amount of work to secure. (SAC ¶ 198.)

The Prospectus also enumerated a number of Japanese shovel-ready projects that could be constructed upon the receipt of funding and approval of various forestry and land use permits. (Prospectus at 109, 112-13.) Sky stated that it had already applied for these permits and submitted the required administrative notifications, and that it expected the permits to be granted within nine months of their application. (Id. at 112-113.) Sky then stated that it "intended to apply for any outstanding permits upon the receipt of funding." (Id.) The Prospectus also stated that, in Japan, Sky "normally submit[s] certain administrative notifications at the time [it] receives funding." (Id. at 109.)

According to Plaintiffs' forensic accountant, Sky's Japanese subsidiary, Sky Solar Japan Co. K.K., entered into a silent partnership agreement with outside investors, who provided Sky with financing for 21 solar projects on distressed terms. (SAC ¶¶ 226-30.) As of the date of the Prospectus, Sky had raised $49.4 million in cash from this partnership. (Prospectus at 83.)

The Prospectus recited numerous risks, with respect to Sky's business as a whole and in specific markets. Sky stated that its growth depended on its ability to raise financing at acceptable terms, which it could not guarantee. (Prospectus at 16-17.) Sky stated that its

> ability to obtain external financing is subject to a number of uncertainties, including:
> • [Sky's] future financial condition, results of operations and cash flows;
> • the general condition of global equity and debt capital markets;
> • regulatory and government support in the form of tax credits, rebates, FIT price support schemes and other incentives;
> • the continued confidence of banks and other financial institutions in . . . [Sky] and the PV industry;
> • economic, political and other conditions in the jurisdictions where [Sky] operate[s]; and
> • [Sky's] ability to comply with any financial covenants under the debt financing.

(Id.)  The Prospectus disclosed several factors that could affect Sky's growth and performance, including the "market demand for and price of [photovoltaic] power," "[engineering, procurement and construction services] costs for [photovoltaic] systems," and subsidies. (Id. at 61.)  The Prospectus also identified several general risks to the successful development of individual projects, including "negotiating and receiving required permits and approvals . . . from government authorities on schedule," "procuring rights to interconnect the solar park to the electric grid or to transmit energy," and securing financing.  (Id. at 23-24.)  The Prospectus also warned that governments administering FIT programs may alter their subsidy program, even retroactively.  (Id. at 26.)

The Prospectus characterized the sale of SSD stock to Fu described earlier as being transacted with an independent third party.  (Prospectus at F-65.)  The Prospectus also stated that the purpose of this transaction was to "reduce [Sky's] net liabilities and focus its resources and working capital on geographic areas," although Plaintiffs allege that their confidential witness believes it was actually undertaken to defraud creditors.  (Id.; SAC ¶ 100.)  Sky also disclosed that it had been the target of "lawsuits, harassment, or other hostile conduct by third parties," about, inter alia, its personnel and business.  (Prospectus at 21.)  This passage of the Prospectus went on to state that, "[f]or example," counsel representing "former employees of Sky Solar Holdings Co., Ltd [and] a former shareholder of Sky Solar Power Ltd, . . . have sent letters threatening litigation and certain of these claimants have sent harassing emails, short messages, and letters to certain . . . shareholders [and] directors . . . alleging that they were deprived of the economic benefits of their holdings in Sky Solar Holdings Co., Ltd.  (Prospectus at 21.)  Plaintiffs note that the Prospectus did not disclose a similar allegation by Plaintiffs' confidential witness. (SAC ¶ 107.)

The Prospectus explained Sky's rationale for transitioning to an IPP model as an effort to "internalize more value from project development and generate stable and recurring long-term cash flow." (Prospectus at 1, 100.) Plaintiffs allege that the transition was actually the product of the failure of the earlier business model and limited financing opportunities going forward. (SAC ¶ 259.)

Subsequent to the filing of Sky's registration statement, Sky filed reports on Form 20-F in 2014, 2015, and 2016 (collectively, the "Form 20-Fs"). (SAC ¶ 302; Docket Entry Nos. 66-1, 66-7, 66-8.) In each Form 20-F, Sky substantially repeated the statements in the Prospectus that described Su's biography and value to Sky and representations regarding and references by incorporation to Sky's code of ethics and corporate governance procedures. (SAC ¶¶ 302-311.) In the 2016 Form 20-F, filed May 15, 2017, Sky stated that it believed that it would be able to commence construction in Chile upon the receipt of funding. (SAC ¶ 203; 2015 Form 20-F, Docket Entry No. 66-8, at 44.[10])

On December 22, 2014, Sky issued a press release announcing its planned expansion into the Chinese solar market. (Id. ¶ 312.) This expansion was to include the acquisition of numerous entities controlled by or affiliated with Su. (Id. ¶ 313.) The press release described the process Sky required for approval of related-party transactions and characterized its internal controls as strong. (Id. ¶ 314.)

On March 7 and May 26, 2015, Sky held conference calls with investors in which Zhang, Sky's Chief Strategy Officer, stated that Sky was evaluating opportunities to expand operations into China through acquisitions of entities controlled or affiliated with Su. (SAC ¶¶

---

[10]     The SAC cites to the 2016 Form 20-F, which is provided by Defendants as the "2015" Form 20-F. (Docket Entry No. 66-8.)

317, 320.)  On the March 7 call, Wang stated that any such deal "must" be approved pursuant to

Sky's "rigorous investment standards and corporate governance procedures."  (Id. ¶ 319.)  Zhang

made a similar statement on the May 26 call.  (Id. ¶ 320.)

On December 22, 2014, Sky's stock was trading at $14 per share.[11]  By March 28,

2016, it was trading at a low price of $1.12.

In its 2016 Form 20-F, Sky announced that Sky had paid a former managing

director a $4.2 million upfront service fee when he resigned in October of 2016 in anticipation of

work to secure certain permits in Japan, and that, in November, the individual had transferred

approximately $800,000 worth of Sky stock to a company owned by Su for no consideration.

(SAC ¶ 118.)  This transaction had been approved by Sky's board.[12]  (Id. ¶ 119.)  Following an

investigation and the resignation of several directors, Sky announced, on June 6, 2017, that

several other transactions and fund transfers undertaken by Sky in April 2017 with business

entities controlled by Su had not been approved by the board or the audit committee.  (Id. ¶¶ 112,

116-18, 120-21.)  Sky also announced that Su would no longer serve as a director or in any

management position at any of Sky's subsidiaries or consolidated entities.[13]  (Id. ¶ 112.)

On September 19, 2017, Sky announced that the unapproved transactions and

fund transfers would be rescinded and Su would repay $15 million to Sky.  (Id. ¶ 122.)  Phillip

Stern, an analyst at Roth, stated that he believed that the 2016 transaction represented a quid pro

---

[11]     "[A] district court may take judicial notice of well-publicized stock prices without
converting the motion to dismiss into a motion for summary judgment."  Ganino v.
Citizens Utils. Co., 228 F.3d 154, 166 fn. 8 (2d Cir. 2000).

[12]     There is no dispute that this transaction was approved by Sky's board.  (Pls' Opp'n,
Docket Entry No. 68, at 9; Defs.' Reply, Docket Entry No. 71, at 11.)

[13]     Plaintiffs allege that Su remains a director of Sky.  (SAC ¶ 28.)

quo and constituted evidence of insufficient internal controls, and that he had consequently lowered his assessment of the company's stock price target.  (Id. ¶¶ 117, 118, 120.)

Between May 15 and June 20, 2017, five more judgments were entered against Su in Chinese courts, resulting in approximately $14.6 million in frozen assets, including his equity in five different companies.  (Id. ¶¶ 125, 295-96.)

Plaintiffs filed the instant action on June 16, 2017, and subsequently amended their complaint on November 9, 2017 and, again, on February 16, 2018.  (Docket Entry Nos. 1, 34 ("FAC"); SAC.)  The FAC added the Underwriter Defendants as parties.  The SAC specified additional alleged misrepresentations and omissions in connection with Plaintiffs' Securities Act claims.

## II.  DISCUSSION

In determining whether a plaintiff has set forth the "short and plain statement of the claim showing that [she is] entitled to relief" required by the Federal Rules (see Fed. R. Civ. P. 8(a)(2)), the Court looks to whether the allegations in the complaint establish the "facial plausibility" of the plaintiff's claims.  Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007)).  Such a showing "must be enough to raise a right to relief above the speculative level," requiring "more than labels and conclusions, [or] a formulaic recitation of the elements of a cause of action."  Twombly, 550 U.S. at 555 (internal quotation marks omitted).  In deciding a Rule 12(b)(6) motion to dismiss, the Court assumes the truth of the facts asserted in the complaint and draws all reasonable inferences from those facts in favor of the plaintiff.  See Harris v. Mills, 572 F.3d 66, 71 (2d Cir.

2009).  "In adjudicating a motion to dismiss, a court may consider only the complaint, any written instrument attached to the complaint as an exhibit, any statements or documents incorporated in it by reference, and any document upon which the complaint heavily relies."  In re Thelen LLP, 736 F.3d 213, 219 (2d Cir.), certified question accepted sub nom. Thelen LLP. v. Seyfarth Shaw LLP, 22 N.Y.3d 1017, (2013), and certified question answered, 24 N.Y.3d 16 (2014) (citing Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2002)).  In assessing the sufficiency of the Complaint the Court has, accordingly, considered the content of the Prospectus and other documents referenced in the SAC.  The Court has also considered news and magazine articles proffered by Defendants, for the fact of their publication, rather than the truth of their contents.  See In re Merrill Lynch & Co. Research Reports Sec. Litig., 289 F. Supp. 2d 416, 425 n.15 (S.D.N.Y. 2003) ("the Court may take judicial notice of newspaper articles for the fact of their publication without transforming the motion into one for summary judgment.").

A.  Securities Act Claims

Section 11 of the Securities Act imposes strict liability on issuers and signatories, and negligence liability on underwriters, where "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a).  Section 12(a)(2) ("Section 12(a)(2)") imposes liability under similar circumstances for misstatements or omissions in a prospectus.[14]  15 U.S.C. § 77l(a)(2).  Section 15 of the Securities Act makes a "control person" liable for causing violations of

---

[14]     The Court notes that Plaintiffs style their primary cause of action as a Section 11 claim, but mainly allege misrepresentations in Sky's Prospectus, which are actionable under Section 12(a)(2).

Sections 11 and 12.  15 U.S.C. § 77o.  "Collectively, the language of sections

11 and 12(a)(2) creates three potential bases for liability based on registration statements and

prospectuses filed with the SEC: (1) a misrepresentation; (2) an omission in contravention of an

affirmative legal disclosure obligation; and (3) an omission of information that is necessary to

prevent existing disclosures from being misleading."  In re Morgan Stanley Info. Fund Sec.

Litig., 592 F.3d 347, 360 (2d Cir. 2010).

        "In judging whether an alleged omission was material in light of the information

already disclosed to investors, [courts in this Circuit] consider whether there is

a substantial likelihood that the disclosure of the omitted material would have been viewed by

the reasonable investor as having significantly altered the total mix of information already made

available."  In re ProShares Trust Secs. Litig., 728 F.3d 96, 102 (2d Cir. 2013) (emphasis in

original).  The court's inquiry should not focus on whether "the particular statements, taken

separately, were literally true, but whether defendants' representations, taken together and in

context, would have misled a reasonable investor about the nature of the [securities]."  McMahan

& Co. v. Wherehouse Entm't, Inc., 900 F.2d 576, 579 (2d Cir. 1990).  Because "[t]he materiality

determination requires delicate assessments of the inferences a 'reasonable shareholder' would

draw[,] . . . a complaint may not properly be dismissed on the ground that the alleged

misstatement or omissions are not material unless they are so obviously unimportant to a

reasonable investor that reasonable minds could not differ on the question of their importance."

Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd., 866 F. Supp.

2d 223, 239 (S.D.N.Y. 2012) (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 450

(1976) and Ganino v. Citizens Utilities Co., 228 F.3d 154, 162 (2d Cir. 2000)) (alterations and

internal quotation marks omitted).

Defendants assert that Plaintiffs' Securities Act claims should be dismissed because Plaintiffs have failed to identify any actionable material misrepresentations or omissions and that the claims are, in any event, time barred under the relevant statutes of limitation and/or repose. The Court turns first to the sufficiency of Plaintiffs' claims of materially misleading statements and omissions.

1. Allegedly Untrue or Misleading Statements

Certain categories of statements are immaterial as a matter of law, such as "puffery," opinions, and forward-looking statements accompanied by adequate cautionary language. Puffery is "an optimistic statement that is so vague, broad, and non-specific that a reasonable investor would not rely on it, thereby rendering it immaterial as a matter of law." In re Gen. Elec. Co. Sec. Litig., 857 F. Supp. 2d 367, 384 (S.D.N.Y. 2012) (citing ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 206 (2d Cir. 2009)). Defendants argue that many of the statements on which Plaintiffs base their claims were merely puffery, and are thus not actionable.

Defendants also argue that many of the challenged statements constituted opinions rather than assertions of fact. In order to state claims based on false or misleading statements of opinion, which are otherwise not actionable, Plaintiffs must allege that "(1) the speaker does not hold the belief professed; (2) the facts supplied in support of the belief professed are untrue; or (3) the speaker omits information that makes the statement misleading to a reasonable investor." Martin v. Quartermain, 732 Fed. App'x 37, 40 (2d Cir. 2018) (quoting General Partner Glenn Tongue v. Sanofi, 816 F.3d 199, 210 (2d Cir. 2016)) (internal quotation marks and alterations omitted).

Defendants assert that certain of the challenged statements cannot support viable claims because they were forward looking statements and were accompanied by sufficient cautionary language. Forward looking statements are protected by the "bespeaks caution" doctrine if such statements are accompanied by cautionary language such that, when examined in the context of the total mix of information, the statement would not mislead an investor. See P. Stolz Family P'ship L.P. v. Daum, 355 F.3d 92, 96 (2d Cir. 2004). The Private Securities Litigation Reform Act (the "PSLRA") includes an analogous statutory safe harbor provision, 15 U.S.C. §§ 77z-2(a) and (c)(1), which protects forward looking statements that are accompanied by meaningful cautionary language regarding circumstances that may cause results to differ from those predicted by the defendant company. See Slayton v. Am. Express Co., 604 F.3d 758, 768 (2d Cir. 2010). Cautionary language will not be effective if it is unduly vague or boilerplate. Id. at 772.

Plaintiffs' SAC identifies several categories of information in the registration statement and/or prospectus as violative of the Securities Act.

a. Statements Regarding Su's Conduct and Business Acumen

Plaintiffs assert that the Prospectus's positive statements about Su's experience and business acumen, as well as positive statements about Sky's management team more generally, were materially misleading insofar as they were not accompanied by disclosures of Su's alleged prior failures in the solar industry and unethical conduct, specifically the seven judgments totaling $44 million entered against him in Chinese courts, the purported true nature of the SSD transaction allegedly undertaken to defraud Sky's predecessor's creditors, and the fraud that was perpetrated by Su's business partners in connection with the project in Spain. Plaintiffs argue that, by speaking about Su's experience and attributes, Sky assumed the duty to

disclose the entirety of Su's relevant biography. Defendants contend that the challenged statements amount to non-actionable puffery, that disclosure of the negative information was not required, and that the omission of such information did not render Sky's positive statements about Su materially misleading.

Specifically, Plaintiffs point to statements in the Prospectus (1) extolling Su's experience prior to founding Sky, (2) his expertise, his business acumen, and his essential contributions to Sky's success, (3) the strength and experience of Sky's management team in general, (4) Su's experience running the largest solar project in Spain, and (5) Su and Sky management's experience and proven track record of working with local management and successful execution in the solar market.

Omissions concerning "corporate mismanagement or uncharged criminal conduct are not actionable unless the non-disclosures render other statements by defendants misleading." Fries v. N. Oil & Gas, Inc., 285 F. Supp. 3d 706, 718-19 (S.D.N.Y. 2018) (collecting cases). Such omissions become materially misleading and must thus be disclosed "in three circumstances: (1) when a corporation puts the reasons for its success at issue, but fails to disclose that a material source of its success is the use of improper or illegal business practices; (2) when a defendant makes a statement that can be understood, by a reasonable investor, to deny that the illegal conduct is occurring; and (3) when a defendant states an opinion that, absent disclosure, misleads investors about material facts underlying that belief." In re Virtus Inv. Partners, Inc., 195 F. Supp. 3d 528, 536 (S.D.N.Y. 2016) (quoting Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC, 164 F. Supp. 3d 568, 581-82 (S.D.N.Y. 2016)) (internal quotation marks omitted).

Defendants identify this court's decisions in <u>In re Xinhua Fin. Media, Ltd. Secs.</u> <u>Litig.</u>, No. 07 Civ. 3994 (LTS) (AJP), 2009 WL 464934, at *6-8 (S.D.N.Y. Feb.25, 2009) ("<u>Xinhua</u>"), and <u>Fries v. N. Oil & Gas, Inc.</u>, 285 F. Supp. 3d at 718-19, as instructive.  In <u>Xinhua</u>, this Court found that failing to disclose malfeasance by corporate officers or that officers profited from related-party transactions did not render brief biographical sketches and general positive characterizations of a company's management team materially misleading.  The Court found that none of the positive statements implied that the corporate officers were not engaged in regulatory or personal malfeasance and that the positive statements did not implicate any specific managerial abilities that implied that any of the alleged negative conduct was not occurring.  <u>Id.</u>

Here, similarly, the absence of disclosures regarding facts and allegations regarding Su's past business relationships did not, as a matter of law, render Sky's statements misleading.  <u>See Xinhua</u>, 2009 WL 464934, at *7 (finding that disclosure of biographical details, such as positions in other companies, was not misleading).  The general positive statements about Su's professional history and management abilities, such as statements that he was a "successful businessman," are at most non-actionable puffery.  <u>See id.</u> at *8 (finding that vague statements characterizing a company's management as "strong" or "capable" were non-actionable puffery on which no reasonable investor would rely).  None of the omitted material would contradict the disclosures that Su was responsible for Sky's strategic planning and would be essential to Sky's future success.  Nor does Plaintiff contend that the facts recited in the disclosure documents regarding Su's roles in connection with the Spanish solar park and other projects were false.  None of these statements became misleading in the absence of information relating to Su's past alleged misdeeds because none of them affirmatively represented that Su did

not engage in past improper transactions as alleged by Plaintiffs, nor would the statements lead a reasonable investor to conclude as much.[15]  See Fries, 285 F. Supp. 3d at 719 (concluding that the omitted facts did not alter the import of the allegedly misleading statements).

Plaintiffs attempt to distinguish Fries based on the fact that, in that case, the defendant was alleged to have concealed an executive's improper conduct in connection with another, un-related company that he had helped found, whereas here, some of Su's alleged misconduct affected Sky or its affiliated entities.  Id. at 712, 722.  The distinction is immaterial.  The Fries court did not focus on the relationship between companies in analyzing whether the omission of information regarding the executive's past activities and experience was misleading.  See id. at 719-720.  Rather, the court examined the actual disclosures and found that none of the omitted information would have rendered that information false.  Id.  The Fries court considered the allegations regarding the activities with the unrelated company in coming to its conclusion that the plaintiff in that case had not raised the requisite inference of scienter.  Id. at 722.  Nothing in Fries provides support for the proposition that there is a duty to disclose negative facts that do not render disclosed statements misleading.

Plaintiffs also assert that statements in the Prospectus relating to Sky's "proven track record . . . operating under local conditions" and its ability to develop local relationships were misleading insofar as they omitted mentioning Su's failure to prevent a large financial loss to a project in Spain through fraud by two local partners.  (Prospectus at 1.)  These challenged statements constitute puffery in that they are vague statements that no reasonable investor would rely upon.  See Southeastern Pennsylvania Transp. Authority v. Orrstown Financial Services,

---

[15]      Furthermore, Plaintiffs do not allege that the challenged statements concealed success achieved by improper means.  See In re Virtus Inv. Partners, 195 F. Supp. 3d at 536.

<u>Inc.</u>, No. 12-CV-00993, 2015 WL 3833849, at *30 (M.D. Penn. Jan. 29, 2019) (finding that

statements extolling defendant's "proven track record of acquisition integration" constituted non-

actionable puffery).  Furthermore, they do not imply that no local partners engaged in fraud.

Accordingly, Plaintiffs' Securities Act claims based on statements in the Prospectus about Su's

history and attributes, as well as those made about Sky's management generally, fail to allege

facts supporting an inference of falsity or material omission that renders them misleading and

will be dismissed.

  b.  <u>Statements Regarding the Adequacy of Sky's Internal Controls</u>

       Plaintiffs next assert that statements describing Sky's implementation of internal

controls to evaluate and approve related-party transactions, its code of ethics, and the recitation

of the fiduciary duties of Sky's directors under Cayman Islands law were misleading because the

controls were either inadequate or nonexistent, as evidenced by Su's subsequent misconduct, and

that such information was material in light Su's past misconduct.[16]  Business codes of ethics are,

however, aspirational documents that, without further allegations, do not imply that they are

effective or that company employees will or have refrained from the behavior they prohibit.[17]

<u>See</u> <u>In re Braskem S.A. Sec. Litig.</u>, 246 F. Supp. 3d 731, 754-56 (S.D.N.Y. 2017) (stating that

---

[16]  In their moving papers, Defendants argued that Sky's failure to warn in the Prospectus that Su might engage in subsequent misconduct, such as the October 2016 transaction, constituted an impermissible claim of fraud by hindsight, and that a defendant has no duty to anticipate and disclose future events.  <u>See</u> <u>Novak v. Kasaks</u>, 216 F.3d 300, 309 (2d Cir. 2000).  In their opposition papers, Plaintiffs clarify that they believe the omission of Su's past alleged misconduct presented a risk, known to Defendants, that rendered the statements about the effectiveness of Sky's internal controls misleading.  (Pls.' Opp'n, Docket Entry No. 68, at 9-10.)

[17]  Likewise, recitation of the fiduciary duties of a director under Cayman Islands law does not imply that all such directors are in compliance or will comply with those laws.

aspirational statements within or about a code of ethics are non-actionable or constitute puffery, whereas statements that imply such codes are effective or will be adhered to may be actionable).

Similarly, statements regarding the introduction of internal controls do not, standing alone, constitute assertions that the controls are adequate, nor does a subsequent circumvention of such controls support an inference that descriptive statements about the implementation of such controls were false.  See Barrett v. PJT Partners Inc., No. 16-CV-2841 (VEC), 2017 WL 3995606, at *5-6 (S.D.N.Y. Sept. 8, 2017) (distinguishing the disclosure of aspirational internal control mechanisms designed to ensure compliance from statements containing assurances or otherwise implying that such measures are effective).  In fact, the Prospectus disclosed both weaknesses in its internal controls and the risk that one of Sky's challenges in transitioning from a small, private company to a public corporation was that continued weaknesses of such internal controls, which the creation of the audit committee and related-party review process were intended to address, put at risk Sky's ability to prevent fraud.[18] See In re ProShares Trust Sec. Litig., 728 F.3d at 102 ("[W]hen a registration statement warns of the exact risk that later materialized, a section 11 claim will not lie as a matter of law." (internal quotation marks, alterations, and citation omitted)).  Furthermore, because these controls post-dated Su's earlier misconduct, the disclosure of Su's past misdeeds could not have significantly

---

[18]     In their Complaint, Plaintiffs state that Sky represented that its internal controls were adequate in the Prospectus.  (SAC ¶ 126.)  Because the Prospectus itself, on which the Complaint relies, does not appear to make such an assertion, the Court does not assume the truth of that allegation in evaluating the sufficiency of the SAC.  See In re Livent, Inc. Noteholders Securities Litig., 151 F. Supp. 2d 371, 405-406 (S.D.N.Y. 2001) ([A] court need not . . . accept as truth conflicting pleadings that . . . are contradicted by statements in . . . documents upon which [the] pleadings rely.").

altered the relevant mix of information about the adequacy of such controls, and thus Sky's statements were not materially misleading due to such omissions.

Plaintiffs cite <u>In re Petrobras Sec. Litig.</u> for the proposition that statements about a business code of ethics or internal controls may form the basis of a material misrepresentation or omission claim if they "were made repeatedly in an effort to reassure the investing public about the Company's integrity, [because] a reasonable investor could rely on them as reflective of the true state of affairs at the Company." 116 F. Supp. 3d 368, 381-82 (S.D.N.Y. 2015). The disclosures at issue in <u>In re Petrobras Sec. Litig.</u> were made in the context of the concealment of an unlawful bribery scheme that affected the company's financial statements and related to the value of the core of its business. The statements were made to reassure the public about the company's integrity, while management was aware of corruption within the company. Plaintiffs have pointed to no such use of assurances in Sky's Prospectus to conceal known, ongoing ethical violations, and, as Defendants highlight, the Prospectus disclosed the current weaknesses of Sky's internal controls, which included the related-party transaction review process, and the risk that Sky would not completely remedy these weaknesses. <u>See</u> <u>Fries</u> 285 F. Supp. 3d at 718 (merely informing investors of the adoption of a code of ethics is not an assurance that the behavior the code seeks to prevent will not occur); <u>cf.</u> <u>In re Sunedison Secs. Litig.</u>, 300 F. Supp. 3d 444, 469 (S.D.N.Y. 2018) (characterizing precedent in which a company claims that internal controls are adequate as actionable assurances).

Accordingly, Sky's claims based on alleged misrepresentations and omissions concerning its internal governance procedures will be dismissed for failure to state a claim.

c. Market Conditions in Japan

Plaintiffs next contend that Sky's positive characterizations of the Japanese market, both generally and as it would affect Sky, were false and materially misleading in that actual conditions were unfavorable.

To the extent Plaintiffs contend that these statements were misleading because the statements failed to convey accurate information about the state of the Japanese solar market, Defendants argue that the SAC fails to state a claim because information regarding the conditions and regulatory actions Plaintiffs allege were not disclosed was publicly available at the time the Prospectus was filed and/or was actually disclosed in the Prospectus. A defendant has no duty to disclose information that is within the public domain through publication in the news media. See Bettis v. Aixtron SE, No. 16-CV-00025 (CM), 2016 WL 7468194, at *12 (S.D.N.Y. Dec. 20, 2016) (quoting Seibert v. Sperry Rand Corp., 586 F.2d 949, 952 (2d Cir. 1978)). Although the Second Circuit found in New Jersey Carpenters Health Fund v. Royal Bank of Scotland Group, PLC, 709 F.3d 109, 127 (2d Cir. 2013), that mere sporadic media coverage that does not "clarify or contextualize" an alleged misstatement may be inadequate to place relevant information into the public domain, the material circumstances underlying this case are different. In New Jersey Carpenters Health Fund, the disclosure issue focused on two articles that stated that the defendant had loosened its underwriting standards, but did not discuss the core of the Plaintiff's contention, which information was that the defendant had concealed the fact that it had actually abandoned its published underwriting guidelines all together, which was uniquely within the defendant's control. Id. at 127; see Bettis v. Aixtron SE, No. 16 CIV. 00025 (CM), 2016 WL 7468194, at *12-13 (S.D.N.Y. Dec. 20, 2016) (distinguishing New Jersey Carpenters Health Fund because the case before the district court involved the public disclosure

of information equally available to the plaintiff and the defendant company). Here, the general state of the Japanese solar market, information about which was published in several articles cited by Plaintiffs in the SAC, was not information uniquely within Defendants' control and thus Defendants had no duty to disclose such information. See Bettis, 2016 WL 7468194, at *12-13.[19] Furthermore, Sky disclosed the relevant Japanese regulatory actions and grid limitations in the Prospectus.[20]

Plaintiff argues that the Court should not deem knowledge of the Japanese markets to be within the public domain because the articles disclosing the economic conditions were in highly specialized or Asian publications and because the Japanese legislation, the Strategic Energy Plan, and METI actions were highly complex and technical and, in the case of the legislation, not available in English at the time. The cited articles and the Prospectus, however, provide the context of the legal and regulatory developments in Japan, were published in the English language, and were equally available to both Sky and Plaintiffs.[21] Cf. Bettis, 2016 WL 7468194, at *13 (finding that both parties had equal access to an Indian publication focusing

---

[19] The Bettis court distinguished another Second Circuit case, United Paperworkers Int'l Union v. Int'l Paper Co., 985 F.2d 1190, 1199 (2d Cir. 1993), for similar reasons. See Bettis, 2016 WL 7468194, at *12-13. United Paperworkers Int'l Union is further distinguishable because it involved a proxy statement with allegedly misleading statements and material omissions that was mailed directly to the plaintiffs; sporadic news reports not sent directly to the plaintiffs would not become part of the narrower mix of information available to a reasonable recipient of such a proxy statement. See Garber v. Legg Mason Inc., 347 Fed. App'x 665, 669 (2d Cir. 2009).

[20] Plaintiffs appear to acknowledge this fact tacitly, but argue that the Prospectus misleadingly downplayed the effect on Sky Solar, a contention that the Court will analyze below in the context of its discussion of whether challenged statements were non-actionable opinions. (See SAC ¶ 186.)

[21] Because the reductions in the FIT rates were reflected in the Prospectus, the reference to other countries reductions of FIT rates was not materially misleading.

on the LED industry and a publication that covered the Asian information technology industry).

Furthermore, Plaintiff has cited no authority to support its theory that a defendant has a duty to

disclose contextual information that is complex, but is also equally available to members of the

public.

The Court next focuses on Sky's various characterizations of the Japanese market

as attractive, Sky's comments on the market's potential effect on Sky's projects, and Sky's

statement that regulatory developments in Japan would accelerate development of Sky's projects

there.  In general, Sky's statements about the attractiveness of the market and statements

characterizing the FIT levels as favorable or generous constitute statements of opinion that, while

optimistic, were not so inconsistent with the underlying facts as to support an inference that Sky

did not actually believe the opinions, nor has Plaintiff shown that they were misleading.

Plaintiffs allege that Japan reduced its FIT subsidies to diversify new power generation projects,

but do not allege that subsidies were eliminated or that the reductions rendered future solar

projects economically infeasible.[22]  While the reduction of FIT subsidies and the suspension of

new solar projects by some utilities could have provided a basis for pessimism, Plaintiffs have

offered no factual allegations from which to infer that Sky could not have found the Japanese

market attractive for other reasons or in comparison to other national markets, even if the

regulatory environment and energy market had become less favorable than it had previously

---

[22]     Plaintiffs allegation that the projects were not economically viable after the FIT
reductions is entirely conclusory.  (See SAC ¶ 188.)  Plaintiffs allegation that the Sky's
2016 Form 20-F disclosed that Sky had 27.9% less solar capacity in operation, under
construction, or in its development pipeline than disclosed in the Prospectus does not
support the inference that constructing solar projects in Japan was economically
infeasible in November 2014 and constitutes fraud by hindsight.  See Novak v. Kasaks,
216 F.3d 300, 309 (2d Cir. 2000) ("Corporate officials . . . are only responsible for
revealing those material facts reasonably available to them."); (SAC ¶¶ 189-90).

been or did not actually develop as Sky had hoped.[23]  See Omnicare, Inc. v. Laborers Dist.

Council Constr. Indus. Pension Fund, 135 S. Ct. 1318, 1332 (2015) ("The investor must identify

particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry

the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes

the opinion statement at issue misleading to a reasonable person reading the statement fairly and

in context. . . . That is no small task for an investor.").

        Sky's assertion in the Prospectus that "[r]ecent government investigations and

rulings should accelerate the development of solar parks within [Sky's Japanese] pipeline,"

cannot be read as false and will be dismissed.  In the SAC, Plaintiffs allege that the reduction in

subsidies would in fact incentivize Sky to accelerate the development of its projects to secure the

most favorable FIT rates, although Plaintiffs characterize this as a negative development because

Sky could not take advantage of future decreases in construction costs and would be exposed to

higher FIT rates if construction was not timely completed.  This statement was not false and,

thus, may not form the basis of a Securities Act claim.

        Finally, Sky's prediction that, if FIT subsidies were to decrease, Sky would

remain profitable because it expected that such a reduction would be in response to a lessened

need for subsidies, due to a decrease in the costs of generating solar power or an increase in spot

prices, is a forward-looking statement.  Although Sky stated that it expected the price of solar

power generation to decrease and/or that the spot market price for electricity in some countries

would increase, it did disclose, on the same page, that its growth could be negatively affected by

---

[23]     Moreover, as noted above, the information upon which Plaintiffs base their assertion that
the Japanese solar market was not favorable was within the public domain and/or
disclosed in the Prospectus, so Plaintiffs cannot state a viable claim of material factual
omission in connection with the favorable opinion regarding the Japanese market.

the price of solar power components and engineering services and the price of and market demand for solar power.[24]  This cautionary language is sufficient to make the forward-looking statement not misleading.

Defendants' motion to dismiss will be granted with respect to the statements made in connection with the Japanese market and Sky's operations there.

d.  Item 303 and 503 Claims

Plaintiffs assert that Sky had an independent obligation under Items 303 and 503 of SEC Regulation S–K to disclose the state of the Japanese regulatory environment.[25]  In re Sunedison Secs. Litig., 300 F. Supp. 3d at 466-67 (finding that Item 303 creates a disclosure obligation under Section 11.)  Item 303 requires a registrant to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable effect on net sales or revenues or income from continuing operations," and disclose "events that will cause a material change in the relationship between costs and revenues."  17 C.F.R. § 229.303(a)(3)(ii).  Instruction 3 to paragraph 303(a) provides that "[t]he discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative

---

[24]     Sky's prediction about the future state of solar power markets is also a non-actionable opinion about the future of government and market actions.  In re Fairway Grp. Holdings Corp. Sec. Litig., No. 14 CIV. 0950 LAK AJP, 2015 WL 4931357, at *17 (S.D.N.Y. Aug. 19, 2015), report and recommendation adopted, No. 14 CIV. 0950 LAK AJP, 2015 WL 5255469 (S.D.N.Y. Sept. 9, 2015) (stating that predictions about the future may be analyzed as opinions or under the bespeaks caution doctrine).

[25]     The SAC also alleges that Sky violated its Item 303 duty to disclose (1) the Chilean power grid's lack of capacity, (2) Sky's inability to raise financing, and (3) Sky's inability to expand its assets and operations.  (SAC ¶ 279.)

of future operating results or of future financial condition." 17 C.F.R. § 229.303(a), Instruction

3. Thus, Item 303 imposes a disclosure duty "where a trend, demand, commitment, event or

uncertainty is both (1) presently known to management and (2) reasonably likely to have

material effects on the registrant's financial condition or results of operations." Litwin v.

Blackstone Group, L.P., 634 F.3d 706, 716 (2d Cir. 2011). Similarly, Item 503 of SEC

Regulation S–K creates a duty to disclose "the most significant factors that make the offering

speculative or risky." 17 C.F.R. § 229.503(c). Plaintiffs assert that Item 503 created a

requirement that Sky disclose the same information they assert is required under Item 303,[26] plus

Su's civil liability for allegedly avoiding debt, as a significant risk to the company. "The same

facts underlying an Item 303 violation may also support an Item 503 violation, and a court's

rationale for determining the former may also support the same determination of the latter." In

re Barclays Bank PLC Sec. Litig., No. 09 CIV. 1989 (PAC), 2017 WL 4082305, at *9 (S.D.N.Y.

Sept. 13, 2017), aff'd, No. 17-3293-CV, 2018 WL 6040846 (2d Cir. Nov. 19, 2018), as

amended (Nov. 20, 2018).

   As previously explained, the Prospectus, as well as media reports in the public

domain, described the regulatory changes underway in the Japanese market. The Prospectus also

predicted that future measures anticipated to be enacted by METI would not affect projects

already approved for grid connection, but might affect Sky's pipeline projects, consistent with

the disclosure requirements imposed by Item 303. Cf. Litwin, 634 F.3d at 718-19 (finding that

public knowledge of a trend or uncertainty did not necessarily obviate the need to disclose the

trend's effect on the company). To the extent that Plaintiffs argue that the relevant disclosures

---

[26]   See supra n.25.

were obscured by Sky's other more optimistic statements, these optimistic statements were, as previously explained, non-actionable statements of opinion and Plaintiffs have not stated a viable Securities Act Claim on the theory that the optimistic statements rendered in the Prospectus noncompliant with Items 303 and 503. Accordingly, Plaintiff's Securities Act claim based upon Sky's duties under Item 303 will be dismissed[27] and, for substantially the same reasons, the claim will also be dismissed to the extent it relies on Item 503.[28]

    e. <u>Market Conditions in Chile</u>

Plaintiffs allege that Sky made misleading statements about the condition of the solar power market in Chile, misleading statements about which projects in Chile were "shovel ready," and a false statement that it had financing in place with the IADB. Plaintiffs also point to Sky's positive statements about the condition of the Chilean solar power market and Sky's prospects in that market.

Sky's characterizations of the Chilean solar market and Sky's prospects to prosper within it, like Sky's statements regarding the attractiveness of the Japanese market, were statements of opinion, and the challenges cited by Plaintiffs are not so inconsistent with the view expressed as to support an inference that Sky could not have believed its own statements of optimism.

---

[27]    Although the SAC asserts summarily that Items 303 or 503 imposed a duty to disclose Chile's lack of grid capacity and Sky's alleged challenges in obtaining financing and expanding its operations, Plaintiffs provide neither facts nor legal argumentation demonstrating that those conditions constituted cognizable trends, uncertainties, or risks required to be disclosed. Plaintiffs' Securities Act claims based on Items 303 and 503 in connection with those conditions are accordingly dismissed.

[28]    Plaintiffs fail to provide any argument or authority to support their assertion that Su's indebtedness constituted a risk required to be disclosed in connection with Sky's operations.

Plaintiffs assert that Sky's representation that it had 44 MW of shovel-ready projects in Chile was false because it did not have grid connection permits for those projects and the Prospectus defined shovel-ready projects as, inter alia, ones having "all permits required for construction and grid connection," except certain non-discretionary permits that are granted if the technical or administrative requirements are met. (Prospectus at 6.) Plaintiffs allege that, under Chilean regulations, a grid connection permit cannot be granted until after construction is complete and the connection can be tested. Although Plaintiff thus pleads plausibly that Sky's Chilean projects did not meet the Prospectus's definition of shovel-ready,[29] they have not pleaded that the Prospectus, which disclosed that grid connection permits for projects in Chile cannot be granted until after construction, was materially misleading in this respect. (Prospectus at 132-34.)

Plaintiffs' allegation that designating these projects as shovel-ready was misleading because the technical permits were very complicated and time-consuming to obtain is also without merit. The definition of a shovel-ready project only specified that permits that had not yet been granted were non-discretionary, not that they would be easy to obtain. Accordingly, Plaintiffs have failed to state a claim that Sky's statements about the status of Sky's Chilean projects were misleading.

Plaintiffs also allege that Sky falsely claimed to have secured financing from the IADB for one of its Chilean projects, implying that the project would soon be built, when no

---

[29]    See supra n.9. While the statements that all permits required for construction and grid connection were in hand, qualified by the conjoined statement "even if" the projects lack non-discretionary permits for which Sky has applied and that will be granted based on compliance with "certain administrative procedures" could be read as consistent with having done the preparatory work for grid permits that would be granted upon construction completion, they could also be read as a representation that the grid permits were actually in hand.

such financing was in place and the project was not in fact built.  The Prospectus states, in a paragraph introduced by the assertion "[w]e have secured project funding from a number of major international institutions," that the IADB "has also entered into a mandate with us worth US$72 million to construct" a project in Chile.  (Prospectus at 104.)  The parties disagree as to whether a "mandate" implies a commitment of financing or an undertaking to advise on or arrange financing.  Both parties cite specialized dictionaries; Defendants cite the Nasdaq Glossary of Stock Market Terms, which defines a mandate as the "[a]llocation of funds to an investment manager to be managed for a specific purpose or style" or "the formal appointment to advise on or arrange project financing,"[30] whereas Plaintiffs cite a definition in the Financial Dictionary, by the Free Dictionary by Farlex, that characterizes a mandate as "[a] standardized, contractual agreement outlining the rights and responsibilities a bank and a customer have toward each other."[31]  Because the paragraph discussing the mandate begins by stating that Sky had "secured" financing from international institutions to construct several projects, the reference to an IADB "mandate" to construct the project in Chile could plausibly be read to state that Sky had secured funds to build that project.  Furthermore, because the determination of this issue may involve analyzing competing definitions of an ambiguous term through the examination of extrinsic evidence, it is inappropriate to rule on this aspect of Plaintiffs' claim at this stage and the Court denies Defendants' motion to dismiss on the merits as to this statement, although Securities Act claims based upon this statement will be dismissed as being brought outside the relevant repose period, as later explained.  Defendants' motion to

---

[30]     Mandate, Nasdaq Glossary of Stock Market Terms, https://www.nasdaq.com/investing/glossary/m/mandate (last visited May 22, 2019).

[31]     Bank Mandate, Financial Dictionary, The Free Dictionary by Farlex, https://financial-dictionary.thefreedictionary.com/Bank+Mandate, (last visited May 22, 2019).

dismiss will be granted with respect to the other alleged misrepresentations made in connection with Sky's activity in Chile.

f.  <u>Statements About Sky's Geographic Reach and Projects</u>

Plaintiffs allege that Sky also made several misrepresentations in the Prospectus about its "broad geographic reach and established presence across key solar markets" as well as about the state of its "established pipeline projects."  (See Prospectus at 100.)  Plaintiffs contend that Sky was actually scaling back its presence in or divesting from operations in several of the countries in which it operated.  Defendants assert that these statements amount to immaterial puffery, characterizing them as vague statements upon which no reasonable investor would rely. <u>See</u> <u>ECA, Local 134 IBEW Joint Pension Trust of Chicago</u>, 553 F.3d at 206.  The Court agrees that no reasonable investor would read statements about Sky's purportedly global presence as describing a certain minimum presence in a threshold number of countries, and in fact, despite Sky's allegedly reduced operations, Plaintiffs do not allege that Sky's operations became strictly local to one geographic area.   Furthermore, the true scope of Sky's operations, projects under construction, and pipeline projects, was disclosed within the Prospectus, including a depiction on a world map.  Sky's statements about the scope of its operations are thus immaterial and, because the information on which they were based was disclosed, these statements would not alter the mix of information already available to a reasonable investor.  <u>See</u> <u>Benzon v. Morgan Stanley Distrib., Inc.</u> 420 F.3d 598, 609 (6th Cir. 2005).  Accordingly, Plaintiffs' Securities Act claims relating to these statements about Sky's geographic reach will be dismissed.

g.  <u>Statements Concerning Sky's Access to Financing</u>

Plaintiffs allege that Sky made several statements that misleadingly represented that Sky had access to financing to build out its solar projects.  Plaintiffs allege that, in fact, Sky

had limited access to financing, raising over $75 million less than originally anticipated from the IPO (SAC ¶ 225) and only being able to obtain financing from vendors selling inferior solar equipment and from Japanese "silent partners" on "distressed terms."[32]

These statements are not actionable, however, because they constituted forward-looking statements accompanied by appropriate cautionary language, and/or were puffery.

To the extent these statements described Sky's future ability and intentions to use financing in the future, they were forward-looking statements conveying predications about Sky's ability to secure financing. The Prospectus generally disclosed the status of Sky's financing sources, including reduced projections of IPO revenues and related plans for allocation of those revenues, and disclosed that Sky's ability to build its projects was contingent on its ability to secure financing, stating that financing could not be guaranteed and was subject to numerous uncertainties including the confidence of the market and banks in Sky and the relevant political, financial, and regulatory climate.[33]

Plaintiffs argue that Sky's cautionary language was "boiler-plate" and did not contain warnings that were specific enough so as to be meaningful. See Slayton, 604 F.3d at 772 ("To avail themselves of safe harbor protection under the meaningful cautionary language prong, defendants must demonstrate that their cautionary language was not boilerplate and conveyed

---

[32]    The Prospectus's disclosure that Sky had secured international financing for several projects, including entering into the "mandate," discussed above, with the IADB to finance a project in Chile, also demonstrates that Sky had access to other sources of funding, although a question remains as to the nature of the commitment for financing the project in Chile.

[33]    Although the Prospectus contained no specific disclosures about Sky's alleged difficulty obtaining more traditional bank financing or that it generally was only able to obtain financing from lower-quality purveyors, Plaintiffs have not demonstrated that the discussion of these specific alleged impediments was necessary to make the general information that was provided not misleading.

substantive information."); see also id. (citing Conference Report at 43, 1995 U.S.C.C.A.N. at 742). Adequate cautionary language must be "tailored to the specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge," rather than a vague statement that the investment generally entails risks. Id. (quoting Inst. Investors Group v. Avaya, Inc., 564 F.3d 242, 256 (3d Cir.2009)) (quotation marks, citations, and alterations omitted); see also Halperin, 295 F.3d at 359 (finding that cautionary language can be overcome if it did "not expressly warn of or did not directly relate to the risk that brought about plaintiffs' loss").

Sky's disclosure was not vague or of a boilerplate level of generalization. It was specific to risks affecting access to financing, and enumerated such relevant risks. Plaintiffs' argument that Sky's failure to change these warnings between the third draft of the Prospectus and the final version notwithstanding the drop in projected IPO revenues renders the warnings boilerplate is without merit. Although the amount Sky forecasted it would raise from the IPO did change during that period, Sky changed the relevant financial figures in the disclosure and Plaintiffs proffer no facts that would plausibly support an inference that the risks Sky faced with respect to access to loans from third parties changed between drafts. The cautionary language was also closely tied to the risks that caused Plaintiffs' loss, namely that lenders would lose confidence in Sky and that the political, regulatory, and market environment for solar power had deteriorated, resulting in Sky's diminished ability to raise funds to develop more solar projects.

To the extent some of these statements can be construed as statements of existing conditions, Plaintiffs have not alleged plausibly that they were false or misleading. Plaintiffs concede that Sky had some access to financing under certain circumstances, which, when coupled with the aforementioned disclosure of risk that it might not be able to obtain additional financing, is consistent with Sky's circumstances as described by Plaintiffs. Thus, at most, Sky's

vague and optimistic statements about its present financing relationships were puffery upon which no reasonable investor would rely.

Plaintiffs' claims based on allegations that Sky misrepresented its ability to secure financing will, therefore, be dismissed.

h.  Statements Regarding Sky's Ability to Expand

Plaintiffs contend that the Prospectus misrepresented Sky's ability to expand its assets and operations.  Specifically, Sky stated in the Prospectus that it was developing certain projects around the world, including several that were shovel-ready, which Sky expected to be ready for funding in 12 to 18 months, and that certain projects could begin construction upon the receipt of administrative permits.  Plaintiffs contend that these statements, which implied that several projects would be built within a relatively short time frame, were misleading because Sky failed to adjust its project development forecast based on the vastly reduced proceeds from the IPO, thus supporting an inference that Sky no longer had the ability to expand such assets.

Sky's statements made in connection with its ability to develop its shovel-ready and pipeline projects constituted forward-looking statements tempered by appropriate cautionary language.  Although Sky did not alter its projections for the development of its shovel-ready and pipeline projects, Sky did accurately reduce its allocations for the funds it expected to raise through the IPO amongst its broad spending categories.  The fact that the final IPO resulted in a reduced amount of cash on hand for investments supports the simple inference that Sky intended to accomplish the same development goals by increasing its reliance on loans and on financing from other sources.  The Prospectus described Sky's ability to secure financing as an uncertainty that could affect its ability to grow.  The risk that Sky would not secure adequate financing was,

in turn, disclosed in the Prospectus, as discussed above in connection with Sky's access to financing.

Plaintiffs also proffer a variation of this argument, positing that Sky misrepresented the status of some of its projects in Japan by labeling them shovel-ready and stating that Sky had commenced the process of obtaining certain non-discretionary permits, which allegedly implied that financing was in place because, as stated in a footnote in the Prospectus, Sky "normally submit[s] certain administrative notifications at the time [Sky] receive[s] funding." (Prospectus at 109.) The cited statements do not, however, imply that financing was secured, because the same paragraph goes on to state that Sky intends to apply for any additional required permits for the Japanese projects upon the receipt of funding. As previously discussed, Sky included meaningful cautionary language identifying the specific risks that could imperil its ability to secure financing and, thus, its ability to expand its project roster.

Accordingly, Plaintiffs' claim based on its contention that Defendants misrepresented Sky's ability to expand its operations will be dismissed.

i.   Sky's Disclosure of its Reasons for Shifting to an IPP Business Model

Plaintiffs allege that Sky's statement in its Prospectus that the IPP model would generate a more "stable and recurring long-term cash flow" concealed Sky's true rationale for moving from a model in which it developed and sold solar projects to an IPP model, and that the omission of the alleged true rationale was material. Plaintiffs contend that Sky was only able to build projects with inferior solar modules because these vendors were the only parties willing to extend financing to Sky, thus diminishing the appeal of Sky's solar projects to potential project buyers. Defendants argue that, even if Plaintiffs' contention as to Sky's motivation were true, disclosing Sky's decision to turn away from a failing business model in favor of another model

would not add material information.  Indeed, Plaintiffs have not alleged, and the Court finds no

basis upon which to draw a reasonable inference, that disclosure of Sky's alleged reasoning for

abandoning its previous model based on the sale of projects would have significantly altered the

total mix of relevant information available to an investor who was considering investing in Sky's

new IPP model.  Plaintiffs' Securities Act claims will therefore be dismissed with respect to

Sky's statements related to its reasons for switching to an IPP model.

j.   <u>Other Alleged Misrepresentations</u>

Plaintiffs assert that Sky's disclosure that it was subject to lawsuits and other

hostile conduct was misleading because it did not disclose that Plaintiffs' confidential witness

also "contend[ed] that he too was . . . cheated by Su of his ownership interest in Sky Solar."

(Comp. ¶ 107.)  The Prospectus, however, cannot be found false or misleading on this basis

because the disclosure of the lawsuit and attendant conduct was given by way of example and

was the same type of malfeasance that Plaintiffs' confidential witness alleges Su committed.  If

anything, the Prospectus supports an inference that other suits against Sky were ongoing or at

least possible.  Plaintiffs' Securities Act claims based on this conduct will therefore be dismissed

for failure to state a claim.

Plaintiffs also allege that the Prospectus's characterization of Fu as an

independent, rather than a related, third party in connection with the SSD transaction was

materially misleading.  Plaintiffs further allege that, contrary to the representation in the

Prospectus that this transaction was undertaken to "reduce [Sky's] net liabilities and focus its

resources and working capital on geographic areas," it was actually undertaken to defraud

creditors according to the confidential witness.  (SAC ¶ 100.)  Plaintiffs have offered only a

conclusory recitation of the belief of their confidential witness that the purpose of the transaction

was to defraud creditors, without specifying any basis for that belief whatsoever.  Accordingly, the SAC does not contain sufficient allegations that the purpose of the transaction stated in the Prospectus was false and, without allegations showing that the transaction was undertaken for a fraudulent purpose, provides insufficient information to support an inference that the alleged misrepresentations would be material to an investor.  Plaintiffs' Securities Act claim based on this disclosure will also, therefore, be dismissed.

### 2. Securities Act Statute of Repose

Section 11 and 12(a)(2) claims are subject to a statute of repose ("Section 13") that provides that "[i]n no event shall any such action be brought to enforce a liability created under [Sections 11 or 12(a)(2)] more than three years after the security was bona fide offered to the public."  15 U.S.C.S. § 77m (LexisNexis 2012); Cal. Pub. Employees' Ret. Sys. v. ANZ Sec., Inc., 137 S. Ct. 2042, 2049 (2017) (characterizing the three-year period as a statute of repose) ("CalPERS").  "[I]n contrast to statutes of limitations, statutes of repose create a substantive right in those protected to be free from liability after a legislatively-determined period of time." Police & Fire Ret. Sys. v. IndyMac MBS, Inc., 721 F.3d 95, 106 (2d Cir. 2013) (quoting Amoco Prod. Co. v. Newton Sheep Co., 85 F.3d 1464, 1472 (10th Cir. 1996)) (internal quotation marks and alterations omitted).  Statutes of repose are thus distinct from statutes of limitations, and are not subject to equitable tolling; the repose period is only subject to alteration through statute.  Id. at 106.

Defendants contend that the claim based on Sky's statement that it had secured IADB financing for a project in Chile was first pleaded in the SAC, which was filed more than

three years after the registration statement and associated Prospectus,[34] is barred by the statute of repose. Courts in this circuit have held that plaintiffs may not avoid the expiration of the repose period by utilizing Federal Rule of Civil Procedure 15(c) ("Rule 15(c)") to relate-back to a previous, timely complaint. See also FDIC v. First Horizon Asset Secs. Inc., 291 F. Supp. 3d 364, 369-72 (S.D.N.Y. 2018) (finding that a plaintiff asserting, inter alia, a Section 11 cause of action could not amend its complaint to assert a cause of action under section 12(a)(2) of the Securities Act). This Court agrees with the weight of authority within this circuit that to allow a plaintiff to utilize Rule 15(c) to avoid the statute of repose would significantly abridge the substantive, statutory rights of Defendants in violation of the Rules Enabling Act. See Silvercreek Mgmt. v. Citigroup, Inc., 248 F. Supp. 3d 428, 450- 52 (S.D.N.Y. 2017).

Plaintiffs contend that the statute of repose does not apply to amendments because it bars only new "actions," and argue that the Court's repose inquiry should be limited to ensuring that their original complaint, initiating this case, was timely filed. In support of this argument, Plaintiffs cite the Supreme Court's construction of the term "action" in CalPERS. The plaintiff in CalPERS filed a Section 11 complaint on its own behalf after the expiration of the repose period, before its case was consolidated with a timely class action suit. The plaintiff then opted out of the class action. Id. at 2047-48. The Supreme Court held that Section 13 did not permit any equitable exceptions to the repose period through tolling and rejected plaintiff's alternative argument that it had timely brought its Section 11 action because the litigation brought on behalf of the class, of which the plaintiff was a putative member, was commenced

---

[34]     The effective date of the registration statement and the date of the prospectus were both November 13, 2014, which is the relevant date for the statute of repose. See P. Finkel v. Stratton Corp., 962 F.2d 169, 173 (2d Cir. 1992) (stating that the relevant date for a Section 11 claim is the date of the registration).

within the relevant period, finding that an "action" "refers to a judicial 'proceeding,' or perhaps to a 'suit'—not to the general content of claims." Id. at 2051-55.

Plaintiffs take the above quote out of context in contending that it permits a timely complaint to be expanded to assert new claims without regard to the statute of repose. The Supreme Court was cautioning against conflating complaints by different plaintiffs in different courts for Section 13 purposes, not holding that filing a complaint within the three-year period would permit the addition of otherwise untimely Securities Act claims. See First Horizon Asset Secs, 291 F. Supp. 3d at 369-75 (finding that CalPERS barred a plaintiff asserting, inter alia, a Section 11 cause of action from amending its complaint to assert a cause of action under Section 12(a)(2)). To permit Plaintiffs to seek liability for Sky's alleged misstatement that the mandate with the IADB was binding, a claim that was introduced in the SAC after the repose period lapsed, would be to undermine Section 13's purpose and abridge Defendants' right to be free from liability after the expiration of three years. See IndyMac MBS, 721 F.3d at 106; see also In re Longtop Fin. Techs. Ltd. Secs. Litig., 939 F. Supp. 2d 360, 379-80 (S.D.N.Y. 2013) (finding that an amendment to a complaint filed after the expiration of the repose period, adding allegations that additional audit opinions provided a basis for additional misrepresentations, was barred). Accordingly, Plaintiffs' claim based on Sky's statement that it secured IADB financing will be dismissed.

3. Section 15 Liability

To plead a Section 15 cause of action, a plaintiff must allege an underlying violation of Sections 11 or 12 and that the defendant exercised the requisite control. In re Lehman Bros. Mortg.-Backed Sec. Litig., 650 F.3d 167, 185-86 (2d Cir. 2011). Because no underlying Securities Act violation remains, Plaintiffs' Section 15 claim will also be dismissed.

B.  Exchange Act Section 10(b) Claims

Plaintiffs also assert a claim pursuant to Exchange Act Section 10(b) and Rule 10b-5 thereunder against Sky and Wang.  They allege that Sky misrepresented or materially omitted information related to (1) Su's biography and history and (2) Sky's internal controls, particularly as Sky's internal controls related to Sky's planned expansion to China.

To succeed on a claim under Section 10(b) and Rule 10b-5, a plaintiff must establish "(1) a [false or misleading] material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  Matrixx Initiatives, 563 U.S at 37-38; see also Basic Inc. v. Levinson, 485 U.S. 224, 238 (1988) ("to prevail on a Rule 10b-5 claim, a plaintiff must show that the statements were misleading as to a material fact.").  Claims alleging fraud-based violations of the federal securities laws are subject to additional pleading requirements.  Plaintiff's Section 10(b) claims are subject to the heightened pleading standards of both Federal Rule of Civil Procedure 9(b) and the PSLRA.  In re Scholastic Corp., 252 F.3d 63, 69-70 (2d Cir. 2001).  Rule 9(b) requires that fraud allegations be stated with particularity.  Fed R. Civ. P. 9(b).  To satisfy the particularity requirement of Rule 9(b), the complaint must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  Stevelman v. Alias Research, Inc., 174 F.3d 79, 84 (2d Cir. 1999) (internal quotation marks and citation omitted).  Similarly, under the PSLRA, when a plaintiff seeks money damages that require proof of scienter, "the complaint [must] . . . state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind."  15 U.S.C.S. § 78u-4(b)(2) (LexisNexis 2018).

The claims based on statements about Su's history and capabilities will be dismissed as non-actionable and/or immaterial for the reasons explained above in connection with Plaintiffs' corresponding Securities Act cause of action. Plaintiff's Rule 10b-5 claims relating to statements made in the Prospectus and similar statements made in subsequent communications about Sky's corporate governance and internal controls must, similarly, also be dismissed for the reasons stated in connection with Plaintiffs' Securities Act claims.[35]

Plaintiffs have, however, asserted Exchange Act fraud claims based on additional alleged misstatements that the Court has not yet evaluated, specifically Sky's statements after the IPO, in conference calls in 2015 and a press release in 2014, that in acquiring Chinese assets, including those held by or affiliated with Su, it would adhere to its "strong" and "rigorous" internal control process to evaluate and approve related-party transactions. The Statements were made on Sky's behalf by Defendants Wang and Zhang.

These statements fail to state an Exchange Act claim in connection with the 2016 transaction because Plaintiffs have failed to allege sufficient facts to demonstrate that representations that the transaction would be subjected to the related-party transaction approval process were false. The 2016 transaction was indeed subjected to board approval, and Plaintiffs point to no particular standards of review that Sky failed to follow. Plaintiffs contend that the allegedly improper nature of the transaction as well as Su and Wang's presumed knowledge of the process based on their corporate positions implies that they knew that the reviews conducted after the 2014 and 2015 statements would not be "rigorous." Characterizing the related-party

---

[35] To the extent that the SAC can be construed to assert claims that other statements in the Prospectus constituted Exchange Act violations, such claims will be dismissed for the same reasons stated above in connection with the Securities Act claims.

transaction review as "rigorous" or "strong," however, amounts to non-actionable puffery; it is unreasonable to infer that an investor who was informed that the Chinese transactions would be subjected to board approval would have found the addition of these adjectives material.

The 2017 related-party transactions were not, however, subjected to prior review, rigorous or otherwise. Assuming for the purposes of this analysis that the occurrence of the unreviewed transactions provides a basis for a finding that the statements were false at a relevant time, the Court next examines the scienter of the relevant defendants.

A securities fraud complaint will only survive a motion to dismiss "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 324 (2007). A court conducting a scienter inquiry, "however, must assess the complaint in its entirety, and not scrutinize each allegation." Employees' Ret. Sys. v. Blanford, 794 F.3d 297, 305 (2d Cir. 2015) (citing Tellabs, Inc., 551 U.S. at 326). Scienter may "be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 198 (2d Cir. 2009) ("ECA") (citations omitted).

The "'motive' showing is generally met when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit," but motives more "common" to corporate officers, "such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry." Id.

If there is no showing of improper motive, a plaintiff may establish scienter by "strong circumstantial evidence of conscious misbehavior or recklessness" by, inter alia, "sufficiently alleg[ing] that the defendants (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." Id. at 199 (quotation marks and citation omitted). To sufficiently "plead recklessness through circumstantial evidence, [a plaintiff] would have to show, at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Id. at 202-03 (quotation marks and citation omitted). "'An allegation that a defendant merely ought to have known'" about reports or statements containing contrary facts "'is not sufficient to allege recklessness.'" See In re Lululemon Sec. Litig., 14 F. Supp. 3d 553, 574 (S.D.N.Y. 2014), aff'd, 604 F. App'x 62 (2d Cir. 2015) (quoting Kuriakose v. Fed. Home Loan Mortg. Corp., 897 F. Supp. 2d 168, 184 (S.D.N.Y. 2012)).

Defendants argue that Plaintiffs have not made the requisite showing of a basis for inferring scienter in connection with Wang's conference call statements that related-party transactions would be subjected to Sky's approval process. Plaintiffs assert that Wang knew the approval process was "severely lax and deficient" because it enabled Su to engage in the 2016 management fee transaction and to cause Sky to enter into transactions, without board approval, worth $15 million with entities affiliated with him in April of 2017. (SAC ¶ 289.) Wang's statements on the conference call predated both the allegedly improper 2016 transaction and the April 2017 transactions. Because only Su is alleged to have profited from these transactions,

Plaintiff has pleaded no facts that plausibly support an inference as to an improper motive on the part of Wang in making the challenged statements. See <u>ECA, Local 134 IBEW Joint Pension Tr. of Chicago</u>, 553 F.3d at 198.

The SAC also fails to allege sufficient circumstantial evidence to support a finding that Wang was reckless or engaged in conscious misbehavior in making these statements. Plaintiffs contend that Wang's duties as CFO, including compliance functions, and his position on Sky's board, which approved the 2016 transaction, demonstrates that he knew or should have known that Sky's internal control procedures were deficient when he stated on a conference call in 2015 that the potential Chinese transactions would be subjected to Sky's approval process. Defendants contend that the more likely explanation for Wang's actions was that he was aware of the prior weaknesses in the related-party approval process, but expected Sky to adhere to the new procedures in its expansion into the Chinese market. Defendants assert that Sky's board's decision to approve the 2016 transaction was unwise, but otherwise compliant with the prescribed process and note that, when Sky became aware of the true nature of the 2016 transaction and the existence of the 2017 transactions, it removed Su from his executive positions and disclosed the transactions. There is no allegation that Wang had advance knowledge of the 2017 transactions.

Plaintiffs have therefore failed to offer a sufficiently cogent basis for an inference of scienter on Wang's part. Plaintiffs' theory that Wang offered assurance that the approval process would be followed when he in fact believed that it would not be followed is implausible in light of Plaintiffs' failure to allege any facts suggesting that Wang knew that Su would engage in transactions by circumventing the approval process and that the board would approve a questionable 2016 related-party transaction benefitting Su at the expense of Sky, without any

personal benefit accruing to Wang.  The more likely inference is offered by Defendants, that

Wang offered these assurances because he was not aware that Su wished to circumvent the

approval process[36] and/or engage in transactions detrimental to Sky for Su's own benefit.  Nor

have Plaintiffs alleged any facts sufficient to demonstrate that Wang's behavior was so

unreasonable or deviated so significantly from the applicable standard of care as to constitute

recklessness.  Plaintiffs only allege that Wang knew or should have known about these

deficiencies based on his position as CFO and director and knowledge of Su's conduct prior to

the imposition of controls, which does not support an inference that Wang had access to any

information that would have alerted him that the board would eventually approve a potentially

unwise transaction and certainly does not support an inference that he could have known that Su

would circumvent the approval process entirely.[37]  See Novak v. Kasaks, 216 F.3d 300, 308-9

(S.D.N.Y.) (recklessness generally requires a showing that defendant made a statement when the

defendant knew contradictory facts, had a duty to check for such facts, or ignored obvious signs

---

[36]     The approval of the 2016 transaction also supports the inference that Sky did, or at least
         intended to, subject related-party transactions to the published approval process; no
         policy prohibited related-party transactions, it was only required that a certain process be
         used to approve them.

[37]     Plaintiffs also point to other allegations as a basis to infer scienter, including Wang's
         signing Sarbanes-Oxley certifications representing that all significant deficiencies and
         material weaknesses in financial reporting design and controls had been reported to Sky's
         auditors and audit committee, and that any fraud involving management or other
         employees involved in internal control over financial reporting had also been reported.
         (SAC ¶ 357.)  Plaintiffs do not proffer factual allegations demonstrating that the
         certifications were false.  Plaintiffs also cite the resignations of several independent
         directors following the disclosure of Su's transactions in 2017, but do not explain how
         those resignations support an inference that Wang's statements on the earlier conference
         calls were made with the requisite scienter.  Cf. Varghese v. China Senghou Phram.
         Holdings, 672 F. Supp. 2d 596, 607-608 (S.D.N.Y. 2009) (finding the resignation of an
         independent director supported an inference of scienter when it was accompanied by an
         email indicating that individual defendants were aware of current internal control
         deficiencies).

of fraud).  Accordingly, the Exchange Act claims relating to Wang's conference call statements will be dismissed as against Wang.

The other Defendant whose scienter is at issue in the current motion practice is Sky itself.  "When [a] defendant is a corporate entity . . . the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter."  Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc., 531 F.3d 190, 195 (2d Cir. 2008).  Corporate scienter may thus be established if a plaintiff pleads the requisite scienter for a certain individual who made a misrepresentation with knowledge of its falsity and whose intent can be attributed to the corporation.  Id.  Alternatively, courts in this district will impute corporate scienter even if the corporation's agent making a misrepresentation did not individually have the requisite knowledge of the falsity of that statement if a sufficiently senior director or officer of the corporation with some oversight over the public-facing misrepresentation had such knowledge and did not intervene.  See Rex & Roberta Ling Living trust v. B. Communications, Ltd., 346 F. Supp. 3d 389, 409-410 (S.D.N.Y. 2018) ("[C]ourts in this district have generally coalesced around the view that there is not a requirement that the same individual who made an alleged misstatement on behalf of a corporation personally possessed the required scienter."  (internal quotation marks and citations omitted)).

The statements in the conference calls and press releases were made by Wang and Zhang,[38] neither of whom exhibited the requisite individual scienter or knowledge of falsity to be imputed to Sky.  Plaintiffs have also failed to allege with particularity sufficient facts to establish that Su exhibited conscious misbehavior by permitting the statements to be made in that Su knew

---

[38]     For similar reasons to those explained with respect to Wang's personal scienter, the Court concludes that Plaintiffs have not sufficiently pleaded Zhang's personal scienter.

in 2014 and 2015 that the statements regarding adherence to the related-party review process were false because he intended to circumvent the related-party approval procedure in 2017.[39] Coronel v. Quanta Capital Holdings Ltd., No. 07 CIV. 1405 (RPP), 2009 WL 174656, at *27 (S.D.N.Y. Jan. 26, 2009) (finding no scienter if the plaintiff alleged no information demonstrating that a defendant possessed contrary information at the time the misrepresentation was made). The SAC provides no details on the transactions that led to Su's pre-IPO civil judgments from which to infer that they were relevant to evasion of control procedures. Similarly, the SSD transaction, which was only conclusorily alleged to have been undertaken to evade creditors, was executed when no related-party control process was in place. The approximately two years between the statement and 2017 transactions and the fact that the 2016 transaction was put before the board further undermine the plausibility of any inference that Su intended to circumvent the approval procedures at the time the statements were made.

To the extent that Plaintiffs assert that Su's scienter can be inferred from his motive and opportunity, this argument also fails. Given the extended time that elapsed between the misstatements and the 2017 transactions and the fact that he did submit the 2016 transaction to the board for approval, the more cogent theory is that Su intended to comply with approval requirements when the alleged misrepresentations were made, but later changed his mind or took advantage of an emerging opportunity to circumvent the applicable procedures. Plaintiffs have thus failed to allege plausibly a basis for inferring scienter on the part of Sky. Therefore the Exchange Act claims against Sky will be dismissed.

---

[39]     Plaintiffs have also failed to allege facts that Su was somehow reckless in failing to know that he would later circumvent the approval process based on his corporate positions.

Accordingly, all of Plaintiffs' claims pursuant to Section 10(b) of the Exchange Act will be dismissed as against the Moving Defendants. Finding no primary violation, the Court also dismisses the control person claim pursuant to Section 20 of the Exchange Act against Wang. See Acticon AG v. China North East Petroleum Holdings Ltd., 615 F. App'x 44, 45 (2d Cir. 2015).

## III. CONCLUSION

For the foregoing reasons, the motion of Sky, Wang, Roth Capital Partners, LLC, and Northland Securities, Inc. to dismiss the SAC as against them is granted.

In their opposition brief, Plaintiffs have requested further leave to amend the SAC in the event that any of the claims is found insufficient. Plaintiffs are hereby granted permission to move, by **June 7, 2019**, for leave to amend the Complaint. Any such motion must comply with the applicable federal, local, and chambers rules, and must be accompanied by a blacklined version of the proposed amended complaint, identifying all changes from the original Complaint. If Plaintiffs do not file a timely motion for leave to amend, the dismissal of the Complaint against the Moving Defendants will be with prejudice.

This case remains referred to Magistrate Judge Freeman for general pretrial management.

Docket Entry No. 65 is resolved.


SO ORDERED.

Dated: New York, New York
        May 23 2019


 /s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
United States District Judge